# Exhibit 1

## State Court Record

## COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO

| | |
|---|---|
| **JAMIE VISKER**<br>**1145 San Michele Way**<br>**Palm Beach Gardens, FL  33418** | ) <br> ) <br> ) <br> ) |
| **ATLANTA VISKER**<br>**1145 San Michele Way**<br>**Palm Beach Gardens, FL  33418** | ) <br> ) <br> ) <br> ) |
| **JAMIE VISKER IRA LPL FINANCIAL**<br>**CUSTODIAN**<br>**1145 San Michele Way**<br>**Palm Beach Gardens, FL  33418** | **Civil Action Number:** _____ <br> ) <br> ) <br> ) <br> ) |
| **ATLANTA VISKER IRA LPL**<br>**FINANCIAL CUSTODIAN**<br>**1145 San Michele Way**<br>**Palm Beach Gardens, FL  33418** | ) **COMPLAINT FOR DECLARATORY** <br> ) **JUDGMENT AND INJUNCTIVE** <br> ) **RELIEF** <br> ) |
| **WINONA POWDER COATING, INC.**<br>**9876 W. Old Rd. 30**<br>**Etna Green, IN  46524** | ) <br> ) <br> ) |
| **EUGENE ROTHGERBER**<br>**1937 N. Co. Rd. 425 East**<br>**Avon, IN  46123** | ) <br> ) <br> ) |
| **JODIE ROTHGERBER**<br>**1937 N. Co. Rd. 425 East**<br>**Avon, IN  46123** | ) <br> ) <br> ) |
| **SMITH INVESTMENTS LIMITED**<br>**PARTNERSHIP**<br>**1413 Morning Rose Place**<br>**Trinity, FL  34655** | ) <br> ) <br> ) <br> ) |
| **THE PETRO GROUP INC.**<br>**210 Fairway Lakes Drive**<br>**Franklin, IN  46131** | ) <br> ) <br> ) |
| **RAINBOW 3 LLC**<br>**210 Fairway Lakes Drive**<br>**Franklin, IN  46131** | ) <br> ) <br> ) |

**FRED FRIBLEY**     )
**1155 Edgewood Drive**   )
**Warsaw, IN  46580**    )
             )
**FREDERICH FRIBLEY IRA ACCOUNT** )
**1155 Edgewood Drive**   )
**Warsaw, IN  46580**    )
             )
**CONNIE FRIBLEY**    )
**1155 Edgewood Drive**   )
**Warsaw, IN  46580**    )
             )
**SUE BROWN IRA ACCOUNT**  )
**2256 Derringer Avenue**   )
**The Villages, FL  32162**   )
             )
**DAVID SNYDER IRA ACCOUNT**  )
**8632 S. Valentine Court**   )
**Claypool, IN  46510**    )
             )
**HOWARD FOX**     )
**229 Blackbird Lane**    )
**Jupiter, FL  33458**    )
             )
**AUDREY ADES**     )
**229 Blackbird Lane**    )
**Jupiter, FL  33458**    )
             )
**SCOTT EYINK IRA ACCOUNT**  )
**2200 Willow Brook Lane**   )
**Hinkley, OH  44233**    )
             )
**WESTHILL DEVELOPMENT, LLC**  )
**445E 200N**       )
**Warsaw, IN  46582**    )
             )
**DOUGLAS K. ROBINSON**   )
**445E 200N**       )
**Warsaw, IN  46582**    )
             )
**DAN J. ROBINSON**    )
**445 E 200N**       )
**Warsaw, IN  46582**    )
             )
             )
             )

2

CHERYL ANN ROBINSON )
445 E 200N )
Warsaw, IN 46582 )
)
DANARI LLC )
106 Playa Rienta Way )
Palm Beach Gardens, FL 33418 )
)
NATHANIEL DROURR )
104 Manor Circle )
Jupiter, FL 33458 )
)
CATHERINE DROURR )
104 Manor Circle )
Jupiter, FL 33458 )
)
DENNIS HARRISON )
15661 N. Boulder Dr. )
Fountain Hills, AZ 85268 )
)
NANCY HARRISON )
15661 N. Boulder Dr. )
Fountain Hills, AZ 85268 )
)
THE CAROL A. BOCKELMAN )
REVOCABLE TRUST )
7564 Noel Road )
Indianapolis, IN 46278 )
)
ANTHONY G. MARLIN )
2532 Lookout Court )
Greenwood, IN 46143 )
)
STACY S. MARLIN )
2532 Lookout Court )
Greenwood, IN 46143 )
)
BURTON RAMSEY )
5604 East 350 South )
Pierceton, IN 46562 )
)
ERNEST B. WIGGINS IRA )
1555 Meadow Lane )
Warsaw, IN 46581 )
)
        Plaintiffs, )

3

|                                   |     |
|-----------------------------------|-----|
|                                   | )   |
| **v.**                            | )   |
|                                   | )   |
| **DOMINIC FERRANTE**              | )   |
| **25 16th Avenue South**          | )   |
| **Naples, FL  34102**             | )   |
|                                   | )   |
| **TODD BINKOWSKI**                | )   |
| **1568 Marsh Wren Lane**          | )   |
| **Naples, FL  34105**             | )   |
|                                   | )   |
| **WINONA PVD COATINGS, LLC**      | )   |
| **1180 Polk Drive**               | )   |
| **Warsaw, IN  46582**             | )   |
|                                   | )   |
| **TFG WHEELS, LLC**               | )   |
| **821 5th Ave. S**                | )   |
| **Naples, FL  34102**             | )   |

**Defendants.**

## COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

## I.

## JURISDICTION

1.   Plaintiffs in this Action are seeking a declaratory judgment pursuant to Ohio Rev. Code Ann. § 2721 (2017) *et seq.* and Ohio R. Civ. P. 57, and injunctive relief pursuant to Ohio Rev. Code Ann. § 2727.02 (2017) *et seq.* and Ohio R. Civ. P. 65(B), in relation to claims for violations of 15 U.S.C. § 78(j) and 15 U.S.C. § 77(q)(a), violations of Delaware statutes and common law, and violations of the Operating Agreement, as defined below.

2.   This Court has personal jurisdiction over Defendants based on their consent in Section 11.1 of the Amended and Restated Limited Liability Company Agreement of Winona PVD Coatings, LLC ("Operating Agreement").

3.   Venue is also proper pursuant to Section 11.1 of the Operating Agreement.

## II.

4

## ALLEGATIONS APPLICABLE TO ALL COUNTS

4.  Winona PVD Coatings, LLC ("Winona") is in the business of applying finishes and coatings to truck and automobile wheels.

5.  Winona's single business location is in Warsaw, Indiana.

6.  Jamie Visker ("Visker") founded Winona in 2006. At the time of its founding, Visker was the sole unitholder of Winona.

7.  Between 2006 and 2011, through a series of private placement memoranda, Winona and/or Visker sold units in Winona to outside investors. As a result of these investment transactions, the unitholders of Winona included the following entities and/or individuals:

| | Investor | Minority Percentage |
|---|---|---|
| a. | Jamie Visker and Atlanta Visker | 16.24% |
| b. | Jamie Visker IRA LPL Financial | 0.04% |
| c. | Atlanta Visker IRA LPL Financial | 0.08% |
| d. | Winona Powder Coating, Inc. | 1.46% |
| e. | Eugene Rothgerber and Jodie Rothgerber | 3.91% |
| f. | Smith Investments Limited Partnership | 0.72% |
| g. | The Petro Group, Inc. | 0.59% |
| h. | Rainbow 3 LLC | 0.65% |
| i. | Fred Fribley | 0.64% |
| j. | Frederich Fribley IRA Account | 0.82% |
| k. | Connie Fribley | 0.46% |
| l. | Sue Brown IRA Account | 0.86% |
| m. | David Snyder IRA Account | 0.56% |

| | | |
|---|---|---|
| n. | Howard Fox and Audrey Ades | 0.56% |
| o. | Scott Eyink IRA Account | 0.23% |
| p. | Westhill Development, LLC | 2.22% |
| q. | Douglas K. Robinson | 0.57% |
| r. | Dan J. Robinson and Cheryl Ann Robinson | 0.57% |
| s. | Danari, LLC | 0.59% |
| t. | Nathaniel Drourr and Catherine Drourr | 1.11% |
| u. | Dennis Harrison and Nancy Harrison | 0.47% |
| v. | The Carol A. Bockelman Revocable Trust | 0.47% |
| w. | Anthony G. Marlin and Stacy S. Marlin | 0.57% |
| x. | Burton Ramsey | 0.29% |
| y. | Ernest B. Wiggins IRA | 0.15% |

(collectively, the foregoing are referred to hereinafter as "Investors" and/or "Plaintiffs").

8.    Winona and Visker routinely went to great lengths to ensure the Investors were regularly informed about the operations, plans, and financial performance of Winona. The Investors were provided regular financial reports. Winona management issued detailed quarterly newsletters. Winona management had regular direct communications with Investors so that Investors would have the opportunity to ask questions regarding Winona's operations and/or financing. Thus, a custom and practice was established to keep the Investors informed of the business activities and financial performance of Winona.

9.    Between 2006 and 2015, Visker was the president and chief executive officer of Winona.

6

10.     Due to major growth opportunities, a need arose for Winona to raise significant capital for expansion of existing manufacturing facilities.

11.     After exploring various opportunities, Winona engaged Donnelly Penman & Partners ("DPP") to raise capital. DPP is an investment banking firm which has experience in the automobile industry. DPP's primary function was the raising of capital through the debt and/or equity markets. Roy W. Vorhees ("Vorhees") was the DPP senior officer responsible for the Winona account.

12.     DPP ultimately located a potential equity investor by the name of Dominic Ferrante ("Ferrante"). Ferrante was formally a managing director of Bain Capital L.P. ("Bain") and founder of Brookside Capital Management, LLC ("Brookside"), a well-known hedge fund affiliated with Bain.

13.     Ferrante was looking to utilize monies made at Bain and Brookside to invest in small to medium manufacturing businesses. Ferrante formed a company named TFG Wheels, LLC ("TFG Wheels") for the purposes of making such an investment in Winona.

14.     Todd Binkowski ("Binkowski") is a close, personal friend of Ferrante. Binkowski is also a senior employee of TFG Wheels. Binkowski often represents the interest of Ferrante in business transactions. As Plaintiffs were to learn, Binkowski has an explosive personality and frequently undermines and belittles those around him, creating a hostile work environment.

15.     Vorhees, on behalf of Winona, engaged in a series of protracted negotiations with Ferrante regarding a possible investment in Winona. These negotiations occurred during the approximate time period of December of 2012 to April of 2013.

16.     Ferrante and TFG Wheels were provided legal representation by John Connery ("Connery") of Hill Ward Henderson, 101 East Kennedy Blvd., Tampa, Florida 33602, in conjunction with the investment in Winona.

17.     Following months of negotiations, a deal was struck whereby Ferrante would invest in Winona.  Although embodied by a series of complex legal documents, the key features of the Ferrante deal included the following:

    a.     Ferrante, through TFG Wheels, agreed to purchase a controlling interest in Winona; and

    b.     The interest would be purchased through TFG Wheels in two (2) separate tranches; tranche one would have a purchase price of nine million dollars and tranche two would have a purchase price of five million dollars.

18.     Following the closing of the two tranches, the owners of Winona would be as follows:

    a.     TFG Wheels      65.16%

    b.     Jamie Visker and Atlanta Visker      16.24%

    c.     Jamie Visker IRA LPL Financial      0.04%

    d.     Atlanta Visker IRA LPL Financial      0.08%

    e.     Winona Powder Coating, Inc.      1.46%

    f.     Eugene Rothgerber and Jodie Rothgerber      3.91%

    g.     Smith Investments Limited Partnership      0.72%

    h.     The Petro Group, Inc.      0.59%

    i.     Rainbow 3 LLC      0.65%

    j.     Fred Fribley      0.64%

    k.     Frederich Fribley IRA Account      0.82%

8

l.  Connie Fribley                                    0.46%

m.  Sue Brown IRA Account                             0.86%

n.  David Snyder IRA Account                          0.56%

o.  Howard Fox and Audrey Ades                        0.56%

p.  Scott Eyink IRA Account                           0.23%

q.  Westhill Development, LLC                         2.22%

r.  Douglas K. Robinson                              0.57%

s.  Dan J. Robinson and Cheryl Ann Robinson          0.57%

t.  Danari, LLC                                       0.59%

u.  Nathaniel Drourr and Catherine Drourr            1.11%

v.  Dennis Harrison and Nancy Harrison               0.47%

w.  The Carol A. Bockelman Revocable Trust           0.47%

x.  Anthony G. Marlin and Stacy S. Marlin            0.57%

y.  Burton Ramsey                                     0.29%

z.  Ernest B. Wiggins IRA                            0.15%

19.  The parties agreed Visker would continue as chief executive officer of Winona and be responsible for day to day operations. Ferrante personally assured Visker and the Investors that he very much wanted and agreed that Visker would continue to operate Winona on a day to day basis. Visker signed an employment agreement ("Employment Agreement") with Winona. The Employment Agreement is attached hereto as Exhibit "A." Visker's duties included the following:

2. Employment Duties. The Employee's employment duties to Winona are as follows:

(i)  Managing the general business of Winona;

9

(ii)   Hiring and supervising all management staff;

(iii)  Maintaining a relationship with major customers and vendors and developing new relationship with prospective customers and vendors;

(iv)   Manage the construction and installation of buildings and equipment for Product Line 2 and Product Line 3 (each as defined below);

(v)    Managing production operations of Winona;

(vi)   Hiring sales staff to promote and generate sales;

(vii)  Hiring financial staff to properly maintain the books and records of Winona;

(viii) Working with production staff to assist Winona in meeting quality and production goals;

(ix)   Engaging outside professionals and consultants;

(x)    Providing not less than monthly written reports to the Winona Board of Managers detailing sales, revenues, expenses, production information and such other information as reasonably requested by the Winona Board of Managers; and

(xi)   Such other reasonable responsibilities determined by Winona's Board of Managers (the "Board") which are consistent with duties, responsibilities, functions and authority customarily associated with the Chief Executive Officer position.

20.   Each existing unitholder of Winona was required by Ferrante and TFG Wheels to execute an Amended and Restated Limited Liability Company Agreement (the "Operating Agreement"). A copy of the Operating Agreement is attached hereto as Exhibit "B."

21.   The Operating Agreement was drafted by Connery and Ferrante.

22.   The Operating Agreement provided for a Board of Managers, consisting of three (3) natural persons. The effect of the Operating Agreement was to provide Ferrante with the authority to appoint two (2) of the three (3) managers, providing Ferrante control of the Board of Managers. *See* Operating Agreement at Article 5.

23.   The third member of the Board of Managers was Visker. The Operating Agreement was drafted so that Visker could represent the interests of the Investors. *Id.* at §5.3.

24.   Neither Ferrante, nor Binkowski, had any material experience with the physical vapor deposition ("PVD") process, the wheel coating business, the automobile supplier business

10

or operating a manufacturing company. Operating PVD equipment properly is essential to the successful operation of Winona.

25. The closing of Ferrante's initial investment in Winona occurred on April 23, 2013. The funding of the second tranche of Ferrante's investment in Winona closed on September 30, 2013 ("Closing").

26. As part of Ferrante's acquisition of a controlling interest in Winona, Ferrante's company, TFG Wheels, signed a Professional Services Agreement with Winona ("PS Agreement"). Pursuant to the PS Agreement, TFG Wheels was to provide professional management services to Winona. A copy of the PS Agreement is attached hereto as Exhibit "C." The PS Agreement required Winona to pay TFG Wheels an annual fee of two hundred thousand dollars ($200,000.00) for the management services. While the fee has been paid annually, Plaintiffs have good cause to believe no such services have been provided, or that they have been provided in a manner which has breached duties owed to the Investors.

27. Following Closing, in late 2014 Binkowski began to erode the authority of Visker. Binkowski was highly and openly critical of employees, management decisions, and of Visker. Binkowski frequently usurped decisions of Visker and interceded in matters for which he had no expertise or experience.

28. In late 2013 and early 2014, Winona expanded operations and added two additional PVD manufacturing lines.

29. During the same period of time, Ferrante and Binkowski had been searching for other private equity investment deals. Because other deals could not be located, Binkowski had little to occupy his time other than interfering with the daily operations of Winona.

11

As a result, Binkowski continued to interfere with the operations of Winona and undermine Visker.

30.  In January of 2015, Binkowski and Ferrante abruptly informed Visker at a meeting at Winona that Visker was being removed a CEO and that Binkowski was taking over the day to day operations of Winona. Despite claims otherwise, there was no legitimate factual basis to remove Visker. This decision was motivated by Binkowski's desire to legitimize his usefulness in the eyes of Ferrante. Strangely, Visker's employment was not terminated, only his duties abrogated in direct violation of his Employment Agreement.

31.  Upon information and belief, Binkowski had convinced Ferrante that Visker was mismanaging Winona. In this way, Binkowski justified his employment and salary to Ferrante.

32.  Binkowski had no prior significant experience with operating a manufacturing operation, no automobile industry experience, and no PVD expertise.

33.  Almost immediately after Binkowski assumed control of Winona, conditions at Winona began to deteriorate. The problems include the following:

   a.  PVD coating lines are highly complex and must be carefully calibrated. Binkowski began to recklessly adjust settings, preventing the lines from operating properly;

   b.  Binkowski, with little knowledge of heating, ventilation and air conditioning ("HVAC") systems, added HVAC equipment to the manufacturing facilities at substantial cost to Winona. This HVAC system introduced foreign materials into the manufacturing process which, in turn, increased scrap rates; and

12

     c.    Binkowski arbitrarily altered time-tested coating recipes with little or no scientific or factual basis for such decisions.

34.    The various changes made or ordered by Binkowski caused equipment to operate improperly and product scrap rates to soar.

35.    Once Binkowski assumed control of Winona, he engaged in a furious campaign of making major changes to all facets of Winona. These changes caused serious harm to Winona and can only be characterized as reckless, irresponsible, and well outside any reasonable business judgment.

36.    While the changes made by, or that are attributable to, Binkowski and Ferrante are too numerous to mention here, the following are examples:

> Winona utilizes a highly complex manufacturing process. After forcing out key Winona employees who were qualified to implement and manage these processes, remaining management engaged in an uninformed and ill-advised effort to modify equipment, alter processes, and modify equipment settings. It should be noted that remaining management had no expertise with the PVD process or the equipment in question. The following are merely examples:
>
> - Placing "I-Control" modules on the Vacuprime booth on Line 3. The result was that no improvements were realized and recipes were changed. The additional problem was that wheels could no longer be coated on both A and B sides. The result was longer cycle times and increased scrap rates.
>
> - A decision that additional air conditioning was required for Line 3 with no understanding of how chilled water systems operated. This caused the addition of two (2) fifty (50) ton chillers and air handlers, which resulted in a substantial increase in foreign material and, in turn, an additional increase in scrap rate. It was later determined that the units were not needed and removed from the system. The total cost for this blunder (excluding the increased cost associated with the scrap rate) was over one hundred fifty thousand dollars ($150,000.00). Binkowski has no HVAC expertise and ignored the advice of those persons with relevant knowledge.

13

- A decision (again, with no prior knowledge of the industry and no input from existing employees) to change gun positions, wheel coating recipes, and removal (and subsequent replacement) of coating guns. The existing gun positions had previously coated over four thousand (4,000) wheel styles on Line 1. This resulted in increased scrap rates.

- A decision to unnecessarily incur substantial cost in adding humidification to the coating rooms. Humidity was likely never a factor which impacted scrap rates and was never required on Line 1.

- A decision to unnecessarily change air flow to the coating rooms on Line 3, negatively impacting the ovens and powder collection from the paint booths. Remarkably, Binkowski would make major changes to equipment settings without keeping detailed records of the changes.

37.    All of these actions greatly increased product scrap rates and all but eliminated profitability for Winona.

38.    Binkowski also greatly increased Winona's expenses and overhead, causing the financial picture of Winona to quickly deteriorate.

39.    Binkowski frequently made highly technical decisions affecting manufacturing with no expertise and without consulting key employees or outside experts. Binkowski's actions and omissions were under the direction and control of Ferrante and/or TFG Wheels.

40.    As a result of Binkowski and Ferrante's mismanagement, and the hostile work environment created by Binkowski at Winona, multiple key technical employees and management personnel either quit or were forced out of Winona, including the following:

a.    Jamie Visker, CEO;

b.    Scott Eyink, Director of Engineering;

c.    Roy Green, Maintenance and Powder Coating Specialist;

d.    Larry Case, Maintenance Manager and Operations; and

14

     e.    Lori Stanger, Vice President and General Counsel.

41.    In addition to the aforementioned conduct, Binkowski demanded he assume relationships with all major customers. These relationships were harmed due to Binkowski's lack of product knowledge and manufacturing processes. Customers began lodging complaints regarding Binkowski's conduct.

42.    Winona eventually hired another president to operate the company named Scott Dahl ("Dahl"). Dahl was forced to undo many of the manufacturing and business decisions of Binkowski. Winona was forced, however, to terminate Dahl's employment because of allegations relating to inappropriate conduct relating to subordinate employees. Rather than find another qualified replacement president, Binkowski again assumed the duties of running the company. Ferrante and Binkowski also then insisted Binkowski be paid a three hundred thousand dollar ($300,000.00) annual salary in addition to the two hundred thousand dollar ($200,000.00) management fee already being paid to TFG Wheels. Visker objected. Visker encouraged Winona to promptly locate a competent replacement. Binkowski responded by wrongfully claiming Visker's consent was not required under the Operating Agreement.

43.    Winona was unable to borrow money from traditional lenders to fund its cash flow needs. Accordingly, Binkowski and Ferrante decided to seek additional funding from existing unitholders through another private equity offering (the "Offering"). Unitholders were sent a letter seeking an additional investment of five million five hundred thousand dollars (the "Letter"). The Letter included a section entitled "Recent Developments." The Letter, which was dated April 18, 2015, is attached hereto as Exhibit "D." The Letter was prepared by Connery and/or Binkowski. The Letter was approved by

15

Binkowski and Ferrante. Visker has no role in preparing the Letter or determining its contents. Visker, who was still technically an employee, but was excluded from the operation of Winona, as Ferrante had taken away all job-related responsibilities, was instructed by Ferrante and Binkowski to sign the Letter so that the same could be sent to the Investors.

44. Upon information and belief, this instruction was made to induce Investors who were Visker's friends and family to invest more in Winona.

45. Visker consistently advised Binkowski and Ferrante that full disclosure should be made to the Investors. Visker was ignored.

46. Visker advised Binkowski and Ferrante that Winona was not in compliance with the Operating Agreement due to Binkowski and Ferrante's failure to disclose information to the Investors and were disregarding long-standing company policies. These warnings were disregarded by Binkowski and Ferrante.

47. Upon information and belief, the Letter was materially misleading in that it omitted information that Visker later learned was provided to the investors in TFG Wheels. Binkowski and Ferrante had access to material information regarding the finances of Winona that they knowingly and willfully elected not to disclose to the Investors.

48. Friends and business acquaintances of Ferrante were also investors in TFG Wheels and/or Winona (the "Ferrante Investors"). Upon information and belief, the Ferrante Investors were supplied different detailed information regarding Winona and its finances in conjunction with the Offering. This same information was not disclosed to the Investors.

49. The Investors each decided to invest further money into Winona based upon the Letter, which omitted information supplied to the Ferrante Investors. The total investment

amount made by the Investors has been approximately three million five hundred thousand dollars ($3,500,000.00).

50. Binkowski also caused Winona to become embroiled in groundless litigation.[1] At Binkowski's direction, with Ferrante's blessing, Winona wrongfully terminated a sales representative agreement with Winona's key outside sales representative, allegedly "for cause." The sales representative then commenced wrongful termination and breach of contract litigation against Winona. In an effort to defend against the Buha Action, Winona, through its lawyer and Binkowski, demanded Visker fabricate deposition evidence and testimony to support Binkowski's wrongful termination decision. When Visker refused, Visker was threatened and pressured to again alter his intended truthful testimony. Visker continued his refusal to offer perjured testimony. Visker's deposition was then abruptly cancelled on January 25, 2017. Thereafter, Winona entered into a multi-million dollar settlement with the sales representative. Winona has since refused to disclose the terms of that settlement to the Investors and has refused to disclose to the Investors documents produced in the litigation.

51. Following Binkowski and Ferrante taking control of Winona, a decision was made to withhold key business and financial information from the Investors. The withholding of information included the following:

   a. Binkowski and Ferrante ceased issuing Winona newsletters to the Investors;

   b. Binkowski and Ferrante ceased advising the Investors of key business events;

   c. Binkowski and Ferrante failed to advise the Investors that Visker has been removed from operating Winona;

---

[1] *Winona PVD Coatings, LLC v. Excel Enterprise, LLC and Barry Buha*, in the United States District Court for the Northern District of Indiana, Fort Wayne Division, under consolidated case numbers 3:16-cv-00019-WCL-CAN and 1:16-cv-00016-TLS-SLC, (the "Buha Action").

17

d.    Binkowski and Ferrante failed to advise the Investors of the serious product scrap rates and failures;

e.    Binkowski and Ferrante failed to advise the Investors of serious cash flow problems which placed Winona on the border of insolvency;

f.    Binkowski and Ferrante failed to advise the Investors that Winona was out of loan covenants with its primary commercial lender;

g.    Binkowski and Ferrante failed to advise the Investors that critical technical employees had either voluntarily resigned due to Binkowski's behavior or had been terminated by Binkowski; and

h.    Binkowski and Ferrante failed to advise the Investors that Winona was being operated by someone without any technical or manufacturing experience.

52.    While Visker remained a member of the Board of managers for a time, he was completely isolated and ignored by Ferrante and Binkowski. While symbolic Manager meetings were held, Visker's counsel and advice was ignored. These meetings were for appearance's sake only. Ferrante and Binkowski would make material decisions outside Visker's presence and without Visker's participation.

53.    Ferrante and Binkowski decided to add an unneeded eighty thousand square feet (80,000 ft$^2$) of manufacturing space and construct a new manufacturing line. Visker argued vehemently against this decision. The line and space were not required to meet customer requirements. Moreover, Winona lacked the cashflow and the borrowing capacity to construct the line, which was then estimated to cost nine million dollars ($9,000,000.00). Visker's warnings were ignored. Ferrante and Binkowski forged ahead with the ill-

18

advised plan without adequate capital, placing Winona in jeopardy of having inadequate funds to operate on a day-to-day basis.

54. During the second quarter of 2016, when cashflow reached a crisis level, Visker was forced to step in and negotiate an atypical business loan from Winona's biggest suppliers of coatings, Axalta Coating Systems, LLC ("Axalta"). Visker was able to negotiate the loan at the last hour to enable Winona to fund the debt crisis created by the mismanagement of Binkowski, Ferrante, and TFG Wheels.

55. The Investors have recently learned that Winona has unlawfully threatened Axalta and informed Axalta that Winona will cease doing business with Axalta unless Axalta makes further unjustified financial concessions to Winona. Upon information and belief, this conduct by Winona may be placing it in breach of its Axalta exclusive supply contract. This decision may also place Winona in jeopardy of losing its Ford Motor Company wheel business, which accounts for more than eighty percent (80%) of Winona's revenue.

56. Winona began to experience further serious cash shortages. These shortages were attributable in large part to Binkowski and Ferrante's mismanagement.

57. On November 11, 2016, Visker resigned as a member of the Board of Managers. Visker's resignation letter is attached hereto as Exhibit "E." The basis for the resignation was multifold. First, Visker believed Winona was disregarding the rights of the Investors. Second, Binkowski and Ferrante refused to consider Visker's opinions and suggestions for addressing the serious problems within Winona. Third, Binkowski, with Ferrante's knowledge and consent, was engaging in a campaign to defame and smear Visker. Fourth, Binkowski and Ferrante were secretly meeting and making decisions for Winona that disregarded the Operating Agreement.

58.    Winona has been grossly mismanaged by Binkowski, Ferrante, and TFG Wheels.

59.    Binkowski, Ferrante, and TFG Wheels have actively concealed their mismanagement from the Investors in an effort to shield themselves from liability.

60.    The Investors have made repeated requests for information regarding Winona. Those requests have largely been ignored by Binkowski and Ferrante.

61.    Because of Visker's status as a large owner of the units in Winona, sixteen and twenty-four hundredth percent (16.24%), Visker is specifically afforded certain additional rights under the Operating Agreement. One of those rights is to request and receive additional detailed financial information from Winona. Visker has made multiple direct requests for Winona's financial information from Kirk Sobecki, vice president and CFO of Winona. These requests were ignored, which is in direct contravention of the Operating Agreement.

62.    Because of problems with Winona and the repeated stonewalling by Defendants, the Investors were forced to retain counsel in early 2017. Commencing in February 2017, the Investors, through counsel, began, once again, requesting operating and financial information relating to Winona.

63.    The Investors made demands for information on February 24, 2017, March 10, 2017, October 9, 2017, October 12, 2017, and December 8, 2017. Copies of those communications are attached hereto as Exhibit "F."[2]

64.    Individual Investors, through electronic mail and telephone calls, have also requested information regarding Winona. Those requests have also largely been ignored.

---

[2] Several days prior to the filing of this Complaint, Winona finally mailed limited, highly sanitized financial information to the Investors. This belated limited disclosure does not diminish any of the allegations of this Complaint.

20

65.     Most recently, rumors began to swirl that Ferrante was attempting to sell Winona.  The Investors were not notified of such a plan.

66.     The Investors now believe those rumors are true.  The Investors have good cause to believe Ferrante engaged DPP to sell Winona.  The Investors further believe that DPP and/or Winona has sent written materials, including potentially confidential company information, to multiple prospective buyers.

67.     The Investors have taken numerous steps to verify information relating to the sale of Winona.  A representative of the Investors ("Investor Representative") contacted DPP.  DPP refused to discuss any Winona matters with the Investor(s), relaying to the Investor Representative that legal counsel for Ferrante and/or TFG Wheels instructed DPP to not share Winona information with the Investors. A transcript of a message from DPP has been maintained.  The transcript states, in part, as follows:

> **Investor Representative:** I got a call from someone who claimed to see an offering sheet on a company I am the second largest shareholder of.  Imagine my surprise.
>
> **DPP:** I can imagine. Sorry (Investor Representative).  Legal counsel informed me not to discuss.
>
> **Investor Representative:** Whose legal?
>
> **DPP:** TFG.

68.     Legal counsel for the Investors has also requested the information from legal counsel for Winona.  Attached hereto as Exhibit "G" is a copy of the request and response.  As of the date of this filing, the Investors have not received any of the requested information.

69.     Binkowski, Ferrante, and Winona have engaged in a concerted effort to deprive the Investors of highly material information related to Winona.

21

70.     Ferrante is attempting to sell Winona in a manner which will not protect, and in fact disregards, the rights of the Investors.

71.     Upon information and belief, Binkowski and Ferrante have engaged in a disturbing pattern of conduct, including the following:

        a.      Suspending regular reporting of Winona business information to the Investors;

        b.      Refusing to distribute financial information to the Investors;

        c.      Repeatedly refusing to respond to numerous inquiries about Winona by the Investors; and

        d.      Disregarding the legal right of the Investors.

72.     Upon information and belief, Binkowski and Ferrante are concealing information from the Investors so as to mask evidence of their wrongful conduct and mismanagement.

73.     Upon information and belief, Binkowski and Ferrante are attempting to delay or prevent the Investors from pursuing a damage claim or obtaining a copy of Winona's accounting records.

74.     Upon information and belief, Ferrante is attempting to sell Winona at a price which would return Ferrante's investment, but not return the majority of the Investors' investments.

75.     Upon information and belief, Binkowski and Ferrante have so mismanaged Winona, Winona is now at risk of losing its single largest customer.  This customer accounts for eighty-five percent (85%) of Winona's annual revenue.  The loss of this customer would render Winona insolvent and unable to meet its financial obligations.  This outcome would be devastating to the Investors.

76.     The Investors are entitled to the business and financial records of Winona.

77. Winona and Ferrante owe fiduciary duties to the Investors, pursuant to the Operating Agreement and Delaware law.

78. The Investors are entitled to an accounting from Winona, pursuant to equitable principles of Delaware law.

79. Binkowski, Ferrante, and TFG Wheels have acted in bad faith in order to conceal their wrongful actions and gross mismanagement.

80. The Investor are unable to evaluate the precise extent of the wrongful conduct, value their units, or determine their pecuniary damages without the records of Winona and/or without an accounting.

81. Binkowski and Ferrante are not acting in the best interest of Winona and the Investors by actively concealing information from the owners of Winona.

82. The Investors are considering their further legal options, including but not limited to, seeking to have a receiver appointed for Winona in order to salvage Winona and preserve its remaining value. However, in order to properly evaluate the need for this remedy the Investors understandably require access to information regarding Winona's finances and business plans.

83. The Investors seek this interim relief in the form of an Injunction and Declaratory Judgment prior to pursing a damage claim in arbitration.

84. Interim relief in the form sought by the Investors is specifically authorized by the Operating Agreement. *See* Exhibit "B" at § 11.25(b).

85. The granting of the interim relief sought by the Investors is in the best interest of Winona and helps ensure Winona's assets can be preserved.

23

86. Winona will not suffer any prejudice, as all information may be produced on a confidential basis to the Investors, subject to a reasonable protective order.

87. Ferrante and Winona have no reasonable basis to oppose the relief sought herein. If in fact Defendants deny the allegations outlined in this Complaint, and Ferrante is operating Winona is good faith, this would be substantiated by disclosing the requested information to Plaintiffs who own approximately thirty-five percent (35%) of Winona.

88. The Investors have good cause to believe the law firm of Will Ward Henderson, 3700 Bank of America Plaza, 101 E. Kennedy Blvd., Tampa, FL 33602-5195, is providing professional legal services to Ferrante, Binkowski, TFG Wheels, and Winona. The Investors believe this representation involves direct conflicts of interest and that Winona is not receiving unbiased legal advice to protect the interests of Winona and its unitholders. The Investors believe this serious conflict of interest is being directed, sanctioned, and approved by Ferrante and Binkowski.

89. The Investors believe that, by failing to protect the interests of Winona and failing to engage independent counsel for Winona, that Ferrante, Binkowski, and TFG Wheels, have breached their duties to Winona and the Investors because of their own self-interest.

## Count I

## Request for Court Ordered Accounting

90. Plaintiffs hereby incorporate paragraphs 1 through 89 as though fully stated herein.

91. Winona is a limited liability company.

92. The Investors are members of Winona and combined own thirty-four and eighty-four hundredths percent (34.84%) of Winona's common units.

24

93.  TFG Wheels, which is owned and controlled by Ferrante, owns a majority interest in Winona.

94.  TFG Wheels and Ferrante are alter-egos of one another.

95.  Ferrante controls all aspects of the management and operations of Winona.

96.  Ferrante directly controls the Board of Managers of Winona,

97.  All decisions to conceal information and deny access to Winona's information to the Investors would be made by Ferrante.

98.  Binkowski, Ferrante, and TFG Wheels owe fiduciary duties to the Investors pursuant to the Operating Agreement and Delaware law.  See Operating Agreement at § 5.3(e).  *See also* 6 Del. § 18-1104.  Feeley v. NHAOCG, LLC, 62 A2d 649, 661 (Del. Ch. 2012).

99.  There is substantial credible evidence of Winona's mismanagement.  *See* ¶¶ 9 through 76, *supra*.

100.  The Investors have made repeated requests of TFG Wheels, Binkowski, Ferrante, and Winona for business and financial information.  These requests have been ignored.  *See* Exhibits F, G, and H.  Outside professionals, such as accountants and investment bankers, have been instructed by Ferrante and/or his attorney(s) to conceal even Winona's most basic information from the Investors.  For example, attached hereto and marked as Exhibit "G" is the content of a text message sent to one of the Investors by Vorhees. Vorhees, an investment banker with DPP, was recently hired by Ferrante and TFG Wheels to sell Winona, including the units owned by the Investors.  Vorhees stated he was instructed by "TFG attorneys" to withhold information about the potential sale Winona from the Investors, which collectively own thirty-four and eighty-four hundredths percent (34.84%) of Winona.

25

101. The Investors require business and financial information for multiple independent reason, including the following:

   a. The Investors have not received one penny of return on their investments in the nearly fifty-three (53) months Ferrante has controlled Winona;

   b. Winona has ceased providing the Investors with business and financial information;

   c. The Investors have been denied the opportunity to value their units in Winona. The Investors have engaged a valuation expert but cannot gain access to information required by the valuation professional; and

   d. There is substantial credible evidence of gross mismanagement. *Infra* at ¶¶ 9 through 76. Examples of the gross mismanagement include, but are not limited to:

      i. failing to protect critical intellectual property of Winona;

      ii. hiring senior employees who have no expertise or training with highly technical manufacturing equipment;

      iii. changing CEO's on at least four (4) separate occasions;

      iv. firing key technical employees because of personality conflicts with Binkowski;

      v. filing spurious litigation, against the advice of counsel, and then having to settle the Buha Action for lack of evidence for millions of dollars;

      vi. alienating key customers because new, untrained employees have no knowledge of the product or the manufacturing technology;

      vii. altering sensitive high technology manufacturing equipment by employees lacking knowledge and training, causing product scrap rates to soar;

      viii. making financial decisions which resulted in negative cash flow for Winona;

26

ix. failing to meet mandatory obligations to lenders because of severe cash flow problems; and

x. operating Winona in a manner which may result in Winona losing its largest customer, which accounts for eighty-five percent (85%) of Winona's business.

102. Delaware law permits the Court to order an equitable accounting under circumstances such as those set forth in this Complaint.

103. Absent an equitable accounting, the Investors do not have access to business information, no method to value their units in Winona, no ability to assess the conditions of Winona, no ability to ascertain why Ferrante is secretly attempting to sell Winona, and no ability to determine what steps the Investors should take to protect Winona.

104. One of the fiduciary duties owed to the Investors by Defendants is a duty to be truthful, make full disclosure of relevant information, and act in the Investors' best interest.

105. Defendants have ignored their fiduciary duties to the Investors.

106. Delaware law provides minority owners with various equitable and statutory remedies, including but not limited to, injunctive relief, the appointment of a receiver, the dissolution of the company, and the right to an equitable accounting in advance of pursuing a claim for damages, so that minority unitholders can protect the company and their interest therein. *See* In Re: Anderson Clayton Shareholders Litigation, 519 A2d 669 (Del Ch. 1986); Gatz properties LLC v. Auriga capital Corp, 59 A3d 1206 (S. Ct. Del 2012); Guth v. Loft Incorp., 5 A.2d 503 (S.C. Del. 1939); In Re: Carlisle Etcetera, LLC, 114 A.3d 592 (Del. Ch. 2015).

107. At this juncture, the Investors are requesting the least intrusive equitable remedy: an order compelling Defendants to grant the Investors and their expert access to the books

and records of Winona and requiring Winona to make regular disclosure of financial and business information to the Investors.

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor, compel an accounting of the assets and liabilities of Winona, and enter an award for all costs, attorneys' fees, and any other relief that may be just and proper in the premises.

## Count II

### Declaratory Judgment that Defendants Owe Fiduciary Duties to Plaintiffs Pursuant to Delaware Law and the Terms of the Operating Agreement.

108. Plaintiffs hereby incorporate paragraphs 1 through 107 as though fully stated herein.

109. Binkowski, Ferrante, and TFG Wheels have significant personal, professional, and legal connections amongst each other.

110. Defendants are the controlling unitholders of Winona and have exerted their dominance over every aspect of the operations of Winona, from the day to day operations to their exclusive control over the Board of Managers.

111. Under Delaware law, the duty of loyalty mandates that the best interest of the company and its unitholders takes precedence over any self-interest possessed by a director, officer, or controlling unitholder and not shared by the unitholders generally. Cede & Co. v. Technicolor, Inc., 634 A.2d 345 (Del. 1993).

112. Further, a non-unitholder who in fact controls the management of a Delaware company owes a fiduciary duty to that company and its shareholders. Harriman v. E.I. Du Pont de Nemours & Co., 327 F. Supp. 101, 106 (D.C. Del. 1974). Thus, for example, one who exercises control over a company which in turn exercises control over a Delaware company may have a fiduciary duty to the latter company. Id.

28

113.    The Board of Managers controls all of Winona's powers, manages the business and affairs of Winona and has the sole power (including the rights and powers to take certain actions, give or withhold certain consents or approvals, or make certain determinations, opinions, judgments, or other decisions) granted to Winona under the Operating Agreement.  *See* Exhibit "B" at Section 5.2.

114.    The Operating Agreement states that the composition of the three-member Board of Managers "must include . . . one (1) person designated by TFG and, after the Second Closing, one (1) [additional] person designated by TFG." Operating Agreement at Section 5.3.  The third position on the Board of Managers is to be appointed by Plaintiffs.

115.    Until he resigned on November 11, 2017, Visker served as the third Manager ("Majority in Interest Manager").

116.    Based on the terms of the Operating Agreement, TFG Wheels controls Winona.  Further, TFG Wheels designated Ferrante and Binkowski to serve on the Board of Managers.  As such, control and management of Winona falls on Ferrante and Binkowski. Consequently, Ferrante and Binkowski owe fiduciary duties to Winona and Plaintiffs.

117.    The Operating Agreement also specifies that the "Managers, in the performance of their duties as such, shall owe to Winona and the members the same fiduciary duties owed by the directors of a corporation to such corporation and its shareholders under the laws of the State of Delaware." Operating Agreement Section 5.3(e).

118.    To date, the Majority in Interest Manager position remains vacant.  The reason for the vacancy is the refusal of Ferrante and Binkowski to act in the best interest of Winona and Ferrante and Binkowski's refusal to engage in legitimate Board meetings.  The effect of

29

this vacancy means that Binkowski, Ferrante, and TFG Wheels exercise exclusive control over Winona in violation of the express provisions of the Operating Agreement.

119.   An actual, present, and justiciable controversy has arisen between Plaintiffs and Defendants by virtue of:

a.   The abuse of power exercised by Ferrante, Binkowski, and TFG Wheels;

b.   The management failures of Ferrante, Binkowski, and TFG Wheels in relation to gross mismanagement of corporate affairs;

c.   The incompetence of Ferrante, Binkowski, and TFG Wheels in relation to in executing basic corporate functions; and

d.   The deceptive practices and securities law violations of Ferrante, Binkowski, and TFG Wheels in relation to failing to provide sufficient information to Plaintiffs when inducing them to make investments and purchase additional shares of Winona.

120.   Plaintiffs seek a declaratory judgment from this Court that Ferrante, Binkowski, and TFG Wheels each owe the Investors fiduciary duties pursuant to the terms of the Operating Agreement and Delaware law, including the following:

a.   The duty to provide full and complete information to the Investors regarding any potential sale of Winona;

b.   The duty to provide all information reasonably required by the Investors to value Winona and the Investors' units therein;

c.   The duty to provide the Investors with copies of all Winona information supplied to DPP;

d.   The duty to provide the Investors with all records relating to the Buha Litigation;

30

    e.    The duty to provide the investors with all Board of Manager meeting minutes;

    f.    The duty to provide the Investors all communications provided by Winona, Ferranti, or Binkowski to TFG Wheels, and/or its members, relating to Winona; and

    g.    The duty to engage independent legal counsel for Winona, separate from the legal counsel representing TFG Wheels, Ferrante, and/or Binkowski, pursuant to Rule 1.7 of the Indiana, Florida, and Ohio Rules of Professional Conduct.

WHEREFORE, Plaintiffs pray this Court enter judgment in their favor, declare that Ferrante, Binkowski and TFG Wheels owe Plaintiffs fiduciary duties pursuant to the terms of the Operating Agreement and Delaware statutory law and common law duties of good faith and fair dealing pursuant to 6 Del. C. § 18-1101, and enter an award for all costs, attorneys' fees, and any other relief that may be just and proper in the premises.

## Count III

### Declaratory Judgment that Plaintiffs are Entitled to Records Pursuant to the Terms of the Operating Agreement and Delaware Law.

121.    Plaintiffs hereby incorporate paragraphs 1 through 120 as though fully stated herein.

122.    The Operating Agreement identifies certain rights of the Managers. One of these rights includes the right to financial statements and other information. *See* Exhibit "B" at Section 5.12(a). Specifically, Winona is to provide Managers in specific time intervals specified in the Operating Agreement:

- Unaudited monthly consolidating and consolidated statements of income and cash flows of Winona, unaudited consolidating and consolidated balance sheets of Winona setting forth comparisons to the annual budget and the corresponding period of the previous fiscal year.

- Income and cash flow statements and balance sheets for the fiscal year setting forth comparisons to the annual budget and to the preceding fiscal year.

- Additional reports, management letters or other detailed information concerning significant aspects of Winona's operations or financial affairs given to Winona by their independent accountants.

- A budget prepared on a monthly or quarterly basis that has been approved by the Board of Managers and other significant budgets prepared by Winona and any material revisions of such annual other budgets.

- Notice of any material default under any agreement to which the Company is a party, any condition or event which is reasonably likely to result in any material liability under any federal, state or local statute or regulation relating to the business of Winona, public health and safety, worker health and safety or pollution or protection of the environment or other statute applicable to Winona or the Business or any other material adverse change, event or circumstance affecting Winona (including, without limitation, the filing of any material litigation, arbitration or other similar proceeding against Winona or the existence of any dispute with an Person which involves a reasonable likelihood of such litigation, arbitration or other similar proceeding being commenced), an officer's certificate from the chief operating officer or chief financial officer thereof specifying the nature and period of existence thereof and what actions have been taken and are proposed to be taken with respect thereto.

- Such other information and financial data concerning Winona as any manager may reasonably request.

32

*Id.* at Section 5.12(a)

123.   In addition to the rights of the Manager, each member is entitled to quarterly unaudited balance sheets showing the assets and liabilities of the Company and an unaudited income statement. *Id.* at Section 8.2.

124.   Further, the Operating Agreement contemplates the exchange of the above information between Managers and Members. *Id.* Section 11.13.

125.   To date, Defendants have failed or refused to provide financial documents to Plaintiffs. In addition, during the course of the Buha Action, Plaintiffs discovered potential existence of separate financial documents – not included as part of an investment offering to Plaintiffs, but, upon information and belief, included in an investment offering to TFG Wheels and other of Defendants' friends – relating to the financial performance of Winona. Upon request, Defendants similarly have refused to provide these documents to Plaintiffs.

126.   The former Manager appointed by Plaintiffs, Visker, requested copies of documents related to the Buha Action. This request remains unfulfilled by Ferrante and Binkowski.

127.   An actual, present and justiciable controversy has arisen between Plaintiffs and Defendants by virtue of:

- Defendants withholding critical financial information from Plaintiffs needed for Plaintiffs to value their investments and understand the performance of their investments in Winona.

- Defendants failing to inform Plaintiffs regarding significant litigation, including, but not necessarily limited to, the Buha Action.

33

- Defendants, upon information and belief, providing materially different investment disclosures to TFG Wheels, TFG investors and other friends of Ferrante and Binkowski in an effort to induce Plaintiffs to invest in Winona.

- Defendants providing false and/or materially deceptive financial information and manager statements regarding the health of the company in the form of an investment disclosure.

128. Plaintiffs seek a declaratory judgment from this Court that:

a. Plaintiffs are entitled to appoint a Manager to the Board of Managers;

b. That a Manager on the Board of Managers is entitled to review all financial and business records of Winona;

c. The Manager may share the financial and business records with Plaintiffs in their capacity as members of Winona;

d. Based on the foregoing, until a Manager is appointed by Plaintiffs, Plaintiffs are entitled to the documents that their Manager representative is entitled to receive, including past financial and business records created for the last three (3) years;

e. Defendants shall provide documents for the last three (3) years to Plaintiffs, including, but not limited to:

   i. Balance sheet, profit and loss and income statements provided to Managers on a monthly, quarterly and yearly basis.

   ii. Documents produced in the Buha Action, all pleadings related thereto, all discovery responses and productions, and any and all settlement agreements entered into by Winona.

34

    iii.    A set of the investment documents provided to TFG Wheels, or any member thereof, relating to the Offering.

    iv.    Communications relating to the Offering, the Buha Action and communications with DPP or any other entity in relation to any plan to sell part or all of Winona or the potential or actual issuance of shares of Winona.

    v.    Any Agreements entered into in relation to the sale of part or all of Winona or the potential or actual issuance of additional shares of Winona.

f.    The aforementioned obligations are continuing in nature and Defendants shall continue to provide these documents pursuant to the terms of the Operating Agreement.

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor, declare:

a.    Plaintiffs are entitled to appoint a Manager to the Board of Managers;

b.    That a Manager on the Board of Managers is entitled to review and copy all financial and business records of Winona;

c.    The Manager can share Winona financial and business records with Plaintiffs in their capacity as members of Winona;

d.    Based on the foregoing, until a Manager is appointed by Plaintiffs, Plaintiffs are entitled to the documents that their Manager representative is entitled to receive;

e.    Defendants shall provide documents to Plaintiffs, including, but not limited to:

    i.    All financial and business records of Winona, including balance sheets, profit and loss and income statements;

35

ii.  Documents produced in the Buha Action, all pleadings related thereto, all discovery responses and productions, and any and all settlement agreements entered into by Winona;

iii.  A set of the investment documents provided to TFG Wheels, or any member thereof, relating to the Offering;

iv.  Communications relating to the Offering, the Buha Action, and communications with DPP or any other entity in relation to any plan to sell part or all of Winona or the potential or actual issuance of shares of Winona;

v.  Any Agreements entered into in relation to the sale of part or all of Winona or the potential or actual issuance of additional shares of Winona;

f.  The aforementioned obligations are continuing in nature and Defendants shall continue to provide these documents pursuant to the terms of the Operating Agreement; and

g.  Enter an award for all costs, attorneys' fees, and any other relief that may be just and proper in the premises.

## Count IV

## Injunction Against Use of the Power of Attorney Outlined in the Operating Agreement

129.  Plaintiffs hereby incorporate paragraphs 1 through 128 as though fully stated herein.

130.  The Operating Agreement provides that the Board of Managers has power of attorney to execute "all instruments, agreements or other documents which the Board of Managers deem appropriate or necessary to reflect any amendment, change, modification or restatement of the [Operating Agreement] that was made in accordance with its terms," "all conveyances and other instruments or documents which the Board of Managers

36

deems appropriate or necessary to reflect the dissolution and liquidation of the company," and all instruments relating to the admission, withdrawal or substitution of any member.

131.  Upon information and belief, Ferrante, Binkowski, and TFG Wheels are in the process of secretly shopping Winona for sale to a third-party.

132.  Upon information and belief, Ferrante, Binkowski, and TFG Wheels have hired DPP to find potential purchasers of Winona without informing any Plaintiffs of the plan to sell Winona.

133.  The sale of Winona substantially affects the rights of Plaintiffs.

134.  The sale of Winona would cause Plaintiffs irreparable harm.

135.  Defendants continue to fail to supply Plaintiffs with any information in relation to the sale of Winona, possible terms of such a sale or any information necessary for Plaintiffs to identify any potential effects of the sale on Winona on Plaintiffs' investment.  This failure is actionable as a breach of Defendants' fiduciary duty to Plaintiffs.

136.  Given the nature and scope of Defendant's breaches, Plaintiffs have a substantial likelihood of success on the merits of their case.

137.  Plaintiffs are in the process of assembling an arbitration claim for Ferrante, Binkowski and TFG Wheel's breaches of fiduciary duties and their violations of securities laws.

138.  As such, Plaintiffs are seeking relief from this court to grant an injunction against the exercise of the Board of Managers' power of attorney as outlined in the Operating Agreement in relation to engaging in a sale of Winona until such a time that Plaintiffs' arbitration claims are settled, or the parties can reach some other agreement in relation thereto.

139. Granting and injunction will not harm Plaintiffs or other investors as the injunction seeks to maintain the status quo in relation to the operations of Winona. Further, the scope of the injunction does not affect day-to-day operations of Winona and is limited in time until resolution of Plaintiffs' arbitration claims.

140. It is in the public interest to have Courts maintain the status quo while parties resolve disputes through alternative dispute resolution.

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor, enjoin Defendants from exercising the power of attorney provision of the Operating Agreement, in relation to the sale of Winona, until such a time that the parties resolve any pending arbitration claims between them, order Defendants to supply documents pursuant to the terms of the Operating Agreement, and enter an award for all costs, attorneys' fees, and any other relief that may be just and proper in the premises.

## Count V

## Injunction Against Sale of the Company

141. Plaintiffs hereby incorporate paragraphs 1 through 140 as though fully stated herein.

142. Upon information and belief, Ferrante and Binkowski are in the process of shopping Winona for sale to a third-party. Upon information and belief, Ferrante and Binkowski have hired DPP to find potential purchasers of Winona without informing any of Plaintiffs of the plan to sell Winona.

143. The sale of Winona substantially affects the rights of Plaintiffs.

144. The sale of Winona would cause Plaintiffs irreparable harm.

145. Defendants continue to fail to supply Plaintiffs with any information in relation to the sale of Winona, possible terms of such a sale or any information necessary for Plaintiffs

38

to identify any potential effects of the sale on Winona on Plaintiffs' investment. This failure is actionable as a breach of Defendants' fiduciary duty to Plaintiffs.

146. Given the nature and scope of Defendant's breaches, Plaintiffs have a substantial likelihood of success on the merits of their case.

147. Plaintiffs are in the process of putting together an arbitration claim for Ferrante, Binkowski and TFG Wheels' breaches of fiduciary duties and their violations of securities laws.

148. As such, Plaintiffs are seeking relief from this court to grant an injunction against the exercise of the Board of Managers' power in relation to engaging in a sale of Winona until such a time that Plaintiffs' arbitration claims are settled, or the parties can reach some other agreement in relation thereto.

149. Granting an injunction will not harm Plaintiffs or other investors as the injunction seeks to maintain the status quo in relation to the operations of Winona. Further, the scope of the injunction does not affect day-to-day operations of Winona and is limited in time until resolution of Plaintiffs' arbitration claims.

150. It is in the public interest to have Courts maintain the status quo while parties resolve disputes through alternative dispute resolution.

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor, enjoin Defendants from exercising any rights in relation to the sale of Winona until such a time that the parties resolve any pending arbitration claims between them, order Defendants to supply documents pursuant to the terms of the Operating Agreement, and enter an award for all costs, attorneys' fees, and any other relief that may be just and proper in the premises.

E-FILED 03/02/2018 04:17 PM  /  CONFIRMATION 708492  /  A 1801222  /  COMMON PLEAS DIVISION  /  IFO

Respectfully submitted,

/s/ Brian W. Fox

Brian W. Fox (0086851)
Michael A. Roberts (0047129)
GRAYDON HEAD & RITCHEY LLP
312 Walnut Street, Suite 1800
Cincinnati, OH 45202
Phone: 513.629.2799
Fax: 513.651.3836
mroberts@graydon.law
bfox@graydon.law
*Attorneys for Plaintiffs*

E. Scott Treadway (#14675-49)
EST Law, LLC
10401 North Meridian Street, Suite 225
Indianapolis, IN 46290
scott@estlawllc.com

8346655.3

EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement") is hereby entered into this 23rd day of April, 2013 (the "Effective Date") by and between Jamie Visker ("Employee") and Winona PVD Holdings, LLC, a Delaware limited liability company ("Winona").

WHEREAS, Winona is currently engaged in the business of coating wheels for use in the automobile industry; and

WHEREAS, it is the desire of Winona that Employee shall, subject to the terms and conditions of this Agreement, continue as an employee and Chief Executive Officer of Winona.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged Winona and Employee hereby agrees as follows:

1.    Employment. During the Term (as defined below), Employee shall be and hereby is employed by Winona as its Chief Executive Officer, upon the terms and subject to the conditions of this Agreement.

2.    Employee Duties. The Employee's employment duties to Winona are as follows:

(i)    Managing the general business of Winona;

(ii)    Hiring and supervising all management staff;

(iii)    Maintaining a relationship with major customers and vendors and developing new relationships with prospective customers and vendors;

(iv)    Manage the construction and installation of buildings and equipment for Product Line 2 and Product Line 3 (each as defined below);

(v)    Managing production operations of Winona;

(vi)    Hiring sales staff to promote and generate sales;

EXHIBIT "A"

(vii)   Hiring financial staff to properly maintain the books and records of Winona;

(viii)  Working with production staff to assist Winona in meeting quality and production goals;

(ix)    Engaging outside professionals and consultants;

(x)     Providing not less than monthly written reports to the Winona Board of Managers detailing sales, revenues, expenses, production information and such other information as reasonably requested by the Winona Board of Managers; and

(xi)    Such other reasonable responsibilities determined by Winona's Board of Managers (the "Board") which are consistent with duties, responsibilities, functions and authority customarily associated with the Chief Executive Officer position.

3.   Term. The term of this Agreement shall be for a period of three (3) years from the Effective Date (the "Term"), unless Employee's employment is terminated in accordance with Section 16, in which case the Term shall end on the date of Employee's termination of employment (whether voluntarily, involuntarily, by the Employee or by Winona)..

4.   Successor Entity. Subject to the terms and conditions of this Agreement, a successor-in-interest to Winona shall be bound by and subject to the terms and conditions of this Agreement and have all of Winona's rights under this Agreement.

5.   Subsidiaries; Related Company. In the event Winona forms a subsidiary, or causes to be formed a subsidiary or Related Company, involved in the wheel coating business it is the intention of Winona that Employee shall also serve as chief executive officer of such

2

Related Company or subsidiary, subject to the approval of the Board and subject to the terms and conditions of this Agreement. A "Related Company" means any company in the wheel coating business in which the members of Winona (including Employee) own a controlling interest.

6.     Compensation.

     (i)     During the Term, Employee shall receive an annual salary of Two Hundred Fifty Thousand Dollars ($250,000.00) (as may be modified in accordance with Section 6(ii), the "Base Salary") payable weekly or in a similar manner to other salaried employees in accordance with Winona's normal payroll practices in effect from time to time. Employee's base salary for any partial year shall be prorated based upon the actual number of days he was employed by Winona during such year.

     (ii)     Employee's Base Salary will, following Winona's satisfaction of the following performance thresholds increase in the following manner: (a) following the calendar quarter in which Winona's EBITDA attributable to Product Line 1 (defined below) and Product Line 2 (as defined in the Securities Purchase Agreement dated on or around the date of this Agreement, among Employee, Winona and TFG Wheels, LLC (the "Purchase Agreement")) exceeds $2,700,000, Employee's Base Salary will increase to Three Hundred Fifty Thousand Dollars ($350,000.00); and (b) if Employee's Base Salary has been increased pursuant to Section 6(ii)(a), then following the calendar quarter in which Winona's EBITDA attributable to Product Line 1, Product Line 2 and Product Line 3 (as defined in the Purchase Agreement) exceeds $4,500,000, Employee's

3

Base Salary shall increase to Four Hundred Fifty Thousand Dollars ($450,000.00). Any increase in Employee's Base Salary will be effective beginning on the first day of the calendar quarter beginning after the calendar quarter in which the applicable threshold was satisfied, but will not be paid by Winona until the first normal payroll payment date occurring immediately after the Company's EBITDA for the calendar quarter in which the performance threshold was satisfied is finally determined (but in no event later than forty-five (45) days after the end of such calendar quarter). On that payroll date Winona will make a lump sum catch-up payment to Employee for the increased compensation not previously paid after the effective date of the increase up to the date of the first payroll payment date of a final determination of EBITDA. Any increase in Base Salary made in accordance with this Section shall be prorated based upon the actual number of days remaining in the year in which such increase occurred. "Product Line 1" means the existing line as of the date of the Initial Closing (as defined in the Purchase Agreement) with the capacity of 240 units. The term "EBITDA" means Winona's earnings before interest, taxes, depreciation and amortization, determined in accordance with United States Generally Accepted Accounting Principles, consistently applied, as determined by Winona's outside accounting firm.

(iii)    Employee shall be eligible to receive an annual performance bonus from Winona of up to thirty percent (30%) of Employee's Base Salary, as

4

determined by the Board (excluding Employee). The bonus criteria shall be annually decided by the Board (excluding Employee), reduced to writing and shall become part of this Agreement. The performance bonus shall be paid to the Employee within one hundred and twenty (120) days after the close of the calendar year to which it applies, subject to Section 16. Any bonus for the portion of 2013 after the Effective Date and any partial calendar year during which Employee was employed by Winona shall be prorated based upon the actual number of days he was employed by Winona during such year, subject to Section 16.

7.     Executive Assistant. Winona shall employ a full time executive assistant who shall work full time for Employee. The executive assistant shall be selected by Employee in his reasonable discretion and subject to Winona's company policies as in effect from time to time. The salary and benefits of the executive assistant shall be determined by Employee and subject to the approval of the Board.

8.     Office Location. Employee maintains offices in his home state of Florida and at Winona's primary business location in Warsaw, Indiana. Employee and Winona agree that Employee may continue to maintain both office locations. Employee shall be present at Winona's Warsaw, Indiana location as reasonably necessary to perform his duties as Chief Executive Officer. Employee shall ensure Employee is reasonably available to management level employees of Winona during normal business hours via cellular telephone, land line telephone and/or internet. Employee shall meet with management level staff as reasonably necessary to perform his duties as Chief Executive Officer. Said meetings may be electronic via conference call or video conferencing.

5

9. Benefits. Employee shall be entitled to all benefits available to other Winona employees including, but not limited to, health insurance, life insurance, disability insurance and pension plans. The Employee acknowledges that nothing in this Agreement obligates or requires Winona to offer any such plans or prevents Winona from terminating or modifying any plan that it may from time to time offer, and Winona reserves the right to amend, modify or terminate any such plan in its sole discretion.

10. [Reserved].

11. Outside Business Interests. So long as Employee is employed by Winona, Employee shall not, without the prior written consent of the Board, perform other services for compensation, other than performing services for Winona Powder Coating, Inc. (which services shall take up no more than 20% of Employee's professional time during any calendar month) in manner and scope as provided on the Effective Date. Nothing in this Section 11 is intended to or shall be deemed to limit the covenants contained in Section 18 or prevent Employee from owning (of record or beneficially) a minority equity ownership interest in any publicly traded company or private company, so long as, in each case, Employee does not participate in the management or control of the company, the company does not directly or indirectly compete with Winona and Employee's ownership does not cause Employee to violate any other provision of this Agreement.

12. Living Facility. Winona currently leases and maintains an apartment in Warsaw, Indiana for use by Employee while present at Winona's Warsaw, Indiana business location. Winona shall, at Winona's expense, continue to lease and maintain said apartment or a comparable apartment in Warsaw, Indiana for use by Employee during the Term.

13. **Auto and Fuel Allowance.** Winona shall supply Employee with an automobile similar to the existing supplied automobile (the "Warsaw Automobile") for use while Employee is at Winona's Warsaw, Indiana business location during the Term. In addition, Employee will continue to be permitted to purchase, on a Winona credit card, fuel used in connection with the Warsaw Automobile while the Employee is in Warsaw, Indiana for business purposes.

14. **Employee Business Expenses.** Winona shall promptly pay directly, or reimburse Employee for, all reasonable business expenses incurred by the Employee in the performance of his duties and responsibilities to Winona, in all cases subject to Winona's standard policies for expense reimbursement in effect from time to time, which policies are subject to prospective change at any time or from time to time in the sole discretion of Winona. For the avoidance of doubt, any expenses charged by Employee to a Winona credit card shall be subject to the same policies, and if such expenses do not comply with such policies, Employee shall be responsible for reimbursing Winona for such expenses.

15. **Vacation.** Employee shall be entitled to take five (5) weeks paid vacation during any calendar year of the Term. Unused vacation time will expire at the end of each calendar year.

16. **Termination of Employment.**

   (i)     The Employee is an employee "at-will," and the Employee's employment may be terminated by Winona for any reason or no reason, with or without cause, at any time by giving the Employee notice of the termination. The terms of this Agreement do not and are not intended to create either an express or implied contract of employment with Winona for any particular period of time or provide for compensation to the Employee following the

7

termination of his employment, except as expressly provided in this Section 16.

(ii)    Employee may, for any reason or no reason at all, terminate Employee's employment with Winona upon providing ninety (90) days advance written notice Winona; provided that upon receipt of notice of termination from the Employee, Winona may, in its sole discretion and without affecting the characterization of the termination of the Employee's employment, terminate the Employee's employment prior to the end of the notice period.

(iii)   Except as provided in Section 16(iv), if Employee's employment is terminated by Employee or Winona for any reason or for no reason at all (including as a result of Employee's death or Disability (as defined below)), (i) Winona shall pay the Employee's Base Salary that is accrued but unpaid through the date of termination, (ii) Winona shall reimburse the Employee pursuant to Section 14 for reasonable expenses incurred but not paid prior to such termination of employment (provided that the Employee must submit those expenses for reimbursement within 30 days after the date of termination) and (iii) the Employee shall be entitled to receive any nonforfeitable benefits already earned and payable to the Employee in accordance with the terms and provisions of this Agreement and any other applicable agreements, plans or programs of Winona in which Employee participated before termination. Except as otherwise expressly provided in Section 16(iv), the Employee shall not be entitled to any other salary,

8

salary continuation, severance, bonuses, employee benefits or compensation from Winona after any termination of his employment, and all of the Employee's rights to salary, bonuses, employee benefits and other compensation hereunder which would have accrued or become payable after his termination shall cease upon such termination, other than as expressly required under applicable law (such as the federal law known as COBRA). In furtherance of the foregoing, if Winona terminates Employee's employment for Cause and it is ultimately determined that such termination was without Cause, it shall not be deemed a breach of this Agreement and Employee shall only be entitled to the amounts provided for in Section 16(iv) in connection with a termination without Cause.

(iv) If the Employee's employment is terminated by Winona during the Term without Cause (as defined below), in addition to the amounts described in Section 16(iii), the Employee shall be entitled to receive (a) an amount equal to twelve (12) months of the Employee's then-current Base Salary which will be paid in accordance with Winona's normal payroll practices as in effect from time to time; and (b) Employee's bonus amount pursuant to Section 6(iii) for the year of termination, pro-rated for the number of days that have elapsed from January 1 of the year of termination through the date of his termination, but only to the extent such bonus is earned as determined by the Board based on the bonus metrics and criteria previously established for (and as measured over) the entire year of

9

termination or, which amount shall be paid at the same time it would have been paid pursuant to Section 6(iii);

in each case, if and only if Employee has executed and delivered to Winona a general release in form and substance reasonably satisfactory to Winona and the general release has become effective, and, only so long as Employee has not revoked or breached the provisions of the general release or breached any of the provisions of Sections 18 through Section 21 of this Agreement.

(v) For purposes of this Agreement, "Cause" means with respect to the Employee, one or more of the following:

    a. Employee's commission of an act that is materially and demonstrably detrimental to the good will of Winona, which act constitutes willful misconduct by Employee in the performance of Employee's contractual duties; or

    b. Commission by Employee of any act of dishonesty resulting or intending to result in material personal gain or enrichment of Employee at the expense of Winona; or

    c. Employee's violation of any of the provisions of Section 18 through 21 of this Agreement;

    d. Employee's material breach of his duties under this Agreement, which breach is not cured within twenty (20) days after Employee's receipt of written notice of such breach from any member of the Board; or

10

e. Employee is convicted of a felony, or is charged with a felony, which charge is reasonably expected to have an adverse effect on Winona's reputation or its business.

In the event Winona believes it has a basis to terminate Employee for Cause, and exercises its termination right hereunder, Winona shall promptly notify Employee in writing of the specific Cause for termination.

(vi) For purposes of this Agreement, "Disability" means that, as a result of his incapacity due to physical or mental illness, Employee is considered disabled under Winona's long-term disability insurance plans or, in the absence of such plans, Employee is unable to perform the essential duties, responsibilities and functions of his position with Winona as a result of any mental or physical disability or incapacity even with reasonable accommodations of such disability or incapacity provided by Winona or if providing such accommodations would be unreasonable, all as determined by the Board (excluding Employee) in its good faith judgment.

(vii) Upon termination of the Employee's employment for any reason, the Employee shall not retain any property of Winona, including, without limitation, any Confidential Information (as defined below), and shall promptly return all property of Winona held by the Employee. Employee further agrees to refer all communications from customers, Winona employees and independent contractors and vendors regarding the business of Winona to a person designated by the Board and to provide the

Board a written report summarizing the status of all open and active Winona projects.

(viii) If at the time Winona terminates Employee's employment without Cause Employee is then a guarantor of or otherwise has personal liability for any of Winona's debt obligations (the "Guarantees") or has supplied cash collateral for any of Winona's debt obligations or credit facilities ("Collateral"), then Winona agrees to use good faith and commercially reasonable efforts to cause, within thirty (30) days after the termination of the Employee's employment without Cause, (a) the Employee to be released from the Guarantees and receive back his Collateral or (b) (i) until such time as the Employee is released from the Guarantees, Winona shall cause a credit-worthy party to indemnify the Employee from and against all losses, damages, claims, liabilities and expenses (including reasonable attorneys' fees) (collectively, "Losses") under the Guarantees incurred by the Employee on account of any action or event occurring after Winona terminated the Employee without Cause and (ii) pay or cause to be paid a cash amount equal to the Collateral, in which case Employee shall give up all rights to the Collateral and the person paying Employee an amount equal to the Collateral will be entitled to receive the Collateral.

17. Further Obligations of Employee. Employee acknowledges and agrees that during the course of Employee's employment by Winona, Employee has had, and will have, access to valuable and confidential professional and business information of Winona, its substantial relationships with prospective and existing clients, suppliers, and customers, trade secrets, and

similar information. Employee further acknowledges and agrees that it is essential to the conduct of Winona's business, the sale of its products and the provision of its services and to the protection of its members' investments that the foregoing information is kept confidential and that its professional and business relationships are protected. Winona desires to restrict Employee's ability to use such information and relationships only in connection with Winona's Business (as defined in the Amended and Restated Limited Liability Company Agreement of Winona dated on or around the Effective Date).

18.   Restrictive Covenants. Winona and Employee agree to the following representations and restrictive covenants:

(i)   Absence of Other Restrictions on Competition. Employee represents and warrants to Winona that Employee is not a party to any restrictive covenant limiting Employee's right to work or perform services for Winona in any capacity whatsoever.

(ii)   Restrictive Covenants. Employee shall not do any of the following, directly or indirectly, in any capacity, either for Employee or on behalf of any other person:

a.   After termination of Employee's employment, Employee shall not retain or remove, without Winona's advance written consent, any list, data, book, record, design, manual, drawing, formula, document, schedule, source code, specification, computer program or software, or other written or electronic information pertaining to the business and financial affairs of Winona;

13

b. At any time during Employee's employment by Winona and following termination for any or no reason, except to the extent expressly authorized in writing by Winona or in the course of performing Employee's duties to Winona, Employee shall not reveal, divulge, or disclose, for any reason or in any manner, to any person who is not an officer, manager, employee, or member of Winona any material information (written or unwritten) concerning trade secrets, proprietary data, or other valuable confidential or business information relating to the business or financial affairs of Winona (collectively, "Proprietary Information"), including the following: (i) information identifying or tending to identify any of the existing or prospective clients, customers, suppliers, employees, and independent contractors of Winona; (ii) information regarding any intellectual property of Winona, including all patents, trademarks, trade names, service marks, and copyrighted materials, and all recipes, menus, copy, ideas, designs, methods, scripts, concepts, inventions, recordings, advertising and promotional materials, and computer programs, software, and source codes, whether or not protected under any law; and (iii) information pertaining to the plans, methods, services, suppliers, processes, prospects, procedures, techniques, financial statements, and financial forecasts and projections of Winona, but excluding any disclosure required by law, by a court of competent jurisdiction, or to respond in good faith to a valid inquiry by a governmental authority

14

and excluding any information that is generally publicly available with respect to the business of Winona.

(iii)    Employee understands that Winona will receive from third parties confidential or proprietary information ("Third-Party Information") subject to a duty on Winona's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Therefore, during the period that Employee is employed by Winona and following termination, Employee will hold Third-Party Information in the strictest confidence and will not disclose to anyone (other than personnel of Winona who need to know such information in connection with their work for Winona) or use, except in connection with Employee's work for Winona, Third-Party Information unless expressly authorized by Winona.

(iv)    During the period that Employee is employed by Winona, and for a period of twenty-four (24) months after termination of Employee's employment (the "Restricted Period"), Employee shall not, directly or indirectly, for Employee or on behalf of any other person, persuade or attempt to persuade any agent, supplier, customer, contractor, prospective customer or other person who has a business relationship with Winona to cease to do business with Winona, reduce the amount of business that it historically has done with Winona, or otherwise adversely alter its business relationship with Winona;

(v)    During the Restricted Period, Employee shall not, directly or indirectly, for Employee or on behalf of any other person, engage in any business,

15

acquire an interest in any business, or serve as an agent, lender, manager, member, officer, partner, director, employee, investor, shareholder, proprietor, consultant, representative, or independent contractor of any business, that directly or indirectly competes with Winona.

(vi)  During the Restricted Period, Employee shall not, directly or indirectly, for Employee or on behalf of any other person: hire, offer, induce, recruit, solicit, influence, or attempt to influence, any person who either is an employee or independent contractor of Winona or has been an employee or independent contractor of Winona during the last six (6) months Employee was employed by Winona to terminate his employment or relationship with Winona for the purpose of working for Employee or any other person, whether or not a competitor of Winona.

Employee shall use all Proprietary Information solely for the purpose of providing services to Winona. Additionally, Employee shall not duplicate or reproduce any Proprietary Information except as necessary to render and furnish services to Winona during Employee's employment. If Winona requests the return of any Proprietary Information, Employee promptly (and in any event within five (5) days) shall return to Winona all Proprietary Information and all copies and any analyses, synopses, summaries, and reproductions of Proprietary Information.

Employee shall not place any Proprietary Information on his personal storage devices.

16

If Employee leaves the employ of Winona, Employee grants consent to notification by Winona to Employee's new employer about Winona's rights and the Employee's obligations under this Agreement.

Employee acknowledges that Employee makes the preceding covenants as consideration to protect and preserve valuable confidential business and professional information of Winona, its substantial business relationships with specific prospective and existing clients and customers, and trade or professional practice secrets associated with its operations. Employee's obligations to Winona under the preceding covenants are independent of any other obligation between Winona and Employee.

19. Employee's Acknowledgment As To Reasonableness of Restrictions. Employee acknowledges, stipulates, and agrees that the preceding restrictions are reasonable as to geographical area, time, and line of business and are reasonably necessary to protect legitimate business interests of Winona, including trade secrets and professional information, other valuable confidential or business information, substantial relationships with existing or prospective customers, and customer goodwill associated with Winona's trade name, ongoing business, and the geographical area in which Winona conducts its business. To the extent the duration, geographical area, or line of business of any of the preceding restrictions would cause them to be unenforceable in a particular jurisdiction, the restrictions automatically will be reformed for purposes of enforcement in that jurisdiction to a duration, geographical area, or line of business that is valid and enforceable in that jurisdiction. Reformation of a restriction to validate its enforcement in any particular jurisdiction, however, will not affect the enforcement of the restriction as stated in any other jurisdiction in which it is enforceable as stated. Also, the

17

invalidity of a restriction in any particular jurisdiction will not affect the validity or enforcement of the restriction in another jurisdiction where it is otherwise valid. The duration of every restriction set forth in Section 18 will be extended by any period during which Employee is in breach of his obligations.

20.    Intellectual Property, Inventions and Patents. In the event that Employee during the term of his employment by Winona generates, authors, conceives, develops, acquires, makes, reduces to practice or contributes to any discovery, formula, trade secret, invention, innovation, improvement, development, method of doing business, process, program, design, analysis, drawing, report, data, software, firmware, logo, device, method, product or any similar or related information, any copyrightable work or any Proprietary Information (collectively, "Intellectual Property"), Employee acknowledges that such Intellectual Property is and shall be the exclusive property of Winona. Any copyrightable work prepared in whole or in part by Employee shall to be deemed "a work made for hire" to the maximum extent permitted under Section 201(b) of the 1976 Copyright Act as amended, and Winona shall own all of the rights comprised in the copyright therein. Without limiting the foregoing, Employee hereby assigns his entire right, title and interest in and to all Intellectual Property to Winona, whether generated, authored, conceived, developed, acquired, made, or reduced to practice during or prior to the Effective Date. For the avoidance of doubt, Employee represents and warrants that all Intellectual Property necessary for use in connection with Winona's Business as conducted and as proposed to be conducted is owned by or licensed (pursuant to a valid license) to Winona. During and after the term of Employee's employment with Winona, Employee shall promptly and fully disclose all Intellectual Property to Winona and shall cooperate with Winona to establish, confirm and protect Winona's interests in and rights and title to such Intellectual Property

18

(including, without limitation, providing reasonable assistance in securing patent protection and copyright registrations and executing all documents as reasonably requested by Winona, whether such requests occur prior to or after termination of Employee's employment with Winona).

21. Remedies. Employee stipulates that a breach by Employee of any of the covenants in Sections 18 and/or 20 of this Agreement will diminish the value of Winona and will cause irreparable and continuing injury to Winona for which an adequate legal remedy will not exist. Accordingly, Employee stipulates that, if Employee breaches any of the covenants in Sections 18 and/or 20 of this Agreement, Winona will be entitled to (A) entry by a court having jurisdiction of an order granting specific performance or temporary injunctive relief, upon the posting of any requisite bond and the filing with the court of an appropriate pleading and affidavit specifying each obligation breached by Employee; (B) the recovery from the Employee of all profit, remuneration, or other consideration that the Employee gains from breaching the covenant and any damages suffered by Winona, to the extent ascertainable; and (C) reimbursement from Employee of all reasonable costs incurred by Winona in enforcing the covenant or otherwise defending or prosecuting any mediation, arbitration, or litigation arising out of the covenant.

22. Sale of Winona. In the event that a transaction occurs during the Term of this Agreement that constitutes a Sale of the Company (as defined in the Operating Agreement), the Employee acknowledges and agrees that the Restricted Period for purposes of the restrictive covenants in Section 18 shall be the longer of (i) three (3) years from the date on which such transaction closes or (ii) the Restricted Period as defined in Section 18.

23. Dispute Resolution.

(i)    Except as otherwise provided in this Agreement, any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity hereof, including the determination of the scope or applicability of this Agreement to arbitration, shall be determined by final and binding, confidential arbitration administered by The American Arbitration Association ("AAA") for resolution by arbitration in accordance with its then-existing commercial arbitration rules, as modified by this Agreement. Any controversy concerning whether a dispute is an arbitrable dispute shall be determined by the arbitrator.

(ii)    The sole arbitrator shall be selected in accordance with such AAA rules. Any arbitration hereunder shall be governed by the United States Arbitration Act, 9 U.S.C. 1-16 (or any successor legislation thereto), and judgment upon the award rendered by the arbitrator may be entered by any state or federal court having jurisdiction thereof. None of the parties or the arbitrator shall disclose the existence, content or results of any arbitration hereunder without the prior written consent of all parties; *provided, however*, that a party may disclose the existence, content or results of any such arbitration to its members, officers, managers, employees, agents, attorneys and accountants and to any other person to whom disclosure is required by applicable laws, including pursuant to an order of a court of competent jurisdiction. Unless otherwise agreed by the parties, any arbitration hereunder shall be held at a neutral location

20

selected by the arbitrator in Orlando, Florida. The cost of the arbitrator and the expenses relating to the arbitration (exclusive of legal fees) shall be borne equally by the parties to the arbitration unless otherwise specified in the award of the arbitrator. Such fees and costs paid or payable to the arbitrator shall be included in "costs" for purposes of Section 24(ix) and the arbitrator shall specifically have the power to award to the prevailing party pursuant to such Section 24(ix) such party's costs and expenses incurred in such arbitration, including fees and costs paid to the arbitrator.

(iii)   The provisions of this Section 23 shall not apply to:

a.   Any specific controversy, dispute, question or issue as to which this Agreement specifically provides another method of determining such controversy, dispute, question or issue and provides that a determination pursuant to such method is final and binding, unless the parties to the dispute agree in writing to waive such procedure and proceed instead pursuant to this Section 23.

b.   Any request or application for an order or decree granting any provisional or ancillary remedy (such as a temporary restraining order or injunction) with respect to any right or obligation of any party, and any preliminary determination of the underlying controversy, dispute, question or issue as is required to determine whether or not to grant such relief. A final and binding determination of such underlying controversy, dispute, question or issue shall be made by an arbitration conducted pursuant to this Section 23 after an appropriate transfer or

21

reference to the arbitrator selected pursuant to this Section 23 upon motion or application of any party to the arbitration. Any ancillary or provisional relief which is granted pursuant to this clause (b) shall continue in effect pending an arbitration determination and entry of judgment thereon pursuant to this Section 23.

(iv) Notice. By executing this Agreement you are agreeing to have any dispute arising out of the matters included in the "arbitration of disputes" provision decided by neutral arbitration as provided by Florida laws and you are giving up any rights you might possess to have the dispute litigated in a court or jury trial. By executing this Agreement you are giving up your judicial rights to appeal, unless those rights are specifically included in the "arbitration of disputes" provision. If you refuse to submit to arbitration after agreeing to this provision, you may be compelled to arbitrate under the authority of Florida law. Your agreement to this arbitration provision is voluntary.

24. Miscellaneous.

(i) Governing Law; Venue. This Agreement and the rights of the parties hereunder shall be governed by and interpreted in accordance with the laws of the State of Florida, without regard to conflict of laws principles. All judicial proceedings brought against the parties arising out of or relating to this Agreement, any obligations hereunder, or the transactions contemplated hereby, subject to Section 23, shall be brought in any state or federal court of competent jurisdiction in Orange County, Florida.

(ii)    <u>Entire Agreement</u>. This Agreement constitutes the entire agreement and understanding between Winona and Employee concerning the subject matter hereof. No modification, amendment, termination, or waiver of this Agreement will be binding unless in writing and signed by Employee and a duly authorized officer of Winona. Failure of Winona or Employee to insist upon strict compliance with any of the terms, covenants, or conditions hereof will not be deemed a waiver of such terms, covenants, and conditions.

(iii)    <u>Specific Performance</u>. The parties hereto acknowledge that money damages alone will not adequately compensate Winona or Employee for breach of any of the covenants and agreements herein and, therefore, in the event of the breach or threatened breach of any such covenant or agreement by either party, in addition to all other remedies available at law, in equity or otherwise, a wronged party will be entitled to injunctive relief compelling specific performance of (or other compliance with) the terms hereof.

(iv)    <u>Successors and Assigns</u>. This Agreement is binding upon Employee and the heirs, executors, successors, permitted assigns and administrators of Employee or Employee's estate. Employee may not assign or transfer to others the obligation to perform Employee's duties hereunder. Winona may assign its rights and delegate its duties under this Agreement without the Employee's consent, by merger or otherwise, including the protections afforded by the covenants and agreements in Section 18, to any parent

23

corporation, subsidiary or other affiliate (through common ownership or otherwise) of Winona, or to any assignee by purchase of Winona or of its assets and business, and the Employee expressly agrees that this Agreement shall be enforceable by any such assignee or successor.

(v)  Withholding Taxes. From any payments due hereunder to Employee from Winona, there will be withheld amounts reasonably believed by Winona to be sufficient to satisfy liabilities for federal, state, and local taxes and other charges and customary withholdings. Employee remains primarily liable to such authorities for such taxes and charges to the extent not actually paid by Winona, and in the event Winona does not make such deductions or withholdings, the Employee shall indemnify Winona for any amounts paid with respect to any such taxes, together (if such failure to withhold was at the written direction of the Employee or if the Employee was informed in writing by Winona that such deductions or withholdings were not made) with any interest, penalties and related expenses thereto.

(vi)  Waiver of Trial By Jury. EMPLOYEE AND WINONA KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE THE RIGHT TO A JURY TRIAL IN ANY LAWSUIT BETWEEN THEM THAT ARISES AT ANY TIME OUT OF THIS AGREEMENT OR EMPLOYEE'S EMPLOYMENT WITH WINONA, WHETHER AT LAW OR IN EQUITY, WHETHER BASED ON A CLAIM OR COUNTERCLAIM ARISING BEFORE OR AFTER THE EFFECTIVE DATE OF THIS AGREEMENT, REGARDLESS OF

24

THE NATURE OF THE CLAIM OR COUNTERCLAIM, AND INCLUDING CLAIMS UNDER TORT, CONTRACT, CORPORATE, AND EMPLOYMENT LAWS.

(vii)  Employee's Cooperation. While Employee is employed by Winona and thereafter, Employee shall cooperate with Winona in any internal investigation performed in response to a third party claim or in anticipation to Winona receiving a third party claim or administrative, regulatory or judicial proceeding as reasonably requested by Winona (including, without limitation, Employee being available to Winona upon reasonable notice for interviews and factual investigations, appearing at Winona's request to give testimony without requiring service of subpoena or other legal process, volunteering to Winona all pertinent information and turning over to Winona all relevant documents which are or may come into Employee's possession, all at times and on schedules that are reasonably consistent with Employee's other permitted activities and commitments).  In the event Winona requires Employee's cooperation in accordance with this Section 24(vii), Winona will reimburse Employee for reasonable expenses incurred in connection therewith (including lodging and meals, upon submission of receipts), but excluding fees and expenses of counsel for Employee (if any), and if he is not employed by Winona at the time of his cooperation, then Winona will pay him reasonable compensation for time spent on the matter.

(viii) <u>Waiver; Modification; Severability</u>. A waiver, discharge, amendment, or modification of this Agreement will be valid and effective only if evidenced by a writing that is signed by or on behalf of the party against whom the waiver, discharge, amendment, or modification is sought to be enforced. No delay or course of dealing by a party to this Agreement in exercising any right, power, or remedy under this Agreement will operate as a waiver of any right, power, or remedy of that party, except to the extent expressly manifested in writing by that party. The failure at any time of either party to require performance by the other party of any provision of this Agreement will in no way affect the party's right thereafter to enforce the provision or this Agreement. In addition, the waiver by a party of a breach of any provision of this Agreement will not constitute a waiver of any succeeding breach of the provision or a waiver of the provision itself. Whenever possible, each provision of this Agreement should be construed and interpreted so that it is valid and enforceable under applicable law. If a court determines that a covenant or agreement in this Agreement is unenforceable, that covenant or agreement will be deemed separable from the remaining covenants and agreements in this Agreement and will not affect the validity, interpretation, or effect of the other provisions of this Agreement or the application of that covenant or agreement to other circumstances to which it is enforceable.

(ix) <u>Prevailing Party</u>. In any mediation, arbitration, or legal proceeding between the Employee and Winona arising out of this Agreement, the non-

26

prevailing party shall reimburse the prevailing party for all costs incurred by the prevailing party therein, including reasonable attorneys' fees.

(x)    <u>Notices</u>. All notices, requests, demands, claims and other communications hereunder shall be in writing and shall be deemed duly given: (i) if personally delivered, when so delivered; (ii) if mailed, three (3) business days after having been sent by first class, registered or certified U.S. mail, return receipt requested, postage prepaid and addressed to the intended recipient as set forth below; (iii) if faxed, on the date of transmission (with confirmation of transmission) if sent during normal business hours, and on the next business day if sent after normal business hours; or (iv) if sent through a nationally-recognized overnight delivery service that guarantees next business day delivery, the business day following its delivery to such service in time for next business day delivery (with all freight or deliver charges prepaid):

If to Winona:

P.O. Box 1856
Warsaw, Indiana 46581
Attn: Board of Managers
Fax: (574) 269-3855

If to the Employee: The Employee's most recent home address or facsimile on file with Winona

Any of the parties may change its address for the purpose of notice by giving like notice in accordance with the provisions of this Section.

27

(xi)    <u>Offset</u>. Winona may not offset amounts in dispute that Employee owes it under this Agreement against distributions payable to Employee by Winona in his capacity as a member of Winona.

(xii)    <u>Winona Powder Coating, Inc.</u> Winona hereby acknowledges Employee is employed by and has an ownership interest in a separate and distinct company known as Winona Powder Coating, Inc. ("<u>Winona Powder</u>"). Winona Powder is in the business of providing electrostatic powder coating for general industrial uses, including but not limited to, the automobile industry, the recreational vehicle industry and the agricultural implement industry. Winona Powder does not utilize physical vapor deposition during its powder coating applications.

Nothing contained in Sections 2, 11 (other than the 20% monthly limit on Employee's professional time spent on Winona Powder matters, which is not modified by this Section 24(xii)), 18(v) or 22 of this Agreement is intended to, and shall not, restrict Employee's ability to own, manage, and/or operate Winona Powder or engage through Winona Powder in the general industrial powder coating business. Employee shall not, however, for himself or for any other person or entity, engage in any business directly or indirectly competing with Winona as set forth in Section 18 above. For the purpose of this Agreement, Winona Powder's general industrial powder coating business shall not be deemed to be direct or indirect competition with Winona.

28

IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the Effective Date.

EMPLOYEE                                           WINONA PVD COATINGS, LLC

_____                  By: _____
Jamie Visker                                       Name: Domenic Ferrante
                                                   Title: Manager

IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the Effective Date.

EMPLOYEE                                    WINONA PVD COATINGS, LLC

_____            By:_____
Jamie Visker                               Name:  Domenic Ferrante
                                           Title:  Manager

SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

OF

WINONA PVD COATINGS, LLC

A Delaware Limited Liability Company

THE UNITS REPRESENTED BY THIS SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH UNITS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR AN EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

CERTAIN OF THE UNITS REPRESENTED BY THIS SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT MAY ALSO BE SUBJECT TO VESTING PROVISIONS, REPURCHASE OPTIONS, OFFSET RIGHTS AND FORFEITURE PROVISIONS SET FORTH HEREIN AND/OR IN A SEPARATE AGREEMENT WITH THE INITIAL HOLDER OF SUCH UNITS. A COPY OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST AND WITHOUT CHARGE.

# EXHIBIT "B"

# SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT
## OF
## WINONA PVD COATINGS, LLC

A Delaware Limited Liability Company

## TABLE OF CONTENTS

ARTICLE 1 - DEFINITIONS ....................................................................... 1

ARTICLE 2 - FORMATION; PURPOSE .......................................................... 1

2.1    LLC Agreement ..................................................................... 1
2.2    Continuation; Name ............................................................... 2
2.3    Place of Business and Principal Office; Registered Agent and Registered Office ..2
2.4    Purpose and Powers ................................................................ 2
2.5    Legal Title ........................................................................ 2
2.6    Term ............................................................................... 3
2.7    No State-Law Partnership ......................................................... 3

ARTICLE 3 - UNITS; ADDITIONAL CAPITAL CONTRIBUTIONS; MEMBER LOANS ........................................................................ 3

3.1    Authorized Units .................................................................. 3
3.2    Additional Capital Contributions by the Members ................................ 3
3.3    Issuance of Additional Equity .................................................... 3
3.4    Management Incentive Units ....................................................... 4
3.5    No Withdrawal of Capital ......................................................... 5
3.6    Negative Capital Accounts ........................................................ 5
3.7    Loans From Members ............................................................... 5
3.8    Preemptive Rights ................................................................ 5
3.9    Uniform Commercial Code .......................................................... 7
3.10   Recapitalization ................................................................. 7

ARTICLE 4 - CAPITAL ACCOUNTS; ALLOCATIONS AND DISTRIBUTIONS ...... 7

4.1    Capital Accounts .................................................................. 7
4.2    Allocations of Net Income and Net Loss ......................................... 8
4.3    Regulatory and Special Allocations .............................................. 8
4.4    Tax Allocations .................................................................. 11
4.5    Taxes of Taxing Jurisdictions ................................................... 12
4.6    Distributions .................................................................... 13
4.7    Tax Distributions ................................................................ 13
4.8    Priority and Distribution of Property ........................................... 14
4.9    No Creditor Status ............................................................... 14

ARTICLE 5 - MANAGEMENT OF THE COMPANY ....................................... 14

i

5.1    Board of Managers ................................................................................14
5.2    Powers .................................................................................................14
5.3    Composition of the Board of Managers ...............................................15
5.4    Meetings of the Board of Managers .....................................................16
5.5    Actions without a Meeting ...................................................................16
5.6    Committees of the Board of Managers .................................................17
5.7    Compensation; Reimbursement ...........................................................17
5.8    Delegation of Authority .......................................................................17
5.9    Officers ................................................................................................17
5.10   Purchase of Units .................................................................................18
5.11   Limitation of Liability ..........................................................................18
5.12   Certain Manager Rights .......................................................................19
5.13   Professional Services Agreement .........................................................20
5.14   Approval For Major Decisions .............................................................20

ARTICLE 6 - RIGHTS AND OBLIGATIONS OF MEMBERS .........................21

6.1    Limitation of Liability ..........................................................................21
6.2    Management of the Company ...............................................................21
6.3    Effect of Bankruptcy, Death or Incompetency of Member ..................22
6.4    Meetings of and Voting by Members ...................................................22
6.5    Member Action Without a Meeting ......................................................24
6.6    Business Opportunities ........................................................................24
6.7    Action by Vote of the Members ...........................................................25

ARTICLE 7 - TRANSFERS OF UNITS ...........................................................25

7.1    Transfers in General ............................................................................25
7.2    Right of First Refusal ..........................................................................25
7.3    Participation Rights .............................................................................27
7.4    Drag-Along Rights ...............................................................................29
7.5    Effect of Assignment ...........................................................................31
7.6    Additional Restrictions on Transfer .....................................................32
7.7    Assignees; Substituted Members .........................................................32
7.8    Admission of New Members .................................................................33
7.9    Amendment of Schedule ......................................................................34
7.10   Legend .................................................................................................34
7.11   Transfer Fees and Expenses .................................................................35
7.12   Void Transfers .....................................................................................35
7.13   Change in Business Form .....................................................................35
7.14   Holdback Agreement ...........................................................................36
7.15   Resignation; Void Assignment .............................................................36
7.16   Indirect Dispositions ...........................................................................36
7.17   Deemed Offer .......................................................................................36
7.18   Purchase Procedures ............................................................................37
7.19   Redemption of Series B Preferred Units ..............................................39

ARTICLE 8 - ADMINISTRATION ...................................................................39

8.1    Bank Accounts .....................................................................................39

ii

8.2     Books and Records ................................................................................39
8.3     Notices ...................................................................................................39

ARTICLE 9 - FISCAL MATTERS .......................................................................40

9.1     Fiscal Year .............................................................................................40
9.2     Tax Reports ............................................................................................40
9.3     Tax Returns; Tax Matters Partner ..........................................................40
9.4     Tax Elections ..........................................................................................41

ARTICLE 10 - TERMINATION ............................................................................41

10.1    Events of Dissolution .............................................................................41
10.2    Winding Up .............................................................................................41
10.3    Distribution on Dissolution and Termination ........................................42

ARTICLE 11 - MISCELLANEOUS ......................................................................42

11.1    Governing Law; Venue; Expenses .........................................................42
11.2    Successors and Assigns ..........................................................................43
11.3    Grammatical Changes .............................................................................44
11.4    Captions and References .........................................................................44
11.5    Severability .............................................................................................44
11.6    Counterparts; Facsimile or Electronic Transmission .............................44
11.7    Waiver of Right to Partition ....................................................................44
11.8    Personal Property ....................................................................................44
11.9    No Third Party Rights .............................................................................44
11.10   Amendments ...........................................................................................44
11.11   Waiver of Statutory Rights .....................................................................45
11.12   Certain Acknowledgments ......................................................................45
11.13   Confidentiality ........................................................................................46
11.14   Power of Attorney ..................................................................................46
11.15   Descriptive Headings; Interpretation .....................................................46
11.16   Offset Against Amounts Payable ............................................................47
11.17   Further Action .........................................................................................47
11.18   WAIVER OF JURY TRIAL ...................................................................47
11.19   Entire Agreement ....................................................................................47
11.20   Confirmation of Ownership ....................................................................47
11.21   Spousal Consent ......................................................................................47
11.22   Tax Consequences ...................................................................................48
11.23   Withholding ............................................................................................48
11.24   Construction and Interpretation ..............................................................48
11.25   Arbitration ..............................................................................................48

E-FILED 03/02/2018 04:17 PM   /   CONFIRMATION 708492   /   A 1801222   /   COMMON PLEAS DIVISION   /   IFO

## SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT
## OF
## WINONA PVD COATINGS, LLC

This SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of WINONA PVD COATINGS, LLC, a Delaware limited liability company (the "Company"), is effective as of August 5, 2015 (the "Effective Date"), by and among the Company and the Members.

### BACKGROUND

The Company was formed as a limited liability company on December 1, 2006, under the Delaware Law. Pursuant to a Unit and Warrant Purchase Agreement effective as of the Effective Date (the "Series B Purchase Agreement"), among the Company and certain of the Existing Members, the Company will issue Series B Preferred Units to its Existing Members for a purchase price of $1.00 per Series B Preferred Unit. The purchasers of Series B Preferred Units will also acquire Warrants to purchase Common Units in the Company under the Series B Purchase Agreement. The Company and Existing Members are parties to an Amended and Restated Limited Liability Company Agreement effective April 23, 2013 (the "Prior LLC Agreement").

The Company and the Existing Members, in accordance with the Prior LLC Agreement, desire to amend and restate the Prior LLC Agreement to, among other things, (i) reflect the Existing Members' acquisition of Series B Preferred Units, (ii) create preferential distribution rights in favor of the holders of Series B Preferred Units, and (iii) further amend and restate the organization, management and operation of the Company, and the Members' respective rights and obligations with respect thereto.

### OPERATIVE TERMS

The parties agree as follows:

### ARTICLE 1
### DEFINITIONS

Unless the context otherwise requires, capitalized terms used in this Agreement shall have the meanings specified in Appendix A.

### ARTICLE 2
### FORMATION; PURPOSE

2.1    LLC Agreement. The Prior LLC Agreement is hereby amended in its entirety and restated herein. This Agreement shall constitute the "limited liability company agreement" of the Company as such term is used in the Delaware Law. The parties hereby agree that from the Effective Date and continuing during the term of the Company the rights, powers and obligations of the Members with respect to the Company will be determined in accordance with the terms

1

and conditions of this Agreement and the Delaware Law, except where the Delaware Law provides that such rights, powers and obligations specified in the Delaware Law apply "unless otherwise provided in the limited liability company agreement" or words of similar effect and, in such event, such rights, powers and obligations are set forth in this Agreement.

2.2     Continuation; Name.  The parties to this Agreement hereby agree to continue the Company as a limited liability company pursuant to and in accordance with the Delaware Law and all other pertinent laws of the State of Delaware for the purposes and upon the terms and conditions set forth in this Agreement.  The name of the Company is "Winona PVD Coatings, LLC" or such other name as the Board of Managers may from time to time determine. At the Company's request, the Members agree to execute such certificates or documents and perform such filings and recordings and all other acts, including the filing of the Certificate, in appropriate governmental offices as may be required in order to comply with all Applicable Laws.

2.3     Place of Business and Principal Office; Registered Agent and Registered Office.

(a)     The mailing address of the Company's principal place of business is 1180 Polk Drive, Warsaw, Indiana 46582, or such other address as the Board of Managers may from time to time designate.

(b)     The Board of Managers may designate any Person as the registered agent and any location as the registered office, as the Board of Managers deems appropriate subject to all Applicable Laws.

(c)     The Company will comply with all requirements necessary to qualify the Company as a foreign limited liability company in each jurisdiction in which the Company's business and operations require such qualification.

2.4     Purpose and Powers.  The Company was formed to engage in any and all lawful activities.  As of the date of this Agreement, the purpose and business of the Company is to: (a) manage and direct the business operations and affairs of the Company and any Subsidiaries (including the development, adoption and implementation of strategies, business plans, and policies concerning the conduct of the Company's and Subsidiaries' business), (b) engage in, conduct, carry on and direct all business affairs related to the Business, (c) acquire or purchase and hold the equity securities of one or more Subsidiaries and to exercise all rights and powers granted to the Company (whether as a holder of equity securities of the Subsidiaries or otherwise) under the Subsidiaries' constituent documents, as the same may be amended from time to time, and (d) engage in any and all lawful activities that are necessary, advisable or incidental to the purposes set forth in this Section 2.4 or which the Board of Managers determines to be in the best interests of the Company or any Subsidiary.

2.5     Legal Title. The legal title to all real or personal property or interests therein now or later acquired by the Company shall be owned, held or operated in the name of the Company, and no Member, individually, shall have any ownership of such property.

2

2.6    Term.   The existence of the Company commenced on filing the Certificate with the office of the Secretary of State of Delaware, and shall continue in full force and effect until dissolution pursuant to the provisions of this Agreement or by operation of Delaware Law.

2.7    No State-Law Partnership.   The Members intend that the Company not be a partnership (including a limited partnership) or joint venture, and that no Member be a partner or joint venturer of any other Member by virtue of this Agreement, for any purposes other than as set forth in the last sentence of this Section 2.7, and neither this Agreement nor any other document entered into by the Company or any Member relating to the subject matter hereof shall be construed to suggest otherwise.   Subject to Section 7.13, the Members intend that the Company be treated as a partnership for federal and, if applicable, state and local income tax purposes, and that each Member and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment.

## ARTICLE 3
## UNITS; ADDITIONAL CAPITAL CONTRIBUTIONS; MEMBER LOANS

3.1    Authorized Units.   Subject to increase pursuant to Section 3.3, the authorized Units that the Company has authority to issue consist of the number of Common Units and Series A Preferred Units reflected on the Schedule of Members, plus all Series B Preferred Units issued pursuant to the Series B Purchase Agreement.   The Units issued shall be recorded on the Company's books and records and reflected on the Schedule of Members.   The Company may (if elected by the Board of Managers) issue certificates representing the issued and outstanding Units (as applicable, the "Certificated Units").   The Company may issue fractional Units.   The ownership by a Member of Units shall entitle such Member to allocations of Net Income, Net Losses and other items and Distributions of cash and other property as set forth in this Agreement.   Any reference in this Agreement to the Schedule of Members shall be deemed a reference to the Schedule of Members, as amended and in effect from time to time.

3.2    Additional Capital Contributions by the Members.   No Member shall be required, at any time after the Effective Date, to make an additional capital contribution to the Company with respect to its Units.

3.3    Issuance of Additional Equity.   Subject to Section 3.4 and Section 3.8, the Board of Managers may, without the consent of the Members, cause the Company to create and/or issue additional Equity Securities (including in separate classes, groups or series of Units having such relative rights, powers and obligations as may from time to time be established by the Board of Managers, including rights, powers, and/or obligations different from, senior to or more favorable than existing classes, groups and series of Units).   The Board of Managers may cause the Company to issue additional Equity Securities to any Person (including a Person who is not then a current Member and Service Providers) on such terms and conditions (including the amount of consideration to be received by the Company in exchange for the Unit, which may be more than or less than the issue price of a Unit purchased before the date of such issuance) determined by the Board of Managers.   A Person who at the time it acquires a Unit is not a Member will be admitted as a Member if the conditions set forth in Section 7.8 are satisfied.   The Board of Managers (without the consent of any of the Members) shall have the power to amend the Schedule of Members to reflect the names of the Members, the number and class, group or

3

series of Units held by the Members and the Percentage Interests of the Members after the Company issues additional Units and to make such other amendments as it deems necessary or desirable to reflect such additional issuances (including, without limitation, amending this Agreement to increase the authorized number of Equity Securities of any class, group or series, to create and authorize a new class, group or series of Equity Securities and to add the terms of such new class, group or series of Equity Securities including economic and governance rights which may be different from, senior to or more favorable than the other existing Equity Securities), in each case without the approval or consent of any other Person. In connection with any issuance of Units (whether on or after the date hereof), the Person who acquires such Units shall execute a counterpart to this Agreement or an Adoption Agreement, accepting and agreeing to be bound by all terms and conditions hereof, and shall enter into such other documents, instruments and agreements to effect such purchase as are required by the Board of Managers (including such documents, instruments and agreements entered into on or prior to the date hereof by the Members, each, an "Equity Agreement"). Each Person who acquires Units may be required in exchange for such Units to make a Capital Contribution to the Company in an amount to be determined by the Board of Managers. Subject to a Member exercising its preemptive rights under Section 3.8, the Members' respective Percentage Interests will be diluted proportionately as a result of the Company's issuance of additional Equity Securities any issuance under this Section 3.3.

3.4    Management Incentive Units . From time to time from and after the date hereof, subject to Section 5.14, the Board of Managers may approve and issue up to that number of Common Units equal to five percent (5%) of the issued and outstanding Units, determined after taking into account all Units purchased by the Existing Members under the Series A Purchase Agreement and all Units issued pursuant to this Section 3.4. Management Incentive Units (or warrants, options, or other rights to purchase or otherwise acquire Management Incentive Units) to Service Providers (each such person, a "Management Member"). By executing this Agreement, each Member authorizes and directs the Company to elect to have the "Safe Harbor" described in the proposed Revenue Procedure set forth in Internal Revenue Service Notice 2005-43 (the "IRS Notice") apply to any Membership Interest in the Company transferred to a Service Provider by the Company on or after the effective date of such Revenue Procedure in connection with services provided to the Company or any of its Subsidiaries. For purposes of making such Safe Harbor election, the Company's tax matters partner is hereby designated as the "member who has responsibility for federal income tax reporting" by the Company and, accordingly, execution of such Safe Harbor election by the tax matters partner constitutes execution of a "Safe Harbor Election" in accordance with Section 3.03(1) of the IRS Notice. The Company and each Member hereby agree to comply with all requirements of the Safe Harbor described in the IRS Notice, including, without limitation, the requirement that each Member shall prepare and file all federal income tax returns reporting the income tax effects of each "Safe Harbor Partnership Interest" issued by the Company in a manner consistent with the requirements of the IRS Notice. A Member's obligations to comply with the requirements of this Section 3.4 shall survive such Member's ceasing to be a Member of the Company and/or the termination, dissolution, liquidation and winding up the Company, and, for purposes of this Section 3.4, the Company shall be treated as continuing in existence. The Members' respective Percentage Interests will be diluted proportionately as a result of the Company's issuance of additional Equity Securities any issuance under this Section 3.4.

4

3.5    No Withdrawal of Capital. No Member shall have any right to withdraw or make a demand for withdrawal of all or any portion of such Member's Capital Contributions (or the amount, if any, reflected in such Member's Capital Account). Except as otherwise provided in this Agreement, no interest or additional share of profits shall be paid or credited to the Members on their respective Capital Accounts, or on any undistributed profits or funds left on deposit with the Company; provided, however, that nothing in this Section 3.5 shall be construed to prevent or prohibit the payment of interest on account of any loan made by any Person to the Company.

3.6    Negative Capital Accounts. No Member shall be required to pay to any other Member or the Company any deficit or negative balance which may exist from time to time in the Member's Capital Account (including upon and after dissolution of the Company).

3.7    Loans From Members. The Company may borrow money from any Member in such amounts as determined by the all members of the Board of Managers and the lending Member. Each borrowing from any Member must be unanimously approved in advance by the Board of Managers. Loans by Members will not be considered Capital Contributions, and shall not result in an increase in the amount of the Capital Account of such Member. The amount of any such loans shall be a debt of the Company to such Member and shall be payable or collectible in accordance with the terms and conditions upon which such loans are made. For purposes of this Section 3.7 only, reference to Member includes any company, partnership or other entity in which a Member has an ownership interest.

3.8    Preemptive Rights.

(a)    If the Company authorizes the issuance or sale of any New Securities (other than Exempted Securities) for cash, the Company shall first offer to sell to each Member, a portion of such New Securities equal to the product of (i) the number of New Securities to be issued and (ii) such Member's Percentage Interest; provided, however, that for purposes of this Section 3.8 the Members' Percentage Interests will be determined as if all of the outstanding Warrants had been exercised for cash and the Common Units issuable as a result of such exercise had been delivered to the holders of the Warrants immediately prior to the Company's offer to sell to each Member New Securities under this Section 3.8. Each such Member shall be entitled to purchase such New Securities at the most favorable price as such New Securities are to be offered to any other Persons; provided that if a Person purchasing New Securities is required to also purchase other securities of the Company, the Members exercising their rights pursuant to this Section 3.8(a) shall also be required to purchase the same strip of securities (on the same terms and conditions) that such other Person is required to purchase. If a Member does not elect to purchase all of the New Securities that such Member is entitled to purchase under this Section 3.8, the Company shall promptly notify the other Members that have elected to purchase their entire allotment of New Securities that they are entitled to purchase under this Section 3.8 of their right to purchase such additional New Securities, on a proportional basis based on the number of New Securities each such participating Member elected to purchase pursuant to this Section 3.8 (or in such other proportion as to which they agree). The purchase price for all New Securities offered to the Members under this Section 3.8(a) shall be payable in cash.

(b)    In order to exercise its purchase rights hereunder, a Member must deliver a written notice to the Company describing its election hereunder within twenty (20) days after

5

receipt of written notice from the Company describing in reasonable detail the New Securities being offered, the purchase price thereof, the payment terms and such Member's Percentage Interest (determined in accordance with Section 3.8(a)). Any elections made by Members shall be deemed rescinded if the Company elects not to proceed with the issuance or sale.

(c) Upon expiration of the 20-day period described in Section 3.8(b), the Company shall be entitled to sell such New Securities that the Members have not elected to purchase during the one hundred eighty (180) days following such expiration on terms and conditions not materially more favorable to the purchasers thereof than those offered to such Members. Any New Securities offered or sold by the Company after such 180-day period or offered by the Company on terms or conditions materially more favorable than those offered to the Members must be reoffered to the Members pursuant to the terms of this Section 3.8 prior to any issuance or sale thereof. For this purpose, any reduction to the purchase price of the New Securities shall be considered a change to the terms and conditions of the offering that is materially more favorable to the purchasers than those offered to the Members.

(d) The Company shall notify each Member electing to purchase New Securities within twenty (20) days after the election notice received under Section 3.8(b) of (to the extent known) (i) the aggregate consideration to be paid by the Member for the additional securities; (ii) the proposal date of such issuance or sale of such securities; and (iii) wire instructions for the account to which the Company wishes Members electing to participate in the sale transfer funds pursuant to Section 3.8(e).

(e) Each Member electing to participate in an issuance or sale pursuant to this Section 3.8 shall deliver to the Company by wire transfer in immediately available funds on the date of issuance of the securities the aggregate consideration to be paid by that Member for the securities. The Company shall deliver to each Member electing to participate in a sale pursuant to this Section 3.8, against such wire transfer, a certificate or certificates (if the Company's other Units are represented by Certificates) representing the New Securities purchased by such Member.

(f) Notwithstanding the foregoing, in lieu of offering any securities to the Members at the time such securities are offered to any Person, the Company may comply with the provisions of this Section 3.8 by making an offer to sell to the Members their Percentage Interest of such securities promptly after a sale to any Person is affected. In such event, for all purposes of this Section 3.8, each Member's Percentage Interest shall be determined without taking into consideration the actual number of securities sold to the Person in the issuance to which this Section 3.8(f) applies so as to achieve the same economic effect as if such offer would have been made prior to such sale.

(g) Additionally, notwithstanding the foregoing, the Board of Managers shall have the authority to grant additional preemptive rights to Persons who hold Equity Securities of the Company but are not Members of the Company as a result of such Equity Securities constituting securities convertible or exchangeable for Units (rather than outstanding Units). In such event, (i) such Persons will be deemed Eligible Members for purposes of this Section 3.8, and (ii) the preemptive rights of the Eligible Members (including, without limitation, the Eligible Members' respective Percentage Interests and resulting number of New Securities they are

6

entitled to purchase) shall be determined on a fully-diluted basis, as if such other Persons had exercised or converted all such Equity Securities into Units. The Members acknowledge that holders of the Warrants have been granted preemptive rights under this Section 3.8.

(h)     The rights of the Members and holders of Warrants under this Section 3.8 shall terminate upon the first to occur of a Public Offering or Sale of the Company. Notwithstanding anything to the contrary in this Section 3.8, the Board of Managers may exclude from this Section 3.8 Members and holders of Warrants who are not Accredited Investors. For greater certainty, the holders of Series B Preferred Units shall have no rights under this Section 3.8 with respect to their Series B Preferred Units and the rights of the other Members and holders of Warrants under this Section 3.8 will be determined as if the Series B Preferred Units were not outstanding.

3.9     Uniform Commercial Code. If Certificates representing the Units are issued, the Units shall be a "certificated security" governed by Article 8 of the Uniform Commercial Code as enacted in the State of Delaware, including for purposes of the definition of a "security" thereunder and for purposes of the definition of a "certificated security" thereunder.

3.10    Recapitalization. Prior to the Company's issuance of Series A Preferred Units to TFG on April 23, 2013 pursuant to the Securities Purchase Agreement, the Company's then outstanding Membership Interests were converted to Common Units.

## ARTICLE 4
## CAPITAL ACCOUNTS; ALLOCATIONS AND DISTRIBUTIONS

4.1     Capital Accounts.

(a)     Generally.  The Company shall establish and maintain, or cause the Company's Accountants to maintain, a separate capital account (a "Capital Account") for each Member.  Each Member's Capital Account will be established and maintained in a manner consistent with the rules set forth in Treasury Regulation Section 1.704-1.  For this purpose, the Board of Managers may, upon the occurrence of the events specified in Treasury Regulation Section 1.704-1(b)(2)(iv)(f), increase or decrease the Capital Accounts in accordance with the rules of such regulation and Treasury Regulation Section 1.704-1(b)(2)(iv)(g) to reflect a revaluation of the Company's property.

(b)     Transfer of Capital Accounts.  The original Capital Account established for each Substituted Member shall be in the same amount as the Capital Account of the Member (or portion thereof) to which such Substituted Member succeeds, at the time such Substituted Member is admitted as a Member of the Company.  The Capital Account of any Member whose interest in the Company shall be increased or decreased by means of the repurchase of Units as contemplated in any agreement to which the Company is a party shall be appropriately adjusted to reflect such transfer or repurchase.

(c)     Modification.  In the event the Board of Managers reasonably determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with Treasury Regulation Section 1.704-1(b)(2)(iv), the

7

Managers may make such modification, provided that it will not have a material effect on the amounts distributable to any Member or upon the dissolution of the Company. The Board of Managers will determine the initial Capital Account balance of any Person exercising a Warrant to acquire a Unit, as well as any corresponding revaluations or adjustments to the Capital Accounts of the other Members upon such exercise.

4.2    Allocations of Net Income and Net Loss.

(a)    Allocations of Net Income and Net Loss. Except as otherwise provided in this Agreement, Net Income or Net Losses for any Fiscal Year shall be allocated among the holders of Units in such a manner that, as of the end of such Fiscal Year, the sum of (a) the Capital Account of each holder of Units, (b) such holder's share of Minimum Gain (as determined according to Treasury Regulation Section 1.704-2(g)) and (c) such holder's partner nonrecourse debt minimum gain (as defined in Treasury Regulation Section 1.704-2(i)(3)) shall be equal to the respective net amounts, positive or negative, which would be distributed to them or for which they would be liable to the Company under this Agreement, determined as if the Company were to (i) liquidate the assets of the Company for an amount equal to their Gross Asset Value and (ii) distribute the proceeds of liquidation pursuant to Section 10.3.

(b)    Excess Loss. The Net Losses allocated under Section 4.2(a) to any Member shall not exceed the maximum amount of Net Loss that can be so allocated without causing or increasing an Adjusted Capital Account Deficit. If some but not all of the Members would have an Adjusted Capital Account Deficit as a consequence of an allocation of Net Loss pursuant to Section 4.2(a), then the limitation set forth in this Section 4.2(b) shall be applied so as to allocate the maximum permissible Net Losses to each Member under the preceding sentence and Treasury Regulation Section 1.704-1(b)(2)(ii)(d). In the event that the allocation of Net Losses to any Member is prohibited under the first sentence of this Section 4.2(b), such Net Losses shall be allocated to the remaining Members in proportion to their respective positive Capital Account balances. With respect to each Fiscal Year or other Fiscal Period thereafter, Net Income (or, to the extent necessary, gross income) shall be allocated to the Members up to the aggregate of, and in proportion to, any Net Losses previously allocated to each Member in accordance with this Section 4.2(b) in the reverse order in which such Net Losses were allocated.

4.3    Regulatory and Special Allocations.

(a)    Company Minimum Gain Chargeback. Notwithstanding any other provision of this Section 4.3, if there is a net decrease in Company Minimum Gain during any Fiscal Year or Fiscal Period, each Member shall be specially allocated items of Company income and gain (as specified in Treasury Regulation Section 1.704-2(f)(6)) for such Fiscal Year or Fiscal Period (and, if necessary, for subsequent periods, as provided in Treasury Regulation Section 1.704-2(j)(2)(iii)) in an amount equal to the portion of such Member's share of the net decrease in such Company Minimum Gain, determined in accordance with Treasury Regulation Section 1.704-2(g)(2). The items of income and gain to be specially allocated pursuant to this Section 4.3(a) shall be determined in accordance with Treasury Regulation Section 1.704-2(f). This Section 4.3(a) is intended to comply with the minimum gain chargeback requirement of Treasury Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

8

(b)     Member Minimum Gain Chargeback.  Notwithstanding any provision of this Section 4.3 to the contrary (except Section 4.3(a)), if there is a net decrease in Member Minimum Gain attributable to a "partner nonrecourse debt" (within the meaning of Treasury Regulation Section 1.704-2(b)(4)) during any Fiscal Year or Fiscal Period, each Member who has a share of the Member Minimum Gain attributable to such partner nonrecourse debt, determined in accordance with Treasury Regulation Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain (as specified in Treasury Regulation Section 1.704-2(j)(2)(ii)) for such Fiscal Year or Fiscal Period (and, if necessary, subsequent periods, as provided in Treasury Regulation Section 1.704-2(j)(2)(iii)) in an amount equal to the portion of such Member's share of the net decrease in Member Minimum Gain attributable to such partner nonrecourse debt, determined in accordance with Treasury Regulation Section 1.704-2(i)(4). The items of income and gain to be specially allocated pursuant to this Section 4.3(b) shall be determined in accordance with Treasury Regulation Section 1.704-2(i)(4).  This Section 4.3(b) is intended to comply with the partner minimum gain chargeback requirement of Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)     Qualified Income Offset.  If any Member that unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) has an Adjusted Capital Account Deficit, computed after the application of Sections 4.3(a) and 4.3(b) but before the application of any other provision of this ARTICLE 4, then items of income and gain for such Fiscal Year or Fiscal Period shall be allocated to such Member in proportion to, and to the extent of, such Adjusted Capital Account Deficit.  This Section 4.3(c) is intended to be a qualified income offset provision as described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted in a manner consistent therewith.

(d)     Nonrecourse Deductions.  Nonrecourse deductions (within the meaning of Treasury Regulation Sections 1.704-2(b)(1) and 1.704-2(c)) for any Fiscal Year or Fiscal Period shall be specially allocated to the Members in proportion to their respective Percentage Interests. "Partner nonrecourse deductions" (within the meaning of Treasury Regulation Section 1.704-2(i)) for any Fiscal Year or Fiscal Period shall be specially allocated to the Member who bears the economic risk of loss with respect to the partner nonrecourse debt (within the meaning of Treasury Regulation Section 1.704-2(b)(4)) to which such partner nonrecourse deductions are attributable in accordance with Treasury Regulation Section 1.704-2(i).

(e)     Regulatory Allocations.  The allocations set forth in Sections 4.3(a) through (d) (the "Regulatory Allocations") are intended to comply with certain requirements of Sections 1.704-1(b) and 1.704-2 of the Treasury Regulations.  The Regulatory Allocations may not be consistent with the manner in which the Members intend to allocate Net Income or Net Losses of the Company or make Company distributions.  Accordingly, notwithstanding the other provisions of this ARTICLE 4 (other than allocations required to be made as a result of an adjustment to the tax basis of the Company's assets pursuant to Section 743 of the Code or Section 734 of the Code) but subject to the Regulatory Allocations, income, gain, deduction, and loss shall be reallocated among the Members so as to eliminate the effect of the Regulatory Allocations and thereby cause the respective Capital Accounts of the Members to be in the amounts (or as close thereto as possible) they would have been if Net Income and Net Losses (and such other items of income, gain, deduction and loss) had been allocated without reference

9

to the Regulatory Allocations. In general, the Members anticipate that this will be accomplished by specially allocating other Net Income and Net Losses (and such other items of income, gain, deduction and loss) among the Members so that the net amount of the Regulatory Allocations and such special allocations to each such Member is zero.

(f) <u>Noncompensatory Options</u>. In accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(s)(2), any Member that exercises a noncompensatory option (as defined in Treasury Regulations Section 1.721-2(f)), which for the avoidance of doubt, includes any Warrants issued pursuant to the Series B Purchase Agreement, to acquire an interest in the Company shall be specially allocated unrealized income, gain, or loss in Company property (that has not been previously reflected in the Capital Accounts) resulting from the adjustment to the Gross Asset Values of the Company's assets set forth in clause (e) of the definition of Gross Asset Value to the extent necessary to reflect that Member's right to share in Company capital as set forth in <u>Section 10.3(a)</u> (assuming for this purpose that all Regulatory Allocations have been or shall be offset by other Regulatory Allocations). If after making the special allocations set forth in the preceding sentence, the exercising Member's Capital Account does not reflect that Member's right to share in Company capital under this Agreement (as described in the preceding sentence), the Company shall reallocate amounts between Capital Accounts as set forth in Treasury Regulations Section 1.704-1(b)(2)(iv)(s)(3).

(g) <u>Change in Percentage Interest</u>. If during any Fiscal Year or Fiscal Period there is a change in the Percentage Interests of the Members, then items of income, gain, loss and deduction for such Fiscal Year or Fiscal Period shall be allocated according to the varying interests of the Members pursuant to any reasonable method selected by the Board of Managers and determined by it to be permitted under Section 706 of the Code.

(h) <u>Recharacterization; Section 754 Election</u>.

(i) <u>Characterization of Payments</u>. If a Taxing Jurisdiction disagrees with the Company's characterization of any amounts paid to a Member (or an Affiliate thereof) as salaries, management fees, commissions or other compensation for services ("<u>Compensation</u>"), and refuses to treat such payments as either guaranteed payments within the meaning of Code Section 707(c) or payments made to such Member other than in such Member's capacity as a "partner" within the meaning of Code Section 707(a), and such Taxing Jurisdiction ultimately treats such amounts paid to a Member (or an Affiliate thereto) as a distribution to such Member for federal income tax purposes which reduces such Member's Capital Account, then the Compensation shall be treated as an allocation of an item of income or gain of the Company to the recipient Member so that, consistent with the intent of the Members, the Compensation shall not be treated as a distribution which reduces the recipient Member's Capital Account. Accordingly, such Member shall be allocated the first available items of Company income and gain (including in a succeeding year) in an amount equal to the Compensation.

(ii) <u>Section 754 Adjustments</u>.

(A) At the election of the Board of Managers, the Company will timely file an election pursuant to Section 754 of the Code in accordance with the

10

procedures set forth in the applicable Treasury Regulations. The Company shall pay all costs of preparing and filing all instruments or documents necessary to effectuate such election and shall prepare and file all tax returns consistently with this Section. Each Member agrees to furnish the Company with all information necessary to give effect to such election and otherwise comply with any reasonable request from the Company relating to the Company's Section 754 election.

(B) Any adjustment to the tax basis of any Company asset pursuant to Section 734(b) or 743(b) of the Code that is required to be taken into account in determining Capital Accounts pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m) shall be treated as an item of gain (if the adjustment is an increase) or loss (if the adjustment is a decrease) and such gain or loss shall be allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Treasury Regulation.

(i)     Members are Independent Contractors; Withholding. The Members hereby acknowledge and agree that for purposes of federal, state and local income taxes, excise taxes and employment taxes, and for purposes of any withholding obligations with respect to such taxes, no Member shall be treated as an employee of the Company and that any compensation received by a Member from or on behalf of the Company shall be treated as a guaranteed payment within the meaning of Section 707(c) of the Code. The Company shall have no obligation to withhold any amount from compensation paid to a Member. Each Member shall be solely responsible for payment of all federal, state and local taxes due on any compensation received from the Company. Each Member shall indemnify and hold the Company harmless from and against any costs, damages, liabilities, interest, fines or penalties relating to such taxes or withholdings, whether incurred with respect to any period before or after the Effective Date.

(j)     Intent of Allocations. The parties intend that the allocation provisions of this ARTICLE 4 shall produce final Capital Account balances of the Members to be equal to the amount each Member is entitled to receive pursuant to Section 10.3. To the extent that the foregoing allocation provisions of this ARTICLE 4 would fail to produce such final Capital Account balances, (1) such provisions may be amended by the Board of Managers, if and to the extent necessary to produce such result and (2) taxable income and tax loss of the Company for prior open years (or items of gross income and deduction of the Company for such years) may be reallocated by the Company (subject to the approval described in subpart (1)) among the Members to the extent it is not possible to achieve such result with allocations of items of income (including gross income) and deduction for the year in which the Company is liquidated.

4.4     Tax Allocations

(a)     Allocations Generally. Except as provided in Section 4.4(b), the income, gains, losses, deductions and credits of the Company with respect to a Fiscal Year or Fiscal Period will be allocated for federal, state and local income tax purposes among the Members in accordance with the allocation of such income, gains, losses, deductions and credits among the Members for computing their Capital Accounts; except that if any such allocation is not permitted by the Code or other applicable law, the Company's subsequent income, gains, losses,

11

deductions and credits will be allocated among the Members so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.

(b) Section 704(c) Allocations. Items of the Company's taxable income, gain, loss and deduction for federal income tax purposes with respect to any property contributed to the capital of the Company shall be allocated among the Members to the extent necessary to satisfy the requirements of Section 704(c) of the Code using the remedial method or any other permissible method selected by the Board of Managers. In addition, if the Gross Asset Value of any Company asset is adjusted pursuant to the requirements of Treasury Regulation Section 1.704-1(b)(2)(iv)(f), then subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) (using the remedial method or any other permissible method selected by the Board of Managers). For purposes of determining the reverse Section 704(c) "built-in-gain" attributable to each asset owned by the Company on the Effective Date, each asset's Gross Asset Value on the Effective Date shall be determined by TFG and the Company's Accountants.

(c) Allocation of Tax Credits, Tax Credit Recapture, Etc. Allocations of tax credits, tax credit recapture, and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Board of Managers taking into account the principles of Treasury Regulation Section 1.704-1(b)(4)(ii).

(d) Exercise of Noncompensatory Options. If Company capital is reallocated between existing Members and a Member exercising a noncompensatory option pursuant to the second sentence of Section 4.3(f), which for the avoidance of doubt, includes any Warrants issued pursuant to the Series B Purchase Agreement, then the Company shall, beginning with the taxable year of the exercise and in all succeeding taxable years until the required allocations are fully taken into account, make corrective allocations so as to take into account the capital account reallocation. For this purpose, a corrective allocation is an allocation (consisting of a pro rata portion of each item) for tax purposes of gross income and gain, or gross loss and deduction, that differs from the Company's allocation of the corresponding book item. Any such allocation shall be made pursuant to the rules set forth in Treasury Regulations Section 1.704-1(b)(4)(x).

(e) Effect of Allocations. Allocations pursuant to this Section 4.4 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Losses, or Distributions or other Company items pursuant to any provision of this Agreement.

4.5     Taxes of Taxing Jurisdictions. To the extent that the laws of any Taxing Jurisdiction permits or requires, each Member requested to do so by the Board of Managers will submit an agreement in writing indicating that the Member will make timely income tax payments to the Taxing Jurisdiction and that the Member accepts personal jurisdiction of the Taxing Jurisdiction with regard to the collection of income taxes attributable to the Member's income, interest and penalties assessed on such income. The Company may withhold and pay over to any Taxing Jurisdiction the amount of tax, penalties and interest with respect to such

12

income determined under the laws of the Taxing Jurisdiction. The Board of Managers may, where permitted by the rules of any Taxing Jurisdiction, file a composite, combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of some or all of the Members on such income to the Taxing Jurisdiction, in which case the Company shall inform the Members of the amount of such tax, interest and penalties so paid. Any payments made on behalf of the Member(s) pursuant to this Section 4.5 shall be treated as a distribution to such Member(s) for purposes of this Agreement.

4.6     Distributions. Subject to Section 4.7 and Section 10.3(a), Distributions may be made to the Members at such times and in such amounts as the Board of Managers may determine in the following order and priority (determined at the time of each Distribution):

(a)     First, to the holders of Series B Preferred Units (pro rata based on their respective ownership of Series B Preferred Units) in an amount equal to the aggregate Unpaid Series B Yield;

(b)     Second, to the holders of Series B Preferred Units (pro rata based on their respective ownership of Series B Preferred Units), until such time as the Series B Preferred Units Unreturned Capital Amount has been reduced to zero dollars ($0); and

(c)     Third, to the holders of Series A Preferred Units (pro rata based on their respective ownership of Series A Preferred Units) in an amount equal to the aggregate Unpaid Series A Yield;

(d)     Fourth, seventy-five percent (75%) to the holders of Series A Preferred Units (pro rata based on their respective ownership of Series A Preferred Units) and twenty-five percent (25%) to the holders of Common Units (pro rata based on their respective ownership of Common Units), until such time as the Series A Preferred Units Unreturned Capital Amount has been reduced to zero dollars ($0); and

(e)     Then, to the holders of Series A Preferred Units and to the holders of Common Units in accordance with their respective Percentage Interests as of the time of such Distribution.

4.7     Tax Distributions. Each Fiscal Year (or at the election of the Board of Managers, any Fiscal Quarter), unless prohibited by Section 18-607 of the Delaware Act or other applicable law or pursuant to any loan or other agreement to which the Company is a party, the Board of Managers shall cause the Company to distribute from its available cash to each Member an amount of cash (a "Tax Distribution") which equals the following: (a) (i) the Assumed Tax Rate, multiplied by (ii) the cumulative taxable income of the Company allocated and estimated to be allocated to such Member in its capacity as a holder of a Unit for tax purposes (net of any tax losses allocated to such Member and not previously taken into account under this clause) through the end of such Fiscal Year (or Fiscal Quarter, as applicable), as determined by the Board of Managers, less (b) the aggregate amount of prior Tax Distributions made to the Member for prior periods. A Tax Distribution for a Fiscal Year (or Fiscal Quarter, as applicable) shall be made not later than the fifth (5th) day prior to the date on which any Member's estimated federal income tax payments are due. For purposes of calculating the amounts payable under Section 4.6 (other

13

than the Excess Distribution Amount), Tax Distributions shall be treated (without duplication) as advances of any amounts Members are entitled to receive pursuant to Section 4.6 (other than the Excess Distribution Amount) in accordance with the allocation of taxable income giving rise to such Tax Distributions; provided that no Member shall be required to repay all or any portion of a Tax Distribution in excess of the amount it otherwise would have been entitled to receive pursuant to Section 4.6 (other than the Excess Distribution Amount). If legally available funds are insufficient to make all Tax Distributions approved by the Board of Managers with respect to a Fiscal Year or Fiscal Quarter, as applicable, in full, Tax Distributions with respect to such Fiscal Year or Fiscal Quarter, as applicable shall be made under this Section 4.7 in proportion to the amounts that would otherwise be distributable to each Member pursuant to this Section 4.7. No Tax Distributions will be paid during the dissolution and liquidation of the Company. Notwithstanding anything to the contrary, in determining the amount of Tax Distributions, items of depreciation or amortization and items of income or gain resulting from any allocations required by Sections 704(c) and 737 of the Code shall not be taken into account. Notwithstanding anything to the contrary in this Section 4.7, the Board of Directors by unanimous consent of all Managers may elect at any time for the Company not to make a Tax Distribution.

4.8     Priority and Distribution of Property.   Except as expressly provided in this Agreement, (a) no Member shall have priority over any other Member as to the return of capital, income or losses, or Distributions and (b) no Member shall have the right to demand or receive property other than cash for its Capital Contributions to the Company or in payment of its share of Distributions (as determined in accordance with this Agreement).

4.9     No Creditor Status.  A Member shall not have the status of, and is not entitled to the remedies available to, a creditor of the Company with regard to distributions that such Member, in its capacity as such, becomes entitled to receive pursuant to this Agreement and the Delaware Law.

## ARTICLE 5
## MANAGEMENT OF THE COMPANY

5.1     Board of Managers.   There is hereby established a committee (the "Board of Managers") comprised of natural persons (each a "Manager" and collectively, the "Managers") having the authority and duties set forth in this Agreement and the Delaware Law.   Each Manager will be entitled to one vote. Each Manager will be a "manager" (as that term is defined in the Delaware Law) of the Company, but, notwithstanding such designation, no Manager will have any rights or powers beyond the rights and powers granted to such Manager in this Agreement. Any decisions to be made by the Board of Managers will require the approval of the Managers holding at least a majority of the votes of all Managers then serving on the Board of Managers (i.e., excluding any vacancies on the Board of Managers). Except as provided in the immediately preceding sentence, no Manager acting alone, or with any other Manager or Managers, will have the power to act for or on behalf of, or to bind the Company in his or her capacity as a Manager.  Managers need not be residents of the State of Delaware or a Member.

5.2     Powers.  Except as otherwise required by non-waivable provisions of Applicable Law or expressly provided in this Agreement, (a) all of the Company's powers shall be exercised

14

by or under the authority of the Board of Managers, (b) the business and affairs of the Company will be managed by or under the direction of the Board of Managers, and (c) the Board of Managers shall have the sole power (including the rights and powers to take certain actions, give or withhold certain consents or approvals, or make certain determinations, opinions, judgments, or other decisions) granted to the Company under this Agreement or any other agreement, instrument, or other document to which the Company is a party.

5.3    Composition of the Board of Managers.

(a)    Number; Initial Managers; Term. The Board of Managers shall consist of three (3) natural persons. Subject to Section 5.3(e), the Board of Managers must include the following persons:

(i)    one (1) person designated by a Majority in Interest (calculated without regard to the Units owned by TFG), who shall initially be Visker (the "Common Manager");

(ii)    two (2) persons designated by TFG (each, a "Series A Manager", and collectively, the "Series A Managers"), who shall initially be Domenic Ferrante and Todd Binkowski.

Each Manager shall serve until a successor is appointed in accordance with the terms of this Agreement or his or her earlier resignation, death, or removal. A person shall become a Manager effective upon receipt by the Company of a written notice (or at such later time or upon the happening of some other event specified in such notice) of such person's designation from a Majority in Interest; provided, however, that the persons identified above by name are Managers effective upon the Effective Date.

(b)    Resignation. A Manager may resign at any time by delivering written notice to the Company. Such resignation shall be effective upon receipt unless it is specified to be effective at some other time or upon the happening of some other event.

(c)    Removal. The removal from the Board of Managers or any of its committees (with or without Cause) of any Series A Manager shall be upon (and only upon) the written request of TFG. The removal from the Board of Managers or any of its committees (with or without Cause) of the Common Manager shall be upon (and only upon) the written request of a Majority in Interest of the Members (calculated without regard to the Units owned by TFG).

(d)    Vacancies. A vacancy on the Board of Managers because of resignation, death or removal of a Manager will be filled by the Person or Persons entitled to appoint such Manager pursuant to the terms of Section 5.3(a). If any Person or Persons fail to appoint a Manager pursuant to the terms of Section 5.3(a), such position on the Board of Managers shall remain vacant until such Person or Persons exercise their right to appoint a Manager as provided hereunder.

(e)    Duties of Managers. The Managers, in the performance of their duties as such, shall owe to the Company and the Members the same fiduciary duties owed by the

15

directors of a corporation to such corporation and its shareholders under the laws of the State of Delaware.

5.4     Meetings of the Board of Managers.

(a)     Generally. The Board of Managers will meet at such time and at such place as the Board of Managers may designate. Additionally, meetings of the Board of Managers may be called by or at the discretion of any two or more Managers. Meetings of the Board of Managers will be called on at least three (3) days' (if the meeting is to be held in person) or two (2) days' (if the meeting is to be held by telephone communications) prior oral, written or electronic notice to the Managers, if any, or upon such shorter notice as all of the Managers may approve. Any Manager may waive such notice as to such Manager.

(b)     Presence; Quorum. Any meeting of the Board of Managers may be held, and any Manager may attend and vote and be present at a meeting, in person or telephonically. The presence (in person or telephonically) of a majority of the Managers then serving on the Board of Managers (i.e., excluding any vacancies on the Board of Managers) will constitute a quorum of the Board of Managers for purposes of conducting business. At all times when the Board of Managers is conducting business at a meeting, a quorum of the Board of Managers must be present. If a quorum is not present, any act taken at the meeting is not a valid act of the Board of Managers. Any decisions to be made by the Board of Managers will require the approval of the Managers holding at least a majority of the votes of all Managers then serving on the Board of Managers (i.e., excluding any vacancies on the Board of Managers). If a quorum is not present at any meeting of the Board of Managers, then Managers having a majority of the votes of the Managers present at the meeting may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present. The actions taken by the Board of Managers at any meeting (as opposed to by written consent), however called and noticed, shall be as valid as though taken at a meeting duly held after proper notice if (but not until), either before, at or after the meeting, the Managers as to whom it was improperly held submit a waiver to the Company (either in writing or electronically) of notice or a consent to the holding of such meeting or an approval of the minutes thereof.

(c)     Attendance and Waiver of Notice. Attendance of a Manager at any meeting (in person or telephonically) will constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not properly called or convened. Neither the business to be transacted at, nor the purpose of, any meeting of the Board of Managers need be specified in the notice or waiver of notice of such meeting.

5.5     Actions without a Meeting. Notwithstanding any other provision of this Agreement, any action of the Board of Managers may be taken without a meeting, without advance notice and without a vote, if a written consent to the action is delivered (either in writing or electronically) by all Managers then serving on the Board of Managers. If a consent is in writing, all the Managers need not sign the same written consent, but may execute a written consent in any number of counterparts. A written consent of Managers will be effective as of the date stated in it or, if an effective date is not stated in the written consent, on the date when the last Manager delivers it. A Manager's delivery of a written consent is irrevocable after it has

16

been delivered to another Manager or the Company. Whenever the Board of Managers takes any action by written consent, the Board of Managers shall file the written consent with the minutes of the proceedings of the Board of Managers. A written consent of Managers has the effect of a vote at a meeting of the Board of Managers and can be described as a vote in any document.

5.6  Committees of the Board of Managers  The Board of Managers may, by resolution, designate from among the Managers one or more committees, each of which will be comprised of one or more Managers. In addition, the Board of Managers may designate one or more of the Managers as alternate committee members, who may, subject to any limitations imposed by the Board of Managers, replace absent or disqualified Managers at any meeting of that committee. Any such committee will have and may exercise all of the authority of the Board of Managers to the extent set forth in any resolution of the Board of Managers, subject to the limitations set forth in the Delaware Law or in the establishment of the committee. A majority of the Board of Managers may remove and/or replace any member or alternate member of any committee. The provisions of this ARTICLE 5 relating to the Board of Managers and the Managers will apply to each committee and its members, *mutatis mutandis*.

5.7  Compensation; Reimbursement. Except for reimbursement of reasonable out-of-pocket costs and expenses, the Managers shall not be compensated for their services as Managers. Each Manager shall be entitled to reimbursement by the Company of any reasonable out-of-pocket costs or expenses incurred by the Manager in the course of his or her service hereunder, including in connection with attending regular and special meetings of the Board of Managers, any board of managers or board of directors of each of the Company's Subsidiaries and/or any of their respective committees.

5.8  Delegation of Authority. The Board of Managers may, from time to time, delegate to one or more Persons (including any Member or Officer and including through the creation and establishment of one or more other committees) such authority and duties as the Board of Managers may deem advisable. Any delegation pursuant to this Section 5.8 may be revoked at any time by the Board of Managers.

5.9  Officers.

(a)  Generally. The Board of Managers may (but need not), from time to time, designate and appoint one or more natural persons as an Officer of the Company. No Officer need be a resident of the State of Delaware, a Member or a Manager. Any Officers so designated shall have such authority and perform such duties as the Board of Managers may, from time to time, delegate to them. The Board of Managers may assign titles to particular Officers (including Chief Executive Officer, President, or Chief Financial Officer), and, if the title is one commonly used for officers of a business corporation, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject in all events to the Board of Managers' right to limit, amend, modify or revoke the authority of the Officer. Each Officer shall hold office until the earlier of the Officer's death, resignation, or removal. Any number of offices may be held by the same individual.

(b)  Resignation; Removal; Vacancies. Any Officer (subject to any contract rights available to the Company, if any) may resign as such at any time. Such resignation shall

17

be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Board of Managers. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation. Any Officer may be removed as such, either with or without cause, by the Board of Managers at any time. Any vacancy occurring in any office of the Company may be filled by the Board of Managers and shall remain vacant until filled by the Board of Managers.

(c)     Duties of Officers.  The Officers, in the performance of their duties as such, shall owe to the Company and the Members the same fiduciary duties owed by the officers of a corporation to such corporation and its shareholders under the laws of the State of Delaware. The Officers are expected to consult with each other in the conduct of the affairs of the Company.

5.10     Purchase of Units.     Subject to the Company's compliance with the other applicable provisions of this Agreement, the Board of Managers may cause the Company to purchase or otherwise acquire Units; provided that this provision shall not in and of itself obligate any Member to sell any Units to the Company. So long as any such Units are owned by the Company such Units shall not be considered outstanding for any purpose.

5.11     Limitation of Liability.

(a)     Standards of Performance.  Except as otherwise provided herein or in any agreement entered into by such Person and the Company and to the maximum extent permitted by the Delaware Law, no Manager nor any such Manager's Affiliates, employees, agents or representatives shall be liable to the Company or to any Member for any act or omission performed or omitted by such Person in his capacity as Manager; provided that, except as otherwise provided herein, such limitation of liability shall not apply (i) with respect to any act or omission by such Person in its capacity as a Member or (ii) to the extent the act or omission was attributable to such Person's breach of fiduciary duty, gross negligence, fraud or material breach of this Agreement, in each case as determined by a final judgment, order or decree of an arbitrator or a court of competent jurisdiction (which is not appealable or with respect to which the time for appeal therefrom has expired and no appeal has been perfected). Each Manager shall be entitled to rely upon the provisions of this Agreement, the advice of legal counsel, independent public accountants and other experts, including financial advisors, and any act or omission by such Manager in good faith reliance on this Agreement or such advice shall in no event subject such Manager or any of such Manager's Affiliates, employees, agents or representatives to liability to the Company or to any Member or any other Person that is a party to or otherwise bound by this Agreement. No amendment, alteration or termination of this Agreement or of any provision of this Section 5.11(a) after the date of this Agreement shall expand the duties or liabilities of a present or former Manager of the Company with respect to acts or omissions prior to the date of such amendment, alteration or termination. Section 5.3(a), to the extent that it restricts or modifies the duties and liabilities of a Manager otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Manager. Subject to Section 5.3(e), each Member acknowledges that each Manager may consider its or its Affiliate's interest as a Member when exercising his or her duties as a Manager and each Member approves of the foregoing.

18

(b)     Effect on Employment Agreements.  Nothing in this Agreement shall in any way affect, limit or modify any Person's rights, powers, entitlements, liabilities, obligations, duties or responsibilities under any Employment Agreement and/or Equity Agreement or any other agreement with respect to the provision of services to the Company and/or any of its Subsidiaries.

5.12    Certain Manager Rights

(a)     Financial Statements and Other Information.  Each Manager shall have the right to receive all of the following information from the Company, and the Company shall, and shall cause each of its Subsidiaries to, provide to each Manager and, in the case of the information described in Section 5.12(a)(ii), to each Major Member:

(i)     as soon as available but in any event within fifteen (15) days after the end of each monthly accounting period in each Fiscal Year: (i) unaudited consolidating and consolidated statements of income and cash flows of the Company and its Subsidiaries for such monthly period and for the period from the beginning of the Fiscal Year to the end of such monthly period, and unaudited consolidating and consolidated balance sheets of the Company and its Subsidiaries as of the end of such monthly period, setting forth in each case comparisons to the annual budget and to the corresponding period in the preceding fiscal year, and all such statements shall be prepared in accordance with sound accounting principles (subject to the absence of footnote disclosures and to changes resulting from normal year-end adjustments for recurring accruals), and shall be certified as correct to the knowledge of the Company's chief financial officer, president, or chief executive officer and (ii) with each report delivered with respect to a month that is the last month of a calendar quarter, a status report prepared by the Company's chief financial officer or president, indicating whether the Company and its Subsidiaries have met their budgeted financial goals (including, without limitation, those delivered pursuant to Section 5.12(a)(v) below), discussing the reasons for any variation from such goals, including detailed accounting of revenues and expenses, and describing what actions the Company and its Subsidiaries have taken and propose to take in order to meet budgeted financial targets in the future;

(ii)     within one hundred and twenty (120) days after the end of each fiscal year, consolidating and consolidated statements of income and cash flows of the Company and its Subsidiaries for such fiscal year, and consolidating and consolidated balance sheets of the Company and its Subsidiaries as of the end of such fiscal year, setting forth in each case comparisons to the annual budget and to the preceding fiscal year, all prepared in accordance with sound accounting principles;

(iii)     promptly upon receipt thereof, any additional reports, management letters or other detailed information concerning significant aspects of Company's or any of its Subsidiaries' operations or financial affairs given to the Company or any of its Subsidiaries by their independent accountants (and not otherwise contained in other materials provided hereunder);

19

(iv)    at least fifteen (15) days prior to the beginning of each Fiscal Year, an annual budget prepared on a monthly or quarterly basis for the Company and its Subsidiaries for such Fiscal Year (displaying anticipated statements of income and cash flows and balance sheets and budgeted capital expenditures), which annual budget shall have been approved by the Board of Managers, and promptly upon preparation thereof any other significant budgets prepared by the Company or any of its Subsidiaries and any material revisions of such annual or other budgets (it being understood that any revisions of any approved budget must be approved by the Board of Managers);

(v)    promptly (but in any event within five (5) business days) after the discovery or receipt of notice of any material default under any agreement to which the Company or any of its Subsidiaries is a party, any condition or event which is reasonably likely to result in any material liability under any federal, state or local statute or regulation relating to the business of the Company or any of its Subsidiaries, public health and safety, worker health and safety or pollution or protection of the environment or other statute or regulation applicable to the Company or any of its Subsidiaries or the Business or any other material adverse change, event or circumstance affecting the Company or any of its Subsidiaries (including, without limitation, the filing of any material litigation, arbitration or other similar proceeding against the Company or any of its Subsidiaries or the existence of any dispute with any Person which involves a reasonable likelihood of such litigation, arbitration or other similar proceeding being commenced), an officer's certificate from the chief operating officer or chief financial officer thereof specifying the nature and period of existence thereof and what actions have been taken and are proposed to be taken with respect thereto; and

(vi)    with reasonable promptness, such other information and financial data concerning the Company or any of its Subsidiaries as any Manager may reasonably request.

The Company's obligation to provide financial information set forth in this Section 5.12(a) terminates upon the first to occur of (1) a Public Offering, (2) Sale of the Company or (3) the Company becoming subject to the reporting provisions of the Securities Exchange Act.

5.13    Professional Services Agreement. Pursuant to the Professional Services Agreement, the Company has engaged and will engage TFG to provide limited advisory and monitoring services to the Company, in exchange for the compensation specified in the Professional Services Agreement. The Company and the Members understand that Domenic Ferrante or his Affiliate is the majority owner of TFG. With full knowledge of the foregoing facts, and an understanding of the financial interest of TFG and Domenic Ferrante in the Professional Services Agreement, the Company and the Members hereby (a) acknowledge and agree that they have reviewed (or had the opportunity to review) the terms and conditions of such Professional Services Agreement, and (b) hereby authorize, ratify and approve of the Company entering into and performing under such Professional Services Agreement.

5.14    Approval For Major Decisions. Neither the Company nor any Subsidiary of the Company may take any of the following actions without the prior written consent of both (i) the

holders of at least a majority of the outstanding Series A Preferred Units and (ii) a Majority in Interest of Common:

        (a)    purchase or redeem or pay any dividend or distribution on any Unit, except as provided under this Agreement;

        (b)    increase or decrease the size of the Board of Managers, except as provided in this Agreement;

        (c)    convert into any other entity or merge with any other entity in a transaction that is not approved by the Board of Managers;

        (d)    enter into or amend any transaction or arrangement with any Company officer, Member, Manager, or family member of any of the foregoing or any entity owned or controlled by any of the foregoing (each an "Insider"), other than (i) compensation paid pursuant to the Professional Services Agreement, (ii) compensation paid to any Company officer that is consistent with past practices or that is unanimously approved by the Board of Managers or (iii) any transaction, arrangement or action that is expressly permitted by any other Section of this Agreement (including, without limitation, the Company's sale of Equity Securities to an Insider pursuant to Section 3.3 and/or Section 3.10 or issuance of Management Incentive Units to an Insider pursuant to Section 3.5, a loan from an Insider pursuant to Section 3.9, or rights of the Company under ARTICLE 7);

        (e)    make any loan or advance to any person, including, without limitation, to any Insider, except advances or similar expenditures in the ordinary course of business;

        (f)    enter into any transaction that will result in a Sale of the Company that is not approved by the Board of Managers; or

        (g)    exclusively license technology or intellectual property, other than licenses granted in the ordinary course of business.

## ARTICLE 6
## RIGHTS AND OBLIGATIONS OF MEMBERS

6.1    Limitation of Liability.  Except to the extent provided in the Delaware Law or in this Agreement, no Member shall be personally liable for the debts, liabilities, contracts or any other obligations of the Company. No Member shall be obligated personally for any such debt, liability, contract or other obligation of the Company solely by reason of being a Member or acting as a Member or Manager.

6.2    Management of the Company.  No Member in its capacity as such has the authority or power to act for or on behalf of the Company in any manner or way, to bind the Company, or do any act that would be (or could be construed as) binding the Company, in any manner or way, or to make any expenditures on behalf of the Company, unless such specific authority and power has been expressly granted to such Member (and not revoked) by the Board of Managers. The Members hereby consent to the exercise by the Board of Managers of the powers conferred on it by Applicable Law and this Agreement.

6.3     Effect of Bankruptcy, Death or Incompetency of Member.

(a)     Death.  The death of any Member shall not in and of itself cause the termination or dissolution of the Company, and the business of the Company shall continue. Upon any such occurrence the executor or administrator of the Member in question shall be entitled to receive, with respect to such Member's Units and on behalf of such Members or such Member's estate, the distributions and allocations of profits and losses to which such Member would be entitled as an assignee, and, subject to the requirements of Section 7.7(b), upon execution of the Adoption Agreement in the form of Appendix A hereto shall have the right to act as a Substituted Member.  The successor in ownership interest shall not have the right to demand valuation or payment for the deceased Member's Units.

(b)     Bankruptcy or Incompetency.  The bankruptcy, dissolution or adjudication of incompetency of any Member shall not in and of itself cause the termination or dissolution of the Company, and the business of the Company shall continue.  Upon any such occurrence, subject to the provisions of ARTICLE 7, the trustee, receiver, administrator, committee, guardian or conservator of the Member in question shall be deemed an assignee of such Member for the purpose of settling or managing the estate or property; provided, however, that any pledgee of such Member who acquires such Member's Membership Interest pursuant to a Permitted Pledge shall automatically be admitted as a Substituted Member after satisfying the requirements set forth in Section 7.7(b).  As an assignee, the successor to the ownership interest of such Member shall have only the rights of such Member in the Company's Net Income and Net Loss and Distributions.  The successor shall not be a Substituted Member except as provided in Section 7.7(b) and neither such Member nor the successor in ownership interest shall have the right to demand immediate valuation and payment for such Member's Units.

6.4     Meetings of and Voting by Members.  Every consent and approval of the Members that is required or permitted by Applicable Law, the Certificate, or this Agreement will be valid only if it is signified by a resolution adopted by either the affirmative vote of the requisite number of Members at a meeting of Members that was duly called and held in accordance with this Agreement, or a written consent that is executed by the requisite number of Members in accordance with Section 6.5.  Unless otherwise provided in the resolution or written consent, a valid consent or approval of the Members will be effective when the resolution is adopted by the Members, in the case of a vote, or signed by the last Member necessary to validate it, in the case of a written consent.

(a)     Member Meetings.  The Company will hold a meeting of Members for the purpose or purposes stated in the notice of the meeting.  The Board of Managers may call a meeting of the Members at any time for any purpose.  Every meeting of Members of the Company will be held at a time, date, and place as designated by the Board of Managers.  The Members may conduct at a meeting only business that is related to the purpose or purposes stated in the notice of the meeting unless the Board of Managers consents to the additional matters as considered.

(b)     Notice of Member Meetings.  The Board of Managers will give each Member not fewer than three (3) or more than sixty (60) days advance written notice of every meeting of Members.  Every written notice of a meeting of Members will state the date, time,

22

place, and each purpose of the meeting, and the action proposed for consideration at the meeting and must be delivered to each Member. A notice of a meeting of Members will be adequate for both the meeting of Members designated in the notice and any adjournment of that meeting, if the date, time, and place to which the meeting is adjourned are announced at the meeting before the adjournment is taken, and if the Board of Managers does not establish after the adjournment a new record date for the adjourned meeting of Members. If any Member transfers any Unit after the effective date of a notice of a meeting of Members, the Board of Managers need not notify the transferee of the meeting of Members.

(c)     Waiver of Notice and Presumption of Assent. A Member may waive notice of any meeting of Members or other action for which notice is required by Applicable Law, the Certificate, or this Agreement by signing and delivering to the Board of Managers a written waiver of the notice either at, before, or after the date and time of the meeting or other action for which notice is required. The Board of Managers will file a written waiver of a notice of a meeting of Members with the minutes of that meeting and will file in the Company's record book for proceedings of its Members a written waiver of any other requisite notice. A Member's attendance at a meeting of Members, in person or by proxy, constitutes a waiver by the Member of the notice of the meeting or any defect in the notice of the meeting, unless the Member (in person or by proxy) objects at the beginning of the meeting to the holding of the meeting or the conduct of business at the meeting.

(d)     Quorum for Member Meetings. Unless otherwise required by Applicable Law, the presence in person or by proxy of Members who own Units representing at least a Majority in Interest constitutes a quorum for the conduct of business at every meeting of Members. Once a quorum is established at a meeting of Members, a subsequent withdrawal of a Member or Members that reduces the Units entitled to vote and represented at the meeting (in person or by proxy) below the number required for a quorum will not affect the validity of any action taken at the meeting or any adjournment of that meeting, unless a new record date is or must be set for the adjourned meeting.

(e)     Member Voting. Except as otherwise provided in this Agreement, each Member shall have the right to one vote for each Common Unit and one vote for each Series A Preferred Unit held by such Member on each matter submitted to a vote or approval by the Members. The Series B Preferred Units are non-voting Units. Solely for purposes of voting (and for determining what constitutes a Majority in Interest or a Majority in Interest of Common for purposes of voting), the number of Common Units held by a Member shall also be deemed to include any Exercise Units that such Member would own assuming an exercise of the Warrants owned by such Member as of the time of determination. Only those Persons who are Members on the day of a meeting will be entitled to vote at a meeting of Members. The Exercise Units attributable to any Warrants held by any Person which is not a Member will be disregarded for purposes of all votes under this Agreement. A Member may vote in person or by proxy. The matter will be approved if a Majority in Interest vote in favor of the action either in person or by proxy, unless a greater number of affirmative votes is required under other provisions of this Agreement. Except as otherwise expressly provided in this Agreement, the Common Units and Series A Preferred Units will vote as a single class.

23

(f)     Proxies.  A Member entitled to vote at a meeting of Members or to express consent or dissent without a meeting, a Person entitled to vote on behalf of a Member which is a corporation, limited partnership, or limited liability company, or a duly authorized attorney-in-fact of a Member, may authorize one or more Persons to vote for such Member by proxy by signing a proxy appointment form.

6.5     Member Action Without a Meeting.

(a)     Any action required or permitted by Applicable Law, the Certificate, or this Agreement to be taken at a meeting of Members of the Company can be taken without a meeting, without advance notice, and without a vote, if a written consent to the action is signed and dated by Members holding at least the percentage of Units that would be required to approve such action if submitted to a vote at a meeting of Members entitled to vote at which all Members were in attendance.

(b)     For the Member action to be effective, written consents representing the requisite vote must be delivered to the Company within sixty (60) days after the earliest dated written consent.  The Members need not sign the same written consent, but may execute a written consent in any number of counterparts.  The delivery to the Company within the 60-day period of a facsimile, photostatic, photographic, or equivalent reproduction of a written consent that appears to have been signed, dated, and transmitted by a Member or the Member's duly appointed proxy or attorney-in-fact will be sufficient and effective so long as the manually signed copy of the written consent is delivered to the Company (as provided above) promptly thereafter.  A Member's execution of a written consent is irrevocable, and a Member cannot later reject or revoke a written consent that has been signed, dated, and delivered in the manner provided above.  Within ten (10) days after obtaining the authorization of its Members to undertake any Company action by written consent, the Company shall notify those Members who did not consent in writing to the action, or who were not entitled to vote on the action taken by written consent, of the action that was taken by written consent; provided that the Company's failure to timely provide notice will not affect the validity of the consent.  The notice must fairly summarize the material features of the authorized action.

6.6     Business Opportunities.  Unless the Board of Managers otherwise unanimously agrees in writing, each (a) of the Key Persons, (b) Member who is employed by the Company or any of its Subsidiaries, and (c) each Member that is controlled by an individual that is described in clauses (a) or (b) above or a Manager of the Company or manager or officer of any of its Subsidiaries, shall, and shall cause each of its Affiliates to, bring all business opportunities to the Company that it becomes aware that are within the scope of the Business of the Company or any of its Subsidiaries.  For purposes of this Section 6.6, a powder coating business that provides electrostatic powder coating for general industrial uses, including the automobile industry, the recreational vehicle industry and the agricultural implement industry (and does not include the PVD process) shall not be deemed to be within the scope of the Business of the Company or any of its Subsidiaries.  This Section 6.6 shall not in any way limit or modify any liabilities, obligations, duties or responsibilities of any Person under any Employment Agreement or Equity Agreement, such provisions shall apply in addition to this Section 6.6.

6.7    Action by Vote of the Members.  Unless prohibited by the Delaware Law or expressly otherwise provided in this Agreement, whenever the Members are required or permitted to vote or otherwise act, the affirmative vote of Members holding not less than a Majority in Interest shall be the act of the Members.

## ARTICLE 7
## TRANSFERS OF UNITS

7.1    Transfers in General.  The sale, transfer, assignment, pledge or other disposition of any interest in any Unit (whether with or without consideration and whether voluntarily or involuntarily or by operation of law), directly or indirectly, to another Person is referred to herein as a "Transfer" and to take such action is referred to herein as to "Transfer."  No Member shall Transfer any Units or Unit Equivalents (or any interest in any Units or Unit Equivalents), except (a) to the Company pursuant to a Transfer approved by the Board of Managers; (b) pursuant to Section 7.2 as a Transferring Holder; (c) to a Permitted Transferee pursuant to a Permitted Transfer, subject to the terms of this ARTICLE 7; (d) pursuant to Section 7.3 as an Electing Unitholder; (e) pursuant to Section 7.4 in an Approved Sale; or (f) a Transfer pursuant to Section 7.13 or Sections 7.17 and 7.18.  Any purported Transfer of a Units or Unit Equivalents not in accordance with this ARTICLE 7 shall be null and void *ab initio* and of no effect.  Each Member shall hold the Company and each other Member harmless from all costs, liabilities or damages, including the costs of enforcing this indemnity, incurred by the Company or any other Member as a result of the Member's purported Transfer of a Unit or Unit Equivalent other than in accordance with this Agreement.

7.2    Right of First Refusal.

(a)    Subject to the terms and conditions set forth in this ARTICLE 7, at least thirty (30) days prior to the Transfer of any Units held by any Member, the transferring Member (the "Transferring Holder") shall deliver a written notice (the "Offer Notice") to the Company and each Eligible Member (other than the Transferring Holder) (each a "ROFR Member").  The Offer Notice shall disclose in reasonable detail the identity of the prospective transferee(s), the number of Units to be transferred, the price and the other terms and conditions of the proposed Transfer together with a complete copy of the offer.  The Transferring Holder shall not consummate such proposed Transfer until at least thirty (30) days after the delivery of the Offer Notice, unless the parties to the Transfer have been finally determined pursuant to this Section 7.2 and Section 7.3 prior to the expiration of such 30-day period (the date of the first to occur of (x) the expiration of such 30-day period after delivery of the Offer Notice or (y) such final determination is referred to herein as the "Authorization Date").  Each Offer Notice shall constitute an irrevocable offer by the Transferring Holder to sell to the Company or the ROFR Member(s) the offered Units on the terms and conditions set forth in the Offer Notice and this Section 7.2.  Notwithstanding anything to the contrary contained in this Section 7.2, no offer in respect of Units may include any form of consideration other than cash (which may be paid at closing, in installments or after any period of time).

(b)    The Company may elect to purchase all or any portion of the Units to be transferred upon the same terms and conditions as those set forth in the Offer Notice by delivering a written notice (the "Company Purchase Notice") of such election to the Transferring

25

Holder within ten (10) days after the Offer Notice has been given to the Company. Within ten (10) days following delivery of the Offer Notice, the Company shall deliver written notice (the "Available Unit Notice") to the ROFR Member(s) setting forth the number and type of Units which it has elected to purchase and the number and type of Units which are available for purchase by the ROFR Member(s) ("Available Units").

(c)   Each ROFR Member shall then be entitled to purchase the number of Available Units equal to the product of (i) the number of Available Units and (ii) a fraction, the numerator of which is such ROFR Member's Percentage Interest, and the denominator of which is the aggregate Percentage Interests of all ROFR Members. To exercise this option, the ROFR Member must deliver written notice (the "Available Unit Purchase Notice") to the Company and the Transferring Holder within fifteen (15) days following delivery of the Offer Notice setting forth the maximum number of Units of each class which the ROFR Member desires to purchase. If a ROFR Member does not elect to purchase all of the Available Units that such ROFR Member is entitled to purchase under this Section 7.2(c), the Company shall promptly notify the other ROFR Members that have elected to purchase their entire allotment of Available Units that they are entitled to purchase under this Section 7.2(c) of their right to purchase such additional Available Units, on a proportional basis based on the number of Available Units each such participating ROFR Member elected to purchase pursuant to this Section 7.2(c) (or in such other proportion as to which they agree). To exercise its option to purchase such additional Available Units, the participating ROFR Member must deliver a written notice to the Company describing its election hereunder within three (3) days after receipt of the written notice from the Company described in the preceding sentence.

(d)   If the Company and/or the ROFR Members have elected to purchase all or any portion of the Units hereunder, the Transfer of such Units shall be consummated as soon as practical after the delivery of the election notice(s) to the Transferring Holder, but in any event within thirty (30) days after the Authorization Date and subject to compliance with Section 7.3 below at the principal office of the Company. The Company or the ROFR Member(s), as applicable, shall give at least ten (10) days prior notice of the date of the closing. At such closing, (i) the Transferring Holder shall deliver to the ROFR Member(s) or the Company, as applicable, the certificate or certificates (if any) representing the Units to be sold at the closing, free and clear of any lien (except to the extent arising under this Agreement) (and the Transferring Holder shall represent and warrant that such Units shall, immediately prior to such sale, be so free and clear and that it will have good and marketable title to such Units), (ii) the ROFR Member(s) or the Company, as applicable, shall deliver to the Transferring Holder the consideration to be paid for the purchased Units in accordance with the terms of the Offer Notice, (iii) the Company shall duly record the Transfer on its books and records, and (iv) the ROFR Member(s) or the Company, as applicable, and the Transferring Holder shall execute such other documents and take such other action as shall be necessary to consummate the purchase and sale of the applicable Units on the terms contemplated by the Offer Notice.

(e)   If the Company and the ROFR Member(s) do not elect, in the aggregate, to purchase all of the Units offered in the Offer Notice from the Transferring Holder, then, subject to compliance with Section 7.3 below, the Transferring Holder shall have the right, within the ninety (90) days following the Authorization Date, to Transfer the portion of such Units which the Company and TFG have not elected to purchase to the Transferee(s) specified in

26

the Offer Notice in the amounts specified in the Offer Notice at a price not less than the price per unit specified in the Offer Notice and on other terms no more favorable to the Transferee(s) thereof than specified in the Offer Notice. Any Units not so Transferred within such 90-day period shall be reoffered to the Company and the ROFR Member(s) pursuant to this Section 7.2 prior to any subsequent Transfer.

(f)     The rights of the ROFR Member(s) and the Company set forth in this Section 7.2 shall be superior to the tag-along rights provided for under Section 7.3 and the ROFR Member(s) and the Company shall be given the opportunity to exercise such rights prior to the tag-along rights in Section 7.3. The provisions of this Section 7.2 shall not apply to any proposed Transfer (i) pursuant to an Initial Public Offering, (ii) to the Company or any of its Subsidiaries, (iii) to a Permitted Transferee, (iv) to any Electing Unitholder's Transfer pursuant to Section 7.3; or (v) pursuant to Section 7.4, 7.13 or 7.19.

7.3     Participation Rights.

(a)     Participation Right. The Members shall be entitled to participate in each Member's Transfer of Units that was subject to Section 7.2 as provided in this Section 7.3, except as provided in Section 7.3(e); provided, however, that this Section 7.3 shall also apply to a sale by TFG for cash of any of its Units in a transaction that is not otherwise exempt from this Section 7.3 by Section 7.3(e)(i) or Section 7.3(e)(iv) (in which case TFG shall be treated as the Transferring Holder solely for purposes of this Section 7.3(a)). Upon determination of the number of Units offered in an Offer Notice that the Company and the ROFR Member(s) do not elect, in the aggregate, to purchase (but in any event within two (2) days after the offer period for the ROFR Member(s) described in Section 7.2 which follows delivery of the Available Unit Notice), the Company shall give written notice to each Member describing in reasonable detail the number of Units to be Transferred (the "Sale Units"), the price and other terms and conditions of such proposed Transfer, and the identity of the prospective transferee(s) (such notice, the "Sale Notice"). Each of the Members shall be entitled, within seven (7) days following delivery of the Sale Notice, to give written notice (a "Tag-Along Notice") to the Transferring Holder and the Company that such Member desires to participate in such proposed Transfer (such Members delivering such notice, collectively, the "Electing Unitholders"), which Tag-Along Notice shall specify the Units such Electing Unitholder desires to include in such proposed Transfer. The Transferring Holder shall attempt to obtain the inclusion in the proposed Transfer of the entire number of Units of the Transferring Holder and Electing Unitholders requested to have included in the Transfer (as evidenced in the case of the Transferring Holder by the Sale Notice and in the case of the Electing Unitholders by the Tag-Along Notice). In the event the Transferring Holder is unable to obtain the inclusion of the entire number of Units in the proposed Transfer, the number of Units to be Transferred pursuant to this Section 7.3 shall be allocated among the Transferring Holder and Electing Unitholders in proportion, as nearly as practicable, to the respect number of Units which each of the Transferring Holder and Electing Unitholders owns on the date of the Tag-Along Notice or in such other percentage as they may agree to.

(b)     Application of Proceeds. The proceeds of any "tag-along" Transfer pursuant to this Section 7.3 which are paid to the Electing Unitholders and Transferring Holder to which this Section 7.3 applies shall be allocated among the Transferring Holder and Electing

27

Unitholders based upon the Units included or deemed to be included in the tag-along Transfer by each of the Transferring Holder and Electing Unitholders as if the proceeds of the tag-along Transfer were paid to the Transferring Holder and Electing Unitholders pursuant to Section 4.6 in connection with a Distribution and the Units of the Transferring Holder and Electing Unitholders included or deemed to be included in the tag-along Transfer were the only outstanding Units of the Company at the time of the Distribution.

(c)  Participation Procedure; Conditions.  With respect to any Transfer subject to Section 7.3(a), each Transferring Holder shall use its best efforts to obtain the agreement of the Transferee to the participation of the Electing Unitholders in such contemplated Transfer, and no Transferring Holder shall Transfer any of its Units to any prospective Transferee pursuant to such Transfer if such prospective Transferee(s) declines to allow the participation of the Electing Unitholders, unless in connection with such "tag-along" Transfer, one or more of the Transferring Holders or their Affiliates purchase the number and class of Units from each Electing Unitholder which such Electing Unitholder would have been entitled to sell pursuant to Section 7.3(a) at the same price and on the same terms and conditions on which such Units were sold to the Transferee(s).  Each Electing Unitholder Transferring Units pursuant to this Section 7.3 shall pay its pro rata share (based on each such Electing Unitholder's share of the aggregate proceeds to paid with respect to such Electing Unitholder's Units) of the expenses incurred by the Transferring Holder in connection with such Transfer and each Electing Unitholder shall be severally obligated to join on a pro rata basis (based on each such holder's share of the aggregate proceeds paid with respect to its Units) in any indemnification or other obligation the Transferring Holder has agreed to in connection with such "tag along" Transfer (other than any such obligations that relate specifically to a particular Member, such as indemnification with respect to representations and warranties given by a Member regarding such Member's title to and ownership of Units); provided that, unless the prospective Transferees permit a Member to give a guarantee, letter of credit or other mechanism (which shall be dealt with on an individual basis), any escrow of proceeds of any such transaction shall be withheld on a pro rata basis among all participating Members (based on each such holder's share of the aggregate proceeds paid with respect to its Units).  For purposes of determining the price specified to be paid to the Transferring Holder for its Units, all consideration paid by the Transferee and its Affiliates with respect to the Units sold shall be considered as the price paid to the Transferring Holder for its Units.  Each participating Member shall enter into any indemnification or contribution agreement reasonably requested by TFG to ensure compliance with this Section 7.3(c).

(d)  Closing.  On the date of the closing of a Transfer under this Section 7.3, each Electing Unitholder shall deliver, subject to the terms and conditions of the Tag-Along Notice, the certificate or certificates (if any) representing the Units of such Electing Unitholder to be included in the tag-along sale at the time and location specified for the closing in the Sale Notice.  If, at the end of a ninety (90) day period after delivery of the Tag-Along Notice, such tag-along sale pursuant to this Section 7.3 has not been consummated on substantially the same terms and conditions as set forth in the Sale Notice, the Transferring Holder will return any certificate previously delivered by any Electing Unitholder and must again follow all of the procedures set forth in this Section 7.3.

(e)     The provisions of this Section 7.3 shall not apply to any proposed Transfer (i) pursuant to an Initial Public Offering, (ii) to the Company or any of its Subsidiaries, (iii) to a Permitted Transferee, or (iv) pursuant to Section 7.4, 7.13 or 7.19.

7.4     Drag-Along Rights.

(a)     Approved Sale.    If the Board of Managers approves a Sale of the Company and the consent of the holders of Series A Preferred Units required pursuant to Section 5.14 has been secured (an "Approved Sale"), each Member shall vote for, consent to and raise no objections against, and not otherwise impede or delay, such Approved Sale.  If applicable, each Member shall Transfer in such Approved Sale all of its Units in the manner and on the terms set forth in this Section 7.4. In furtherance of the foregoing, if the Approved Sale is structured as a (x) merger or consolidation, each Member shall waive any dissenters rights, appraisal rights or similar rights in connection with such merger or consolidation or (y) sale of Units, subject to Section 7.4(g), each Member shall agree to sell, and shall sell, all of its Units and rights to acquire Units on the terms and conditions approved by the Board of Managers.  Each Member shall take all reasonably necessary or desirable actions in connection with the consummation of the Approved Sale as requested by the Board of Managers.  Each Member shall be obligated to join in writing on a pro rata basis (based upon the consideration paid in respect of such Member's Units in such Approved Sale in relation to the aggregate consideration paid in respect of all Units in such Approved Sale and in a matter respecting the relative distribution preferences and priorities set forth in this Agreement) in any indemnification, escrow, holdback or other obligations that the Company or TFG acting alone agrees to provide in connection with the Approved Sale (other than any such non-escrow obligations that relate solely to a particular holder of Units, such as indemnification with respect to representations and warranties  given by a holder of Units regarding such holder's title to and ownership of Units, in respect of which only such holder shall be liable).

(b)     Conditions.  The obligations of the Members with respect to the Approved Sale are subject to the satisfaction of the following conditions: (i) the consideration payable upon consummation of such Approved Sale to all Members shall be allocated among the Members based upon the classes of Units included or deemed to be included in the Approved Sale by each of the Members as if the proceeds of such Approved Sale were paid to the Members by the Company in complete liquidation pursuant to the rights and preferences set forth in the Agreement as in effect immediately prior to the consummation of such Approved Sale (but without the Company paying any amounts in such liquidation with respect to any obligations that are being assumed in the Approved Sale); (ii) if any Member is given an option as to the form of consideration to be received, each Member shall be given the same option; provided that, in the event that any securities are part of the consideration payable to the Members, each Member that is not an "accredited investor" as such term is defined under the Securities Act may, in the discretion of the Board of Managers, receive, and hereby agrees to accept, in lieu of such securities, cash consideration with an equivalent value to such securities as determined by the Board of Managers; and (iii) none of TFG or its Affiliates (other than the Company or any Subsidiary of the Company) shall be required to enter into any non-competition covenant or agreement or any other similar covenant or agreement that could prohibit or restrict such Member (or its Affiliates, other than the Company or any Subsidiary of the Company) in any way, including from conducting any business or investing in any Person.  All consideration paid

29

by the Transferee with respect to the purchase of the Member's Units, including payments for non-competition restraints, consulting fees, management fees or other fees, or goodwill, in each case, to the extent they are not reasonable payments for actual services rendered or to be rendered, shall be considered as part of the price specified to be paid for all of the Units, and shall be accounted for accordingly in the calculation of the amount to which each Member is entitled to receive pursuant to this Section 7.4. Notwithstanding anything to the contrary in this Section 7.4, if any Member is given an option to "roll over" all or any portion of its Units into equity of the purchaser in an Approved Sale, a similar "roll over" option shall not be required to be given to any other Members.

(c)     Indemnification; Expenses.     Each Member shall enter into any indemnification or contribution agreement reasonably requested by the Board of Managers to ensure compliance with this Section 7.4. Each Member shall pay its pro rata share (as if such expenses reduced the aggregate proceeds available for distribution to the Members in such Approved Sale) of the expenses incurred by the Members pursuant to an Approved Sale to the extent such expenses are incurred for the benefit of all Members. Expenses incurred by any Member on its own behalf (including the fees and disbursements of counsel, advisors and other Persons retained by such holder in connection with the Approved Sale) will not be considered costs incurred for the benefit of all Members and, to the extent not paid by the Company, will be the responsibility of such Member. If a Member refuses to sign an indemnification or contribution agreement in accordance with this Section 7.4(c), the Board of Managers may cause all or any portion of the Member's proceeds from the Approved Sale to be deposited and held by an escrow agent selected by the Board of Managers, with such escrow proceeds to be used to satisfy such Member's indemnification obligations, as determined in accordance with this Section 7.4, with any proceeds remaining in the escrow account after lapse of the indemnification period to be released to such Member.

(d)     Purchaser Representative.     If the Company, TFG or the holders of the Company's Equity Securities enter into any negotiation or transaction for which Rule 506 (or any similar rule then in effect) promulgated by the Securities and Exchange Commission may be available with respect to such negotiation or transaction (including a merger, share exchange, consolidation or other reorganization), the Members that do not qualify at the time as "accredited investors" (as such term is defined in Rule 501 promulgated by the Securities and Exchange Commission) will, at the request of the Company or TFG, appoint a purchaser representative (as such term is defined in Rule 501 promulgated by the Securities and Exchange Commission) reasonably acceptable to TFG. If any Member appoints a purchaser representative designated by the Company or TFG, the Company will pay the fees of such purchaser representative, but if any holder Member declines to appoint the purchaser representative designated by the Company or TFG, such holder will appoint another purchaser representative, and such holder will be responsible for the fees of the purchaser representative so appointed.

(e)     Proxy.     Each Member hereby constitutes and appoints as the proxies of such party and hereby grants a power of attorney to the Board of Managers or a designee of the Board of Managers, with full power of substitution, with respect to any and all votes regarding any Approved Sale, and hereby authorizes each of them to represent and to vote, if and only if the party (a) fails to vote in a timely manner or (b) attempts to vote (whether by proxy, in person or by written consent), in a manner which is inconsistent with the terms of this Section 7.4, all of

30

such Member's Units in favor of an Approved Sale pursuant to and in accordance with the terms and provisions of this Section 7.4. Each of the proxy and power of attorney granted pursuant to the immediately preceding sentence is given in consideration of the agreements and covenants of the Members in connection with the transactions contemplated by this Agreement and, as such, each is coupled with an interest and shall be irrevocable unless and until this Section 7.4 terminates. Each Member hereto hereby revokes any and all previous proxies or powers of attorney with respect to such Member's Units and shall not hereafter, unless and until Section 7.4 terminates, purport to grant any other proxy or power of attorney with respect to any of such Member's Units, deposit any of such Member's Units into a voting trust or enter into any agreement (other than this Agreement), arrangement or understanding with any Person, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of such Member's Units, in each case, with respect to any of the matters set forth herein. References in this Section 7.4(e) to a Member's Units shall be deemed to include all Units over which such Member is the record or beneficial owner or which such Member otherwise has the right, power or authority, directly or indirectly, to vote or direct the voting of.

(f)      Approved Sale Details.  The Company or TFG, at least five (5) days before the proposed date of any Approved Sale, shall provide each holder of Units with written notice thereof. The notice shall (to the extent then known) set forth: (i) the name and addressed of the proposed parties in the Approved Sale, (ii) the proposed structure of the Approved Sale; (iii) the proposed amount and kind of consideration to be paid in connection with the Approved Sale and the terms and conditions of payment; and (iv) the number of outstanding Units at such time.

(g)      Sale of Less than All Units.  If the Approved Sale does not require the transfer of all of the outstanding Units, each Member shall transfer a number of the Units owned by such Member equal to the number of Units owned by such Member multiplied by a fraction, the numerator of which is the number of Units to be transferred in such Approved Sale by all of the Members and the denominator of which is the total number of Units held by all of the Members.

7.5    Effect of Assignment.

(a)      Termination of Rights.  Any Member who assigns any Units or other interest in the Company shall cease to be a Member with respect to such Units or other interest and shall no longer have any rights or privileges of a Member with respect to such Units or other interest. For greater certainty, a Member will not cease to be a Member merely as a result of pledging its Units pursuant to a Permitted Pledge. A Transfer shall not otherwise eliminate the Member's entitlement to any rights associated with the Member's remaining interest and shall not cause the Member to be released from any liability to the Company or any other Person solely as a result of the Transfer.

(b)      Deemed Agreement.  Any Person who acquires in any manner whatsoever any Units or other interest in the Company, irrespective of whether such Person has accepted and adopted in writing the terms and provisions of this Agreement, shall be deemed by the acceptance of the benefits of the acquisition thereof and to have agreed to be subject to and bound by all of the terms and conditions of this Agreement.

31

(c)     Assignee's Rights.  A Transfer of Units permitted hereunder shall be effective as of the date of assignment and compliance with the conditions to such Transfer and such Transfer shall be shown on the books and records of the Company.  Unless and until an Assignee becomes a Substituted Member pursuant to Section 7.7, the Assignee shall not be entitled to any of the rights or privileges granted to a Member hereunder or under Applicable Law, other than the rights and privileges specifically granted to Assignees pursuant to this Agreement.

7.6     Additional Restrictions on Transfer.

(a)     Restrictions.  Units are transferable only pursuant to (i) public offerings registered under the Securities Act or any transfer exempt from registration under the Securities Act, (ii) Rule 144 or Rule 144A of the U.S. Securities and Exchange Commission (or any similar rules then in force) if such rule is available and (iii) other legally available means of transfer permitted by this Agreement.

(b)     Execution of Counterpart.  Each Transferee of Units or other interests in the Company shall, as a condition prior to such Transfer, execute and deliver to the Company an Adoption Agreement pursuant to which such Transferee shall agree to be bound by the provisions of this Agreement.

(c)     Notice.  In connection with the Transfer of any Units, the holder of such Units will deliver written notice to the Company describing in reasonable detail the Transfer or proposed Transfer.

(d)     Legal Opinion.  No Transfer of Units or any other interest in the Company (other than Units owned by TFG) may be made unless in the opinion of counsel, satisfactory in form and substance to the Board of Managers (which opinion may be waived by the Board of Managers), such Transfer would not violate any federal securities laws or any state or provincial securities or "blue sky" laws (including any investor suitability standards) applicable to the Company or the interest to be Transferred, or cause the Company to be required to register as an "Investment Company" under the U.S. Investment Company Act of 1940, as amended.  Such opinion of counsel shall be delivered in writing to the Company prior to the date of the Transfer.

(e)     Regulatory.  No Transfer of Units or any other interest in the Company may be made if the Transfer will result in the Company violating or losing any license, right, permit or authorization required by law or any regulatory authority to operate the Company and its Subsidiaries respective businesses.

7.7     Assignees; Substituted Members.

(a)     Unless the assignee of any Unit is admitted as a Substituted Member as provided in Section 7.7(b) (or is the Company or another Member), (i) the assignee shall only have only the rights of the transferring Member in the Company income, gain, loss, deductions and distributions rights, (ii) the assignee shall have no right to vote on Company matters, inspect Company books and records or otherwise participate in Company affairs, and (iii) the interest of

the assignee shall be disregarded for purposes of determining whether Members owning the required Units have voted on any matter requiring a vote of the Members.

(b)     An assignee of the whole or any portion of the transferring Member's Units, validly assigned pursuant to this ARTICLE 7, may become a "Substituted Member" in the place of the transferring Member, to the extent of the Units validly transferred, if all of the following conditions are satisfied; provided, however, that any Person who acquires a Member's Units pursuant to a Permitted Pledge shall automatically be admitted as a Substituted Member after delivering a fully executed Adoption Agreement to the Board of Managers:

(i)     A fully executed and acknowledged written instrument of assignment has been filed with the Company which sets forth the intention of the transferring Member that the assignee become a Substituted Member in its place, to the extent of the Units assigned;

(ii)     The assignee executes and acknowledges an Adoption Agreement and such other instruments, in form and substance reasonably satisfactory to the Board of Managers, as are reasonably necessary or desirable to effectuate the admission and to confirm the agreement of the assignee to be bound by all the terms and provisions of this Agreement with respect to the Units acquired; and

(iii)     The Board of Managers approves the admission of the assignee as a Substituted Member, provided that no such approval shall be required to admit any assignee or transferee that acquired Units pursuant to a transfer permitted by ARTICLE 7.

(c)     Notwithstanding anything to the contrary in this Agreement, both the Company and the Board of Managers will be entitled to treat the transferring Member as its absolute owner in all respects, and will incur no liability for distributions made in good faith to that Member, until a written assignment that conforms to the requirements of this ARTICLE 7 has been received by the Company and accepted by the Board of Managers.

(d)     No party hereto shall avoid the provisions of this Agreement by making one or more Transfers to one or more Permitted Transferees and then disposing of all or any portion of such party's interest in any such Permitted Transferee.

7.8     Admission of New Members. A Person who acquires a Unit pursuant to an issuance of additional Units under Section 3.3 or Section 3.4 shall be admitted as a Member if all of the following conditions are satisfied:

(a)     In the case of a Person which is not a natural person, the Person provides evidence satisfactory to the Board of Managers of the Person's authority to become a Member of the Company;

(b)     The Company receives the consideration that the Board of Managers has set as the subscription price for the new Units being issued;

33

(c)     The Person executes and acknowledges an Adoption Agreement and such other instruments, in form and substance satisfactory to the Board of Managers, as the Board of Managers deems reasonably necessary or desirable to effectuate the admission and to confirm the agreement of the Person to be bound by all the terms and provisions of this Agreement with respect to the Units acquired;

(d)     The Board of Managers approves the admission of the Person as a Member; and

(e)     The Person satisfies all other terms and conditions for admission as a Member as set forth by the Board of Managers.

7.9     Amendment of Schedule. As soon as reasonably practicable following a transaction described in this ARTICLE 7, the Board of Managers will, without the need for the consent of the Members, amend the Schedule of Members to reflect the names of the Members, the number of Units held and the Percentage Interests of the Members immediately after the transaction. Such revised Schedule of Members shall replace in its entirety the Schedule of Members in effect immediately prior to the transaction.

7.10    Legend.

In the event that Certificated Units are issued, such Certificated Units will bear the following legend:

> "THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR APPLICABLE STATE SECURITIES LAWS ("STATE ACTS") AND MAY NOT BE SOLD, ASSIGNED, PLEDGED, TRANSFERRED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR STATE ACTS OR AN EXEMPTION FROM REGISTRATION THEREUNDER.  THE TRANSFER OF THE UNITS REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE CONDITIONS SPECIFIED IN AN AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT AS AMENDED AND MODIFIED FROM TIME TO TIME, GOVERNING THE ISSUER (THE "COMPANY"), BY AND AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH SHALL BE FURNISHED UPON REQUEST."

To the extent applicable, Certificated Units may also bear a legend in substantially the following form:

> "THE UNITS REPRESENTED BY THIS CERTIFICATE MAY ALSO BE SUBJECT TO CERTAIN VESTING PROVISIONS, REPURCHASE OPTIONS, OFFSET RIGHTS AND FORFEITURE PROVISIONS SET FORTH IN THE AMENDED AND RESTATED LIMITED LIABILITY

COMPANY AGREEMENT AND/OR A SEPARATE AGREEMENT WITH THE INITIAL HOLDER, A COPY OF WHICH SHALL BE FURNISHED BY THE COMPANY UPON WRITTEN REQUEST AND WITHOUT CHARGE."

If a Member holding Certificated Units delivers to the Company an opinion of counsel, satisfactory in form and substance to the Board of Managers (which opinion may be waived by the Board of Managers), that no subsequent Transfer of such Units will require registration under the Securities Act, the Company will promptly upon such contemplated Transfer deliver new Certificated Units which do not bear the portion of the restrictive legend relating to the Securities Act set forth in this Section 7.10.

7.11    Transfer Fees and Expenses.  The Transferor and Transferee of any Units or other interest in the Company shall be jointly and severally obligated to reimburse the Company for all reasonable expenses (including attorneys' fees and expenses) of any Transfer or proposed Transfer, whether or not consummated.

7.12    Void Transfers.  Except as provided in Section 7.13, any Transfer by any Member of any Units or other interest in the Company in contravention of this Agreement or which would cause the Company to not be treated as a partnership for U.S. federal income tax purposes shall be void and ineffectual and shall not bind or be recognized by the Company or any other party.

7.13    Change in Business Form.

(a)    In the event that the Board of Managers and a Majority in Interest elect to convert the Company into a corporation (by merger or otherwise) or another form of business entity at any time, (i) the terms and conditions contained in this ARTICLE 7 shall be, as closely as possible, adopted by the new entity, and (ii) each holder of outstanding Units shall receive shares of capital stock of the new entity equal to the percentage that such Member would have received of the total capital stock assuming the capital stock was distributed to all Members following the Company's liquidation in accordance with Section 10.3(a) on the day of the corporate conversion (after giving effect to any payments as a result of the redemption (if any) of any Units).  The Board of Managers will determined the value of each share of capital stock for purposes of this Section 7.13(a).  At the request of the Board of Managers, all Members shall execute and deliver any agreement, instrument or other document reasonably required to consummate such conversion.

(b)    In connection with such conversion, the terms of the Units of each class and this Agreement shall be extinguished, but new agreements or instruments shall be created to provide for substantially the same substantive rights as those set forth herein but in the form appropriate for a corporation, and with such modifications as may be necessary to permit such conversion to be effected on a tax-free basis (e.g., by establishing terms for any preferred stock to be issued in the conversion that cause such preferred stock to not constitute "nonqualified preferred stock" within the meaning of Code Section 351(g)), all as may be reasonably determined by the mutual agreement of the Board of Managers and a Majority in Interest at such time.

(c)     In the event of an Initial Public Offering, the Company and each Member shall take all necessary or desirable actions requested by the Board of Managers in connection with the consummation of such Initial Public Offering, including consenting to, voting for and waiving any dissenters rights, appraisal rights or similar rights with respect to a reorganization of the Company pursuant to the terms of this Section 7.13 and compliance with the requirements of all laws and regulatory bodies which are applicable or which have jurisdiction over such Initial Public Offering.  If the Initial Public Offering is not a Qualified Public Offering, each Member agrees to enter into a securityholders agreement with the successor entity to the Company (the "Successor") and each other Member which contains restrictions on the Transfer of such capital stock and other provisions (including with respect to the governance and control of such corporate successor) in form and substance similar to the provisions and restrictions set forth in this Agreement.

7.14     Holdback Agreement.  No Member shall effect any public sale or distribution of any Units or of any capital stock or equity securities of the Company or the Successor, or any securities convertible into or exchangeable or exercisable for such Units, stock or securities (a) in the case of the Initial Public Offering, during the seven (7) days prior to and the 180-day period beginning on the effective date of such Initial Public Offering and (ii) in the case of any other underwritten public offering, during the seven (7) days prior to and the 90-day period beginning on the effective date of such public offering, in each case, except as part of such underwritten public offering or unless otherwise permitted by the Company and TFG.

7.15     Resignation; Void Assignment.  No Members shall have the right to resign or withdraw as a Member.  Any Transfer by any Member in contravention of this Agreement shall be void and ineffectual and shall not bind or be recognized by the Company or any other party.  In the event of any Transfer in contravention of this Agreement, the purported transferee shall have no right to any profits, losses or Distributions of the Company or any other rights of a Member.

7.16     Indirect Dispositions.  The transfer, sale, assignment or other disposition of any equity interest in any Member (other than TFG and other than a Member who is a natural person), shall be deemed a Transfer of the Units owned by such Member.  The sale, assignment or transfer by a Member of all or any part of the economic interest associated with such Member's Units (including the interest in the profits or capital appreciation of the Company and the right to receive distributions from the Company), other than pursuant to a Permitted Transfer, shall be deemed a Transfer of the Units owned by such Member.  In either such event, the Units owned by such Member must be offered to the applicable Members in accordance with Section 7.2 and are subject to purchase pursuant to Section 7.17.  For the sake of clarity, if an indirect transfer would be a Permitted Transfer if the transfer had been a Transfer of a Unit, then this Section 7.16 will not apply to such indirect transfer.

7.17     Deemed Offer.

(a)     Any of the events set forth in Section 7.17(b) with respect to a Member shall constitute a deemed offer (a "Deemed Offer") by the Member (the "Deemed Offeror") to sell all of such Member's Units (the "Deemed Offered Interest"), and the Company shall have

36

the right to purchase such Deemed Offered Interest pursuant to the ordering and timing provisions set forth below.

(b)     For purposes of this Section 7.17, with respect to any Member, the Deemed Offer events are each of the following:

(i)     The Member's Bankruptcy;

(ii)     If the Member is employed by or engaged by the Company, the Member's employment by or engagement with the Company or any Subsidiary is terminated for any reason; provided, however, that this Section 7.17(b)(ii) shall not apply to the Key Persons;

(iii)     A transfer, sale, assignment or other disposition of equity of the Member that violates Section 7.16; or

(iv)     The Member's purported voluntary or involuntary Transfer of Units not otherwise permitted by this Agreement.

(c)     In the event of a Deemed Offer event, the Deemed Offeror shall be deemed to have offered to sell the Deemed Offered Interest to the Company and the Company shall promptly notify the Managers of such event. The Company shall have the right and option, within one hundred eighty (180) days after its actual knowledge of the event giving rise to the Deemed Offer event, to accept the Deemed Offer and acquire the Deemed Offered Interest for the purchase price and on the terms set forth in Section 7.18 below; provided, if for any reason the Company does exercise its right during such period to purchase all of the Deemed Offered Interest, the Company shall assign to TFG all of its rights under this Section 7.17 to purchase all or any portion of the Deemed Offered Interest that the Company has not purchased (the "Available Deemed Offered Interest").

(d)     If the Company accepts such offer to purchase, it shall so advise the Deemed Offeror in writing and shall designate the date, not more than thirty (30) days following the date of such notice, and the time and place, where such sale shall be completed. If the Deemed Offered Interest is not purchased by the Company or its assignee(s) (each, a "Deemed Offeree," and collectively, the "Deemed Offerees"), the Deemed Offered Interest will remain with the Deemed Offeror or be transferred to the Deemed Offeror's successor, as the case may be, but shall remain fully subject to and bound by the terms of this Agreement.

7.18     Purchase Procedures. When required pursuant to Section 7.17, the purchase of the Deemed Offered Interest shall be made as follows:

(a)     Purchase Price. The purchase price for the Deemed Offered Interest will be equal to the fair market value (as of the date of such repurchase) of the Deemed Offered Interest as determined in good faith by the Board of Managers, subject to Section 7.18(d) ("Fair Market Value"), taking into account all relevant factors determinative of value.

(b)     Method and Time of Payment. Unless otherwise agreed upon by the Deemed Offeror and each purchasing Deemed Offeree, each purchasing Deemed Offeree will

37

pay the purchase price for the Deemed Offered Interest purchased pursuant to Section 7.17 as follows:

        (i)     The purchase price shall be paid to the Deemed Offeror as follows: (A) twenty percent (20%) of such purchase price shall be paid to the Deemed Offeror on the date such Transfer of the Deemed Offered Interest shall be completed (the "Deemed Offer Closing Date") by bank cashier's or certified check; and (B) the balance of such purchase price shall be evidenced by a non-negotiable promissory note dated as of the Deemed Offer Closing Date secured by the Deemed Offered Interest, from the purchasing Deemed Offeree to the Deemed Offeror providing for principal to be paid in four (4) consecutive equal annual installments, commencing on the first anniversary of the Deemed Offer Closing Date, and for accrued interest to be payable on each principal installment date; provided, that if a Sale of the Company occurs during such period the promissory note will be due and payable on the closing of such transaction. The interest rate payable on the unpaid balance of the promissory note shall initially be the Prime Rate plus two percent (2%) on the Deemed Offer Closing Date, and shall be adjusted annually on the anniversary of the Deemed Offer Closing Date to be equal to the Prime Rate in effect on such date plus two percent (2%). The purchasing Deemed Offeree shall have the right to prepay the promissory note, in whole or in part, from time to time, without penalty. Notwithstanding the foregoing, (1) if the purchase price to be paid to the Deemed Offeror is less than $200,000 and the Company has adequate cash reserves to pay the purchase price on the Deemed Offer Closing Date, as determined by the Board of Managers, then the entire purchase price will be due and payable in cash on the Deemed Offer Closing Date and (2) subject to the Board of Manager's determination of adequate cash reserves, the Company will use commercially reasonable efforts to pay thirty-three percent (33%) of the purchase price on the Deemed Offer Closing Date and repay the promissory note by the second anniversary of the Deemed Offer Closing Date.

        (ii)    In the event the Company is a purchasing Deemed Offeree, then at the election of the Company made in its sole discretion, any payments due by the Company hereunder to the Deemed Offeror in return for the Deemed Offered Interest may be reduced in whole or in part at such time or times as the Company may elect in the amount of (or any portion of the amount of) any indebtedness of the Deemed Offeror to the Company.

        (iii)    The purchase of the Deemed Offered Interest will take place at the principal office of the Company, or at such other place as may be mutually agreed upon by each purchasing Deemed Offeree and Deemed Offeror.

        (c)    Delivery of Documents.  Upon the closing of the purchase and sale pursuant to Section 7.17 and this Section 7.18, the Deemed Offeror will deliver to the purchasing party in exchange for payment of the purchase price, the certificate(s), if any, representing the portion of the Deemed Offered Interest being purchased, duly endorsed for transfer and free and clear of all liens, claims, or encumbrances, with evidence of payment of any applicable transfer taxes and fees.

(d)    Conflict.    If there is a conflict between this Section 7.18 and the repurchase terms under any Equity Agreement or Employment Agreement, at the option of the Board of Managers, the terms of the Equity Agreement or Employment Agreement will control.

7.19    Redemption of Series B Preferred Units.

(a)    Subject to the terms of this Section 7.19, upon such time as when the holders of Series B Preferred Units have received distributions pursuant to Sections 4.6(a) equal to the aggregate Unpaid Series B Yield and distributions pursuant to Section 4.6(b) such that the Series B Preferred Units Unreturned Capital Amount has been reduced to zero dollars ($0), the Company (but no other Member) shall have the right, exercisable at any time, by sending written notice to the holders of Series B Preferred Units, to redeem all of their Series B Preferred Units with cash at an aggregate redemption price of $1.00 (the "Redemption Price") as of the date of delivery of such written notice (the "Redemption Notice Date").

(b)    Any redemption of Series B Preferred Units shall occur no later than the date that is one hundred eighty (180) days after the Redemption Notice Date. At any such closing, the Company shall pay to the holders of the Series B Preferred Units (in proportion to the ratio of the number of Series B Preferred Units held by such Member to the number of all Series B Preferred Units issued by the Company), respectively, (upon surrender by the applicable Members at the Company's principal office of all of the certificates representing their Series B Preferred Units, if a certificate has been issued) an amount in immediately available funds equal to the Redemption Price.

## ARTICLE 8
## ADMINISTRATION

8.1    Bank Accounts.    All funds of the Company shall be deposited in a separate bank account or money market account, as the Board of Managers shall determine, and withdrawals shall be made only on the signature of a Manager, the Company's Chief Financial Officer, Chief Executive Officer or President or such other Persons authorized by the Board of Managers.

8.2    Books and Records.    The Company will maintain separate books and records of the Company that show a true record of its costs and expenses incurred, sources and applications of funds, charges made, credits made and received, and income derived in connection with the operation of the Company's business.    These books of account, together with a copy of this Agreement and the Certificate will at all times be maintained at the principal place of business of the Company.    After the end of each calendar quarter, the Company shall cause to be prepared and distributed to each Member an unaudited balance sheet showing the assets and liabilities of the Company as of the close of such calendar quarter and an unaudited statement of income and expenses showing the results of operations for such calendar quarter and the current calendar year to date.

8.3    Notices.    The address of each of the Members shall for all purposes be as set forth in the Company's books and records, and the address of the Company shall for all purposes be as set forth in Section 2.3(a), unless otherwise changed by the applicable party by notice to the other parties as provided herein.    Except as otherwise provided in Sections 5.4 and 5.5 and this

Section 8.3, all notices or other communications required or permitted to be given pursuant to the provisions of this Agreement shall be in writing and shall be deemed to have been given, delivered or made, as the case may be (notwithstanding lack of actual receipt by the addressee): (a) upon hand delivery, (b) three (3) business days after having been deposited in the United States mail, certified or registered, return receipt requested, sufficient postage affixed and prepaid, (c) one (1) business day after having been timely deposited with an expedited, overnight courier service (including U.S. Express Mail, Federal Express or Airborne), or (d) upon delivery of a facsimile transmission which is confirmed on the sender's facsimile machine as having been sent to the recipient at the proper facsimile number, addressed to the party to whom notice is intended to be given at the address or facsimile number for the party. Without limiting the manner in which a notice, consent or waiver may otherwise be effectively given, any notices, consents or waivers permitted or required by Section 5.4 or Section 5.5 may also be given effectively to Managers and the Company by Electronic Transmission. Notice given by Electronic Transmission pursuant to the immediately preceding sentence shall be deemed given: (x) if by facsimile, upon delivery of such facsimile confirmed on the sender's facsimile machine as having been sent to the recipient at the facsimile number for the Manager or the Company; (y) by electronic mail, with respect to a Manager, when directed to such Manager's electronic mail address, and, with respect to the Company, when directed to the corporate e-mail address of the Company's Chief Executive Officer, President or Secretary, or if there be none, any other similar officer or of the Company; or (z) if by any other form of Electronic Transmission, with respect to a Manager, when directed to such Manager, and, with respect to the Company, when directed to the Company's Chief Executive Officer, President or Secretary, or if there be none, any other similar officer or of the Company.

## ARTICLE 9
## FISCAL MATTERS

9.1     Fiscal Year.  The fiscal year of the Company (the "Fiscal Year") shall be the calendar year, and the tax year of the Company shall be the calendar year, subject to the requirements of section 706 of the Code.

9.2     Tax Reports.  As soon as reasonably practicable after the end of each tax year of the Company, the Company will deliver or cause to be delivered to each Member such information as is necessary (including a statement for that year of each Member's share of net income, net losses or other items of the Company) for such Member's preparation of its federal and state or other income tax returns.

9.3     Tax Returns; Tax Matters Partner.  The Company shall prepare, or cause the Company's Accountants to prepare at the expense of the Company, and file a federal information tax return in compliance with the provisions of the Code and any required state or local tax returns. The Board of Managers will appoint the Company's "tax matters partner" for purposes of Sections 6221 through 6231 of the Code and the Treasury Regulations promulgated thereunder. The tax matters partner will keep the Board of Managers informed of its activities as the tax matters partner and will give the Board of Managers notice of, and opportunity to attend and, to the extent permitted by Applicable Law, participate in any hearing, meeting or consultation with any Taxing Jurisdiction. The Company will reimburse the Company's tax matters partner for any reasonable expenses incurred in addressing any tax dispute involving the

40

Company. Each Member agrees to cooperate with the Company and to do or refrain from doing any or all things reasonably requested by the Company with respect to the conduct of such proceedings.

9.4    Tax Elections. Except as otherwise provided in this Agreement, the Board of Managers shall determine whether to make or revoke any election pursuant to the Code.

## ARTICLE 10
## TERMINATION

10.1    Events of Dissolution. The Company shall be dissolved on the earliest to occur of:

(a)    A reasonable period of time (taking into account, among other matters, the need to determine, pay or discharge, or make adequate provision for the payment or discharge of, contingent liabilities) after (i) the consummation of a transaction or series of related transactions that constitute a Sale of the Company under clause (i) of the definition thereof, and (ii) the liquidation, dissolution or winding up of all of the Subsidiaries;

(b)    the approval of TFG and the Board of Managers; or

(c)    any other event requiring the dissolution of the Company under the Delaware Law.

10.2    Winding Up.

(a)    Upon the dissolution of the Company pursuant to Section 10.1, the Company business shall be wound up and its assets liquidated by the Board of Managers (or one or more representatives appointed by the Board of Managers) in accordance with this Section 10.2, and the net proceeds of such liquidation shall be distributed in accordance with Section 10.3. The Board of Managers shall be responsible for taking all action necessary or appropriate to wind up the affairs and distribute the assets of the Company upon its dissolution. The costs of liquidation shall be borne as a Company expense.

(b)    On completion of the distribution of Company assets as provided herein, the Company is terminated (and the Company shall not be terminated prior to such time), and the Board of Managers shall file (or cause to be filed) all certificates and notices of the dissolution of the Company required by law. The Board of Managers shall proceed without any unnecessary delay to sell and otherwise liquidate the Company's assets; provided, however, that (i) if the Board of Managers shall determine that an immediate sale of part or all of the Company assets would cause undue loss to the Members, then in order to avoid such loss, the Board of Managers may defer the liquidation, to the extent permitted by Applicable Law, and (ii) with the consent of a Majority in Interest, the Board of Managers may distribute the Company's assets in-kind. In the event that the Board of Managers distributes the Company's assets in-kind, the Board of Managers shall ascertain the fair market value by appraisal of such assets, and each Member's Capital Account shall be charged or credited, as the case may be, as if such asset had been sold for cash at such fair market value and the gain or loss recognized thereby had been allocated to and among the Members in accordance with ARTICLE 4 above.

41

10.3    Distribution on Dissolution and Termination.

(a)    Upon dissolution of the Company, the net proceeds of such liquidation shall be applied and distributed in the following order of priority (provided that the higher level(s) of priority have been fully satisfied):

(i)    First, to pay to all creditors of the Company (including, but not limited to, any Members, Managers or Affiliates of a Member or Manager that are creditors of the Company) and the expenses of liquidation;

(ii)    Second, to the setting up of any reserves that may be deemed reasonably necessary by the Board of Managers for any contingent or unforeseen liabilities or obligations of the Company, which reserves may be paid over to an escrowee designated by the Board of Managers to be held for the purpose of disbursing such reserves in payment of any of the aforementioned contingencies and, at the expiration of such period as shall be deemed advisable, to distribute the balance thereafter remaining in the manner provided in this Section 10.3;

(iii)    Third, to the holders of the Series B Preferred Units in an amount equal to the aggregate Series B Liquidation Preference;

(iv)    Fourth, to the holders of the Series A Preferred Units in an amount equal to the aggregate Series A Liquidation Preference;

(v)    Fifth, to the holders of Series A Preferred Units and the holders of Common Units an amount equal to the amount of the Distributions made pursuant to Section 10.3(a)(iv), pro rata in accordance with their respective Catch-up Percentages; and

(vi)    Then, to the holders of Series A Preferred Units and the holders of Common Units in accordance with their respective Percentage Interests as of the time of such Distribution.

(b)    No Member shall have any right to demand or receive property other than cash upon dissolution and liquidation of the Company.

(c)    Each Member shall look solely to the assets of the Company for all distributions with respect to the Company and its Capital Contributions thereto and share of profits and losses thereof, and shall have no recourse therefore (upon dissolution or otherwise) against the Board of Managers or any other Member.

## ARTICLE 11
## MISCELLANEOUS

11.1    Governing Law; Venue; Expenses.  This Agreement and the rights of the parties hereunder shall be governed by and interpreted in accordance with the laws of the State of Delaware, without regard to conflict of laws principles.  ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST THE PARTIES ARISING OUT OF OR RELATING TO THIS

AGREEMENT, ANY OBLIGATIONS HEREUNDER, OR THE TRANSACTIONS CONTEMPLATED HEREBY, SUBJECT TO SECTION 11.25, SHALL BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN HAMILTON COUNTY, OHIO. BY EXECUTING AND DELIVERING THIS AGREEMENT, THE PARTIES, IRREVOCABLY (A) ACCEPT GENERALLY AND UNCONDITIONALLY THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS, (B) WAIVE ANY OBJECTIONS WHICH SUCH PARTY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, ANY OBLIGATIONS HEREUNDER OR THE TRANSACTIONS CONTEMPLATED HEREBY BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (A) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM, (C) AGREE THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO SUCH PARTY AT THEIR RESPECTIVE ADDRESSES PROVIDED IN ACCORDANCE WITH SECTION 8.3, AND (D) AGREE THAT SERVICE AS PROVIDED IN CLAUSE (C) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER SUCH PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT AND ANY OF THE AGREEMENTS DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

In any arbitration or legal proceeding arising out of this Agreement, the losing party shall reimburse the prevailing party, on demand, for all costs incurred by that prevailing party in enforcing, defending, or prosecuting the terms of this Agreement, including all fees, costs, and expenses of experts, mediators, attorneys, witnesses, arbitrators, and supersedeas bonds, whether incurred before or after demand or commencement of legal proceedings and whether incurred pursuant to trial, appellate, mediation, arbitration, bankruptcy, administrative, or judgment-execution proceedings.

11.2    Successors and Assigns.   Any Person acquiring or claiming an interest in the Company, in any manner whatsoever, shall be subject to and bound by all terms, conditions and obligations of this Agreement to which its predecessor in interest was subject or bound, without regard to whether such a Person has executed a counterpart hereof or any other document contemplated hereby. No Person, including the legal representative, heir or legatee of a deceased Member, shall have any rights or obligations greater than those set forth in this Agreement, and no Person shall acquire an interest in the Company or become a Member hereof except as permitted by the terms of this Agreement. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their permitted successors, assigns, heirs, legal representatives, executors and administrators.

43

11.3    Grammatical Changes.  Whenever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, the feminine or the neuter gender shall include the masculine, feminine and neuter gender as the circumstances require.

11.4    Captions and References.  Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision hereof.  Unless otherwise expressly provided to the contrary, references in this Agreement to articles, sections, paragraphs and the like constitute references to the articles, sections and paragraphs of this Agreement.

11.5    Severability.  If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those to which it is held invalid, shall not be affected thereby; provided that the parties shall attempt to reformulate such invalid provision to give effect to such portions thereof as may be valid without defeating the intent of such provision; and provided further that this Section 11.5 shall not apply to change the status of any Member to that of a Manager or Officer, or to alter the classification of the Company as a partnership under the Code.

11.6    Counterparts; Facsimile or Electronic Transmission.  This Agreement and any amendment hereto may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument, notwithstanding that all of the Members are not signatories to the original or the same counterpart. A party's receipt of a facsimile signature page or Electronic Transmission of a signature page to this Agreement shall be treated as the party's receipt of an original signature page.

11.7    Waiver of Right to Partition.  Each of the Members hereby irrevocably waives any and all rights that it may have to maintain an action for partition of the Company's assets.

11.8    Personal Property.  This Agreement shall not be deemed to create in any Member any right, title, interest or lien in, to or on all or any portion of the Company's assets, it being understood that any right or interest of any Member created by this Agreement shall solely be an interest in the Company and shall be personal property.

11.9    No Third Party Rights.  This Agreement is for the sole and exclusive benefit of the Members, the Managers and the Company and no other Person or entity (including any creditors of the Company or the Members other than any pledgee of a Member who acquires such Member's Units pursuant to a Permitted Pledge) shall under any circumstances be deemed to be a beneficiary of any of the rights, remedies, terms and provisions of this Agreement.

11.10    Amendments.    Except as otherwise expressly provided elsewhere in this Agreement, this Agreement and the Certificate may be altered, modified or changed, and one or more of the provisions of this Agreement waived, with the written approval of, at the time of such alteration, modification, change or waiver, (a) the Board of Managers and (b) a Majority in Interest, and the Company and all holders of Units shall be bound by any amendment, modification, alteration, change or waiver of this Agreement effected in accordance with this

44

Section 11.10, whether or not such Person consent to such amendment, alteration, modification, change or waiver; provided, however, that (y) if any amendment, modification, alteration, change or waiver materially adversely affects one or more Members in a manner different from the Members approving the amendment, modification, alteration, change or waiver, the consent of the majority in interest (measured by their respective Percentage Interests) of such Members shall also be required for such amendment, modification, alteration, change or waiver of this Agreement and (z) any amendment that would subject a Key Person to Section 7.17(b)(ii) shall require the consent of such Key Person.

11.11  Waiver of Statutory Rights.  Matters not covered in this Agreement relating to limited liability companies shall be governed and controlled by the Delaware Law; provided, however, that Section 18-210 of the Delaware Law (entitled "Contractual Appraisal Rights") and Section 18-305(a) of the Delaware Law (entitled "Access to and Confidentiality of Information; Records") shall not apply to or be incorporated into this Agreement and each Member hereby expressly waives any and all rights under such sections of Delaware Law.  For greater certainty, the waiver of Section 18-305(a) of the Delaware Law shall not be deemed to be a waiver of information rights provided under this Agreement.

11.12  Certain Acknowledgments.  Upon execution and delivery of a counterpart to this Agreement, an Adoption Agreement or similar document or agreement, each Member (including each Substituted Member, but not including TFG) shall be deemed to acknowledge to TFG as follows (and with respect to clauses (a) and (b), to each other Member and the Company): (a) the determination of such Member to enter into this Agreement has been made by such Member independent of any other Member and independent of any statements or opinions as to the advisability of such purchase or as to the properties, business, prospects or condition (financial or otherwise) of the Company and its Subsidiaries which may have been made or given by any other Member or by any agent or employee of any other Member and (b) no other Member has acted as an agent of such Member in connection with making its investment hereunder and that no other Member shall be acting as an agent of such Member in connection with monitoring its investment hereunder, (c) TFG has retained Hill Ward Henderson in connection with the transactions contemplated by the Transaction Documents, (d) Hill Ward Henderson is not representing and will not represent any Member (other than TFG) in connection with the Transaction Documents or any dispute which may arise between TFG, on the one hand, and the Company, any of its Subsidiaries or any other Member (other than TFG), on the other hand, in connection with the Transaction Documents, (e) such Member will, if it wishes counsel on the transactions contemplated by the Transaction Documents, retain its own independent counsel, (f) Hill Ward Henderson may represent TFG in connection with any and all matters contemplated by the Transaction Documents (including any dispute between TFG, on the one hand, and the Company, any of its Subsidiaries or any other Member (other than TFG), on the other hand) and such Member waives any conflict of interest in connection with such representation by Hill Ward Henderson and (g) subject to rules of professional responsibility applicable to Hill Ward Henderson, the Company and its Subsidiaries may engage Hill Ward Henderson to represent the Company and its Subsidiaries on any matter other than the transactions contemplated by the Transaction Documents, or any dispute arising out of the Transaction Documents that involves TFG.

45

11.13  Confidentiality.  It is anticipated that the Company and Members will exchange certain Confidential Information relating to the Company's and its Subsidiaries' businesses, including analyses, compilations, studies or other material containing, or based in whole or in part upon, Confidential Information. Each Member agrees that such Confidential Information of the Company and its Subsidiaries shall (a) be kept confidential, (b) not, except as provided below, be disclosed by a receiving party to any Person in any manner without the prior written consent of the Company and (c) except as expressly provided in this Agreement, not be used by a receiving party other than for the Company's business. Notwithstanding the foregoing, (x) each Member may disclose such Confidential Information to its partners or members (existing or potential, provided that the party receiving such Confidential Information is required to keep such information strictly confidential), financing sources, managers, directors or officers, and also to its auditors, attorneys, employees and agents on a "need to know" basis, and (y) no Person shall have an obligation to keep confidential any Confidential Information if and to the extent disclosure of any Confidential Information is specifically required by law or by any regulatory authority having jurisdiction over the Company, its Subsidiaries or any of the Members (a "Regulatory Authority"); provided, however, that in the event disclosure by any Person is required by any Regulatory Authority, the Person shall provide the Company with prompt notice of such requirement, prior to making any disclosure, so that the Company may seek an appropriate protective order.

11.14  Power of Attorney.  Each Member hereby constitutes and appoints the Board of Managers and the liquidators, as applicable, and their respective designees, with full power of substitution, as its true and lawful agent and attorney-in-fact, with full power and authority in its name, place and stead, to execute, swear to, acknowledge, deliver, file and record in the appropriate public offices (a) this Agreement, all certificates and other instruments and all amendments hereof or thereof in accordance with the terms hereof which the Board of Managers deems appropriate or necessary to form, qualify, or continue the qualification of, the Company as a limited liability company in the State of Delaware and in all other jurisdictions in which the Company may conduct business or own property or as otherwise permitted herein; (b) all instruments, agreements or other documents which the Board of Managers deems appropriate or necessary to reflect any amendment, change, modification or restatement of this Agreement that was made in accordance with its terms, without taking into account the power granted under this Section 11.14; (c) all conveyances and other instruments or documents which the Board of Managers (or its designee) and/or the liquidators deems appropriate or necessary to reflect the dissolution and liquidation of the Company pursuant to the terms of this Agreement; and (d) all instruments relating to the admission, withdrawal or substitution of any Member pursuant to this Agreement.  The foregoing power of attorney is irrevocable and coupled with an interest, and shall survive the death, disability, incapacity, dissolution, bankruptcy, insolvency or termination of any Member and the Transfer of all or any portion of its Units and shall extend to such Member's heirs, successors, assigns and personal representatives.

11.15  Descriptive Headings; Interpretation.  The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement. Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa.  The use of the word "including" in this Agreement shall be by way of example rather than by limitation.  Reference to any agreement,

46

document or instrument means such agreement, document or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and if applicable hereof. Whenever required by the context, references to a Fiscal Year shall refer to a portion thereof. The use of the words "or," "either" and "any" shall not be exclusive. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. Wherever a conflict exists between this Agreement and any other agreement, this Agreement shall control but solely to the extent of such conflict.

11.16 <u>Offset Against Amounts Payable</u>. Whenever the Company is to pay any sum to any Member or any Affiliate or related Person thereof, any amounts that such Member or such Affiliate or related Person owes to the Company or any of its Subsidiaries may be offset or deducted from that sum before payment and (the "<u>Rights Member</u>") may be paid by the Company to the Rights Member. If there is a conflict between this <u>Section 11.16</u> and the offset or set-off provision contained in any other Transaction Document, the offset or set-off provision in such other Transaction Document shall control.

11.17 <u>Further Action</u>. The parties agree to execute and deliver all documents, provide all information and take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of this Agreement.

11.18 <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO EXPRESSLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY LAWSUIT OR PROCEEDING RELATING TO OR ARISING IN ANY WAY FROM THIS AGREEMENT OR THE MATTERS CONTEMPLATED HEREBY.

11.19 <u>Entire Agreement</u>. This Agreement, those documents expressly referred to herein and other documents dated as of even date herewith embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

11.20 <u>Confirmation of Ownership</u>. Each Member on the Effective Date acknowledges and confirms (a) its ownership of Units of the Company, as of the Effective Date, as shown on the <u>Schedule of Members</u>, (b) that it does not own, or have the right to acquire, any other Units, membership interests or other equity interests in the Company and (c) any certificate representing a membership interest in the Company received by the Member prior to the Effective Date is no longer valid and shall be replaced by this Agreement and a Certificated Units reflecting the Member's ownership of Units, as shown on the <u>Schedule of Members</u>.

11.21 <u>Spousal Consent</u>. If requested by the Board of Managers, each married Member, and each such Member who, subsequent to the date hereof, marries or remarries, shall concurrently with his or her execution hereof deliver to the Board of Managers the written consent of his or her spouse; <u>provided</u>, <u>however</u>, that the failure of any such Member to do so shall not affect the validity or enforcement of this Agreement.

47

11.22 Tax Consequences. Each Member understands that it (and not the Company) shall be responsible for its own tax liability that may arise out of its acquisition, ownership and sale of such Member's Units.

11.23 Withholding. Each Member represents, severally and not jointly, to the Company that it is not, and at all times while it is a Member will not be, a foreign person subject to withholding under Section 1445 or 1446 of the Code.

11.24 Construction and Interpretation. The language in all parts of this Agreement shall be construed, in all cases, according to its fair meaning, and not for or against either party hereto. The parties acknowledge that each party and its counsel have reviewed revised or otherwise had input into this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

11.25 Arbitration

(a) EXCEPT AS PROVIDED IN SECTION 11.25(a) BELOW, ANY CONTROVERSY, DISPUTE OR CLAIM OF WHATSOEVER NATURE ARISING OUT OF, IN CONNECTION WITH, OR IN RELATION TO THE INTERPRETATION, PERFORMANCE OR BREACH OF THIS AGREEMENT, INCLUDING ANY CLAIM BASED ON CONTRACT, TORT OR STATUTE, SHALL BE DETERMINED BY FINAL AND BINDING, CONFIDENTIAL ARBITRATION ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION ("AAA") IN ACCORDANCE WITH ITS THEN-EXISTING COMMERCIAL ARBITRATION RULES, AND THE SOLE ARBITRATOR SHALL BE SELECTED IN ACCORDANCE WITH SUCH AAA RULES. ANY ARBITRATION HEREUNDER SHALL BE GOVERNED BY THE UNITED STATES ARBITRATION ACT, 9 U.S.C. 1-16 (OR ANY SUCCESSOR LEGISLATION THERETO), AND JUDGMENT UPON THE AWARD RENDERED BY THE ARBITRATOR MAY BE ENTERED BY ANY STATE OR FEDERAL COURT HAVING JURISDICTION THEREOF. NONE OF THE COMPANY, ANY MEMBER OR THE ARBITRATOR SHALL DISCLOSE THE EXISTENCE, CONTENT OR RESULTS OF ANY ARBITRATION HEREUNDER WITHOUT THE PRIOR WRITTEN CONSENT OF ALL PARTIES; PROVIDED, HOWEVER, THAT ANY MEMBER MAY DISCLOSE THE EXISTENCE, CONTENT OR RESULTS OF ANY SUCH ARBITRATION TO ITS MEMBERS, SHAREHOLDERS, PARTNERS, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ATTORNEYS AND ACCOUNTANTS AND TO ANY OTHER PERSON TO WHOM DISCLOSURE IS REQUIRED BY APPLICABLE LAWS, INCLUDING PURSUANT TO AN ORDER OF A COURT OF COMPETENT JURISDICTION. UNLESS OTHERWISE AGREED BY THE MEMBERS, ANY ARBITRATION HEREUNDER SHALL BE HELD AT A NEUTRAL LOCATION SELECTED BY THE ARBITRATOR IN HAMILTON COUNTY, OHIO. THE COST OF THE ARBITRATOR AND THE EXPENSES RELATING TO THE ARBITRATION (EXCLUSIVE OF LEGAL FEES) SHALL BE BORNE EQUALLY BY THE PARTIES TO THE ARBITRATION UNLESS OTHERWISE SPECIFIED IN THE AWARD OF THE ARBITRATOR. SUCH FEES AND COSTS PAID OR PAYABLE TO THE ARBITRATOR SHALL BE INCLUDED IN "COSTS AND EXPENSES" FOR PURPOSES OF SECTION 11.1 AND THE ARBITRATOR SHALL SPECIFICALLY HAVE THE POWER TO AWARD TO THE PREVAILING PARTY PURSUANT TO SUCH

48

SECTION 11.1 SUCH PARTY'S COSTS AND EXPENSES INCURRED IN SUCH ARBITRATION, INCLUDING FEES AND COSTS PAID TO THE ARBITRATOR.

(b)     THE PROVISIONS OF THIS SECTION 11.25 SHALL NOT APPLY TO:

(i)     ANY SPECIFIC CONTROVERSY, DISPUTE, QUESTION OR ISSUE AS TO WHICH THIS AGREEMENT SPECIFICALLY PROVIDES ANOTHER METHOD OF DETERMINING SUCH CONTROVERSY, DISPUTE, QUESTION OR ISSUE AND PROVIDES THAT A DETERMINATION PURSUANT TO SUCH METHOD IS FINAL AND BINDING, UNLESS THE PARTIES TO THE DISPUTE AGREE IN WRITING TO WAIVE SUCH PROCEDURE AND PROCEED INSTEAD PURSUANT TO THIS SECTION 11.25.

(ii)     ANY REQUEST OR APPLICATION FOR AN ORDER OR DECREE GRANTING ANY PROVISIONAL OR ANCILLARY REMEDY (SUCH AS A TEMPORARY RESTRAINING ORDER OR INJUNCTION) WITH RESPECT TO ANY RIGHT OR OBLIGATION OF ANY MEMBER OR THE COMPANY, AND ANY PRELIMINARY DETERMINATION OF THE UNDERLYING CONTROVERSY, DISPUTE, QUESTION OR ISSUE AS IS REQUIRED TO DETERMINE WHETHER OR NOT TO GRANT SUCH RELIEF. A FINAL AND BINDING DETERMINATION OF SUCH UNDERLYING CONTROVERSY, DISPUTE, QUESTION OR ISSUE SHALL BE MADE BY AN ARBITRATION CONDUCTED PURSUANT TO THIS SECTION 11.25 AFTER AN APPROPRIATE TRANSFER OR REFERENCE TO THE ARBITRATOR SELECTED PURSUANT TO THIS SECTION 11.25 UPON MOTION OR APPLICATION OF ANY PARTY TO THE ARBITRATION. ANY ANCILLARY OR PROVISIONAL RELIEF WHICH IS GRANTED PURSUANT TO THIS CLAUSE (ii) SHALL CONTINUE IN EFFECT PENDING AN ARBITRATION DETERMINATION AND ENTRY OF JUDGMENT THEREON PURSUANT TO THIS SECTION 11.25.

(c)     NOTICE:     BY EXECUTING THIS AGREEMENT YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY DELAWARE LAWS AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY EXECUTING THIS AGREEMENT YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF DELAWARE LAW. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.

EACH MEMBER AND THE COMPANY ACKNOWLEDGES AND STIPULATES THAT IT HAS READ AND UNDERSTANDS THE FOREGOING AND AGREES TO

SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION TO NEUTRAL ARBITRATION.

[Signature Page Follows]

50

SIGNATURE PAGE TO
SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY
AGREEMENT
OF
WINONA PVD COATINGS, LLC

COMPANY

WINONA PVD COATINGS, LLC,
a Delaware limited liability company

By: _____
Name: Jamie T. Visker
Title: Manager

SIGNATURE PAGE TO
SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY
AGREEMENT
OF
WINONA PVD COATINGS, LLC

MEMBERS

IF MEMBER IS AN INDIVIDUAL:

.........................................................          .........................................................
Signature of Natural Person                    Signature of Co-Member, if any

.........................................................          .........................................................
Printed Name of Natural Person                 Printed Name of Co-Member, if any

TYPE OF INTENDED OWNERSHIP

............  Individual                        ............  Joint Tenants with Rights of Survivorship
............  Tenant by Entireties             ............  Tenants-in-Common

IF MEMBER IS AN ENTITY:

Jamie Visker IRA LPL Financial Custodian
Name of Corporation, Fund, Trust,
Partnership or other Entity that is the Member

.........................................................
Signature of Individual
Signing on Behalf of Member

.........................................................
Printed Name and Title of Individual
Signing on Behalf of the Member

Address:

.........................................................
.........................................................

Telephone: ...............................................
Fax: ........................................................
Email: ......................................................

**SIGNATURE PAGE TO
SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY
AGREEMENT
OF
WINONA PVD COATINGS, LLC**

**MEMBERS**

## IF MEMBER IS AN INDIVIDUAL:

_____          _____
Signature of Natural Person                Signature of Co-Member, if any

_____          _____
Printed Name of Natural Person             Printed Name of Co-Member, if any

TYPE OF INTENDED OWNERSHIP

_____ Individual                         _____ Joint Tenants with Rights of Survivorship
_____ Tenant by Entireties              _____ Tenants-in-Common

## IF MEMBER IS AN ENTITY:

Atlanta Visker IRA LPL Financial Custodian
Name of Corporation, Fund, Trust,
Partnership or other Entity that is the Member

_Atlanta Visker_
Signature of Individual
Signing on Behalf of Member

_____
Printed Name and Title of Individual
Signing on Behalf of the Member

Address:
_____
_____
_____
Telephone: _____
Fax: _____
Email: _____

SIGNATURE PAGE TO
SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY
AGREEMENT
OF
WINONA PVD COATINGS, LLC

MEMBERS

**IF MEMBER IS AN INDIVIDUAL:**

_____
Signature of Natural Person

Jamie T. Visker
Printed Name of Natural Person

TYPE OF INTENDED OWNERSHIP

_____ Individual
_____ Tenant by Entireties

_____
Signature of Co-Member, if any

Atlanta S. Visker
Printed Name of Co-Member, if any

_____ Joint Tenants with Rights of Survivorship
_____ Tenants-in-Common

**IF MEMBER IS AN ENTITY:**

_____
Name of Corporation, Fund, Trust,
Partnership or other Entity that is the Member

_____
Signature of Individual
Signing on Behalf of Member

_____
Printed Name and Title of Individual
Signing on Behalf of the Member

Address: _____
_____
_____

Telephone: _____
Fax: _____
Email: _____

**SIGNATURE PAGE TO**
**SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY**
**AGREEMENT**
**OF**
**WINONA PVD COATINGS, LLC**

<u>**MEMBERS**</u>

<u>**IF MEMBER IS AN INDIVIDUAL**</u>:

_____          _____
Signature of Natural Person                    Signature of Co-Member, if any

_____          _____
Printed Name of Natural Person                 Printed Name of Co-Member, if any

TYPE OF INTENDED OWNERSHIP

_____ Individual              _____ Joint Tenants with Rights of Survivorship
_____ Tenant by Entireties    _____ Tenants-in-Common

<u>**IF MEMBER IS AN ENTITY**</u>:

_____
Name of Corporation, Fund, Trust,
Partnership or other Entity that is the Member

_____
Signature of Individual
Signing on Behalf of Member

_____
Printed Name and Title of Individual
Signing on Behalf of the Member

Address:

_____
_____

Telephone: _____
Fax: _____
Email: _____

## APPENDIX A

### DEFINITIONS

1.       AAA has the meaning set forth in Section 11.25(a).

2.       Accredited Investor means an "accredited investor" as such term is defined under the Securities Act and the rules and regulations promulgated thereunder.

3.       Adjusted Capital Account Deficit means with respect to any Capital Account as of the end of any relevant Fiscal Year or Fiscal Period, the amount by which the balance in such Capital Account is less than zero. For this purpose, such Person's Capital Account balance shall be (a) reduced for any items described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5), and (6), and (b) increased for any amount such Person is obligated to contribute or is treated as being obligated to contribute to the Company pursuant to Treasury Regulation Sections 1.704-1(b)(2)(ii)(c) (relating to partner liabilities to a partnership) 1.704-2(g)(1) or 1.704-2(i) (relating to Minimum Gain).

The above definition is intended to comply with the provisions of Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

4.       Adoption Agreement means an agreement substantially in the form of the Adoption Agreement attached as Exhibit A to this Agreement.

5.       Affiliate means, when used with reference to a specified Person, (a) any officer, manager, partner, member, relative or spouse, or trustee thereof, of the specified Person, or (b) any Person that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with the specified Person. "Affiliate" when used in reference to any Member shall also include any Person that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with any one or more of the beneficial owners of such Member.

6.       Agreement means this Second Amended and Restated Limited Liability Company Agreement of the Company, as amended, modified and/or waived from time to time.

7.       Applicable Laws means any treaty, law, statute, regulation, ordinance, rule, order, principal of common law or other requirement enacted, promulgated or imposed by any Governmental Entity, including any federal, state or foreign constitution.

8.       Approved Sale has the meaning set forth in Section 7.4(a).

9.       Assignee means a Person to whom Units have been Transferred in accordance with the terms of this Agreement and the other agreements contemplated hereby, but who has not become a Member in accordance with Section 7.6(b).

10.      Assumed Tax Rate means twenty-five percent (25%).

A-1

11.    Authorization Date has the meaning set forth in Section 7.2(a).

12.    Available Deemed Offered Interest has the meaning set forth in Section 7.17(c).

13.    Available Unit Notice has the meaning set forth in Section 7.2(b).

14.    Available Unit Purchase Notice has the meaning set forth in Section 7.2(c).

15.    Available Units has the meaning set forth in Section 7.2(b).

16.    Bankruptcy of a Person shall be deemed to have occurred upon the happening of any of the following: (a) the filing by such Person of an application for, or a consent to, the appointment of a trustee for such Person's assets; (b) the filing by such Person of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing its inability to pay its debts as they come due; (c) the making by the Person of a general assignment for the benefit of creditors; (d) the filing by the Person of an answer admitting the material allegations of, or its consenting to or defaulting in answering, a bankruptcy petition filed against it in any bankruptcy proceeding; or (e) the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating the Person a bankrupt or appointing a trustee of its assets, and such order, judgment or decree continues unstayed and in effect for a period of ninety (90) days.

17.    Board of Managers has the meaning set forth in Section 5.1.

18.    Business means the business of (a) coating automobile wheels and/or rims with the Company's G-Chrome® finish and other finishes, (b) coating other automobile products and equipment with the Company's G-Chrome® or other finishes and (c) coating other products using a PVD process.

19.    Capital Account has the meaning set forth in Section 4.1(a).

20.    Capital Contribution means the total amount of money and the Gross Asset Value (as determined by the Board of Managers) of any property (determined net of any liabilities secured by such property that the Company is considered to assume or take subject to and determined consistently with Section 752(c) of the Code and without regard to Section 7701(g) of the Code) contributed to or deemed contributed to the Company by a Member. In this regard, the Gross Asset Value of property contributed on the exercise of a noncompensatory option (as defined in Treasury Regulations Section 1.721-2(f)) (e.g., a Warrant), which for the avoidance of doubt, includes any Warrants issued pursuant to the Series B Purchase Agreement, does not include the fair market value (as determined by the Board of Managers) of the noncompensatory option privilege itself, but does include (a) the cash and the fair market value of the consideration paid to the Company to acquire the noncompensatory option and (b) the cash and the Gross Asset Value (as determined by the Board of Managers) of any other property (other than the noncompensatory option) contributed to the Company on the exercise of the noncompensatory option.

A-2

21.    Catch-up Percentage means, with respect to (a) TFG, the TFG Catch-up Percentage, and (b) each holder of Units (other than TFG), an amount expressed as a percentage equal to the holders proportion (determined based on the Percentage Interests of all holders of Units, other than TFG) of one (1) less the TFG Catch-up Percentage.

22.    Cause means, with respect to any termination of employment or engagement by the Company or any Subsidiary: with respect to any other Management Member, the Management Member (a) is charged with a felony or crime involving moral turpitude or is convicted of or pleads guilty or no contest to any other crime, (b) commits an act constituting fraud, theft, dishonesty (including relating to financial matters) or material deceit, (c) improperly and without authorization from the Board of Managers discloses to any Person any information constituting Confidential Information or a trade secret of the Company or any of its Affiliates, (d) commits an act constituting a material violation of applicable law relating o the workplace environment (including laws relating to sexual harassment or age, race, sex or other prohibited discrimination), (e) uses or possesses any unprescribed controlled substances or abuses alcohol while performing his duties, (f) fails or is unable (other than by reason of death or Disability) to perform such duties, complete such tasks or follow such direction as reasonably prescribed by the Board of Managers, or to carry out effectively any other obligations of the Company or its Affiliates, (g) disregards his duties or fails to act, where performing such duty or action would be appropriate in the ordinary course of his position, (h) fails to observe material policies of the Company or any Affiliate of the Company generally applicable to executives, (i) acts with gross negligence or willful misconduct in the performance of his duties to the Company or its Affiliates, or (j) breaches any material term of this Agreement or any other agreement he has with the Company or any if its Affiliates.

23.    Certificate means the Certificate of Formation of the Company filed with the Department of State of the State of Delaware pursuant to the Delaware Law on December 1, 2006.

24.    Certificated Units means Units evidenced by a membership unit certificate and has the meaning set forth in Section 3.1.

25.    Code means the Internal Revenue Code of 1986, as amended.

26.    Common Manager has the meaning set forth in Section 5.3(a)(i).

27.    Common Unit means a Membership Interest in the Company which has been designated under this Agreement or by the Board of Managers as a Common Unit having the rights and obligations specified with respect to the Common Units in this Agreement.

28.    Company has the meaning provided in the first paragraph of this Agreement.

29.    Company Minimum Gain has the same meaning as the term "partnership minimum gain" under Treasury Regulation Sections 1.704-2(b) and 1.704-2(d).

A-3

30.     Company Purchase Notice has the meaning set forth in Section 7.2(b).

31.     Company's Accountants means a firm of independent certified public accountants selected by the Board of Managers.

32.     Compensation has the meaning set forth in Section 4.3(h)(i).

33.     Competitive Activity means, during the term of any Management Member's employment with the Company or any of its Subsidiaries and during the two (2) year period immediately following such Management Member's termination of employment or engagement, (a) directly or indirectly owning any interest in, managing, controlling, participating in, being employed by, consulting with, rendering services for or in any manner engaging in any business that competes directly or indirectly with the businesses of the Company or its Subsidiaries, as such businesses exist or are in process on such Management Member's termination of employment or engagement; provided, that the passive ownership of not more than two percent (2%) of the outstanding equity securities of any class of a corporation which is publicly traded will not be deemed to be a Competitive Activity, so long as the Management Member has no active participation in the business of such corporation or (b) violating any of the restrictive covenants in his Employment Agreement.

34.     Confidential Information means, with respect to the Company or any of its Affiliates, any financial statements, budgets and other financial information, trade secret, confidential study, data, calculations, software storage media or other compilation of confidential information, patent application, customer lists, details of client or consultant contracts, confidential pricing policies, sales techniques, information relating to suppliers, information relating to special and particular needs of the operational methods, marketing plans or strategies, product development techniques or plans, business acquisition plans or any portion or phase of any scientific or technical information, confidential designs, computer programs (including source or object codes, confidential processes or procedures, unpublished research or technical data or improvements, or other confidential proprietary or intellectual property of the Company or any of its Affiliates, whether or not in written or tangible form, and whether or not registered, which, in each case, are known only to the Company and/or its Affiliates and others, such as lenders and advisors, having a confidential relationship to the Company and/or its Affiliates with respect thereto, and including all files, records, manuals, books, catalogues, memoranda, notes, summaries, plans, reports, records, documents and other evidence thereof. With respect to each Member or other Person holding any Units, the term "Confidential Information" does not include information that becomes available to the Member or such other Person on a non-confidential basis from a source other than the Company or any of its Affiliates or their respective representatives, provided that the source is not reasonably known by the Member or other Person to be bound by a confidentiality agreement with or other contractual, legal or fiduciary obligation of confidentiality to the Company or any other party with respect to such information.

35.     Deemed Offer has the meaning set forth in Section 7.17(a).

36.     Deemed Offer Closing Date has the meaning set forth in Section 7.18(b)(i).

A-4

37. **Deemed Offered Interest** has the meaning set forth in Section 7.17(a).

38. **Deemed Offeree** has the meaning set forth in Section 7.17(d).

39. **Deemed Offeror** has the meaning set forth in Section 7.17(a).

40. **Delaware Law** means the Delaware Limited Liability Company Act, as it may be amended from time to time, and any successor to the Delaware Law.

41. **Depreciation** means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year or other period; provided, however, that if the Gross Asset Value of an asset differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year or other period, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction with respect to such asset for such Fiscal Year or other period bears to such beginning adjusted tax basis; and provided further that, if the adjusted tax basis of an asset for federal income tax purposes at the beginning of such fiscal Year or other period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board of Managers.

42. **Disability** means, with respect to a Management Member, the Management Member's inability, due to illness, accident, injury, physical or mental incapacity or other disability or similar cause, to perform the essential functions of his or her job, with or without reasonable accommodation, for a period of at least 60 consecutive days or for shorter periods aggregating at least 90 days (whether or not consecutive) during any twelve-month period, as determined in the reasonable judgment of the Board of Managers (excluding such Management Member if he is a member of the Board of Managers at the time of such determination). A Management Member shall be deemed to be "disabled" effective on the 60th or 90th day of Disability, whichever is applicable.

43. **Distribution** means each distribution made by the Company to a Member (or deemed made pursuant to Section 4.5), whether in cash, property or securities of the Company and whether by liquidating distribution, redemption, repurchase or otherwise; provided that none of the following shall be a Distribution: (a) any recapitalization or exchange of securities of the Company, and any subdivision (by unit split or otherwise) or any combination (by reverse unit split or otherwise) of any outstanding Units, (b) any repurchase by the Company of any securities of the Company in connection with the termination of employment of an employee of the Company or any Subsidiary of the Company; provided such repurchase was approved by the Board of Managers, (c) any repurchase of Units pursuant to any right of first refusal or other repurchase right in favor of the Company under this Agreement, or (d) any issuance of Units by the Company upon a conversion of its convertible Units by the holder of such convertible Units.

44. **Effective Date** has the meaning set forth in the first paragraph of this Agreement.

45. **Electing Unitholders** has the meaning set forth in Section 7.3(a).

46.   Electronic Transmission means any form of communication, not directly involving the physical delivery of paper, that creates a record that may be (a) retrieved and reviewed by the recipient thereof, and (b) retained or stored by the recipient electronically or printed or otherwise reproduced in paper form by such a recipient.

47.   Eligible Member means (a) each Member who has a Percentage Interest of at least five percent (5%) and is an Accredited Investor and (b) any other Member which the Board of Managers may from time to time designate as an Eligible Member.

48.   Employment Agreement means any employment agreement, consulting agreement, confidentiality agreement, noncompete agreement, nonsolicitation agreement, senior management agreement or any similar agreement to which the Company or any of its Subsidiaries is a party, each as amended from time to time.

49.   Equity Agreement has the meaning set forth in Section 3.3.

50.   Equity Securities means, with respect to the Company, (a) additional Units or other equity interests in the Company, (b) obligations, evidences of indebtedness or other securities or interests convertible or exchangeable into Units or other equity securities in the Company, and (c) warrants, options, or other rights to purchase or otherwise acquire Units or other equity interests in the Company or securities described in clause (b) above (including, without limitation, any Warrants).

51.   Excess Distribution Amount means, an amount with respect to each Distribution made to the holders of Series A Preferred Units pursuant to Section 4.6(d), equal to excess, if any, of the Distribution made to the holders of Series A Preferred Units pursuant to Section 4.6(d) over the amount of the Distribution that would have been made to the holders of Series A Preferred Units pursuant to Section 4.6(d) had the Distribution pursuant to Section 4.6(d) been made to all Members in accordance with their respective Percentage Interests.  To illustrate this definition, if the holders of Series A Preferred Units collectively have a 50% Percentage Interest at the time of a $100,000 Distribution pursuant to Section 4.6(d), then the holders of the Series A Preferred Units would actually receive $75,000 from the Company and the Excess Distribution Amount would be $25,000 (i.e., $75,000 less $50,000).

52.   Exempted Securities shall mean (a) the Common Units , Series A Preferred Units and Series B Preferred Units issued to the Members as shown on the Schedule of Members on or before the Effective Date, (b) additional Series B Preferred Units pursuant to the Series B Purchase Agreement, (c) Management Incentive Units, or warrants, options, or other rights to purchase or otherwise acquire Management Incentive Units, issued to Service Providers in accordance with Section 3.4, (d) Equity Securities issued in connection with debt financings, refinancings, restructurings or similar transactions, (e) Equity Securities issued upon exercise or conversion or exchange of other Equity Securities which were Exempted Securities, (f) Equity Securities issued pursuant to a conversion of the Company effected in accordance with Section 7.13; (g) Equity Securities issued pursuant to the exercise of Warrants to acquire Common Units

A-6

under the Series B Purchase Agreement; or (h) Units issued in connection with any Unit split, Unit dividend or recapitalization of the Company.

53.     Exercise Units means, at the time of reference, those Common Units which would be issued by the Company to a Member upon an exercise of all Unexercised Warrants held by such Member, assuming the Member paid the full exercise price in cash.

54.     Existing Members means the Members of the Company on the date of this Agreement.

55.     Fair Market Value has the meaning set forth in Section 7.18(a).

56.     Family Group means, as to any particular Person, (a) such Person's spouse and descendants (whether natural or adopted), (b) any trust solely for the benefit of such Person and/or such Person's spouse and/or descendants (determined ignoring any remainder or similar interest coming into effect only upon the death of all such Persons) and (c) any partnerships, corporations, or limited liability companies where the only partners, shareholders, or members are Persons referred to in the preceding clauses (a) and (b).

57.     Fiscal Period means any interim accounting period within a Fiscal Year established by the Board of Managers and which is permitted or required by Section 706 of the Code.

58.     Fiscal Quarter means each calendar quarter ending March 31, June 30, September 30 and December 31, or such other quarterly accounting period as may be established by the Board of Managers.

59.     Fiscal Year has the meaning set forth in Section 9.1.

60.     Governmental Entity means any federal, state, provincial, municipal, foreign or local government, any political subdivision thereof or any other executive, legislative, administrative, judicial, quasi-judicial or other governmental entity, department, commission, court, board, bureau, agency or instrumentality.

61.     Gross Asset Value means, with respect to any Company asset, such asset's adjusted basis for U.S. federal income tax purposes, except that the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the fair market value (as determined by the Board of Managers) of such asset as determined at the time of the contribution. The Gross Asset Value of all Company assets may be adjusted by the Board of Managers to equal their respective fair market values as determined by the Board of Managers in accordance with the rules set forth in Section 1.704-1(b)(2)(iv)(f) of the Treasury Regulations as of: (a) the date of the acquisition of any additional Units by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the date of the distribution of more than a de minimis amount of Company property; (c) the acquisition of an additional interest in the Company by any new or existing Member (other than a de minimis interest) which is acquired as consideration to that Member for the provision of services to or for the benefit of the Company acting in a

Member capacity or in anticipation of becoming a Member, (d) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); or (e) an election under Section 734(b) of the Code or Section 743(b) of the Code but only as provided in Regulations Section 1.704-1(b)(2)(iv)(m) and only to the extent not duplicative of adjustments made pursuant to clauses (a) through (d). The Gross Asset Value of all Company assets shall be adjusted by the Board of Managers to equal their respective fair market values as determined by the Board of Managers in accordance with the rules set forth in Section 1.704-1(b)(2)(iv)(f) of the Treasury Regulations immediately after the exercise of a noncompensatory option (as defined in Treasury Regulations Section 1.721-2(f)), which for the avoidance of doubt, includes any warrants issued pursuant to the Series B Purchase Agreement. The Gross Asset Value of any Company asset distributed to any Member shall be adjusted immediately prior to such distribution to equal its fair market value. Depreciation shall be calculated by reference to Gross Asset Value, instead of tax basis, once Gross Asset Value differs from tax basis.

62. Initial Public Offering means an underwritten initial public offering pursuant to an effective registration statement under the Securities Act of any class of capital interests or stock of the Company or the Successor.

63. Insider has the meaning set forth in Section 5.14(d).

64. IRS Notice has the meaning set forth in Section 3.4.

65. Key Persons means Visker, Fred Fribley, Larry Beals, Scott Ryink and Dave Snyder.

66. Major Member means a Member whose Percentage Interest exceeds ten percent (10%), at the time of reference.

67. Majority in Interest means the Member(s) holding Units and deemed to own Exercise Units attributable to outstanding Warrants representing at least a majority of all the sum of all Units and Exercise Units deemed outstanding attributable to outstanding Warrants held by the Members entitled to vote on the matter requiring approval.

68. Majority in Interest of Common means the Member(s) holding Common Units and Exercise Units deemed outstanding attributable to outstanding Warrants representing at least a majority of all Common Units and Exercise Units deemed outstanding attributable to Warrants of the Members entitled to vote on the matter requiring approval.

69. Management Incentive Unit means a Common Unit having the rights and obligations specified by the Board of Managers (whether in this Agreement, an equity incentive plan adopted by the Board of Managers, and/or the Equity Agreement evidencing the grant of the Management Incentive Unit), including Common Units issued as a "profits interest" in the Company for income tax purposes.

70. Management Member has the meaning set forth in Section 3.4.

A-8

71. _Managers_ has the meaning set forth in _Section 5.1_.

72. _Member_ means the Existing Members and the other Persons listed from time to time on the _Schedule of Members_ and any Person admitted to the Company as a member of the Company, but only for so long as such Person is shown on the Company's books and records as the owner of one or more Units. Whenever the context requires, references in this Agreement to a Member shall include an assignee who does not become a Substituted Member whenever such reference relates solely to an economic interest in the Company.

73. _Member Minimum Gain_ means an amount, with respect to each "partner nonrecourse debt" (within the meaning of Treasury Regulation Section 1.704-2(b)(4)), equal to the Company Minimum Gain that would result if such partner nonrecourse debt were treated as a nonrecourse liability (within the meaning of Treasury Regulation Sections 1.704-2(b)(3) and 1.752-1(a)(2)), determined in accordance with Treasury Regulation Section 1.704-2(i).

74. _Membership Interest_ means, with respect to any Member, the ownership interest of the Member in the Company having the rights, including rights in respect of allocations of Net Income and Net Loss and to receive distributions conferred by this Agreement, which ownership interests are personal property affording only the rights and privileges as are expressly set forth in this Agreement and under the Delaware Law. All Membership Interests are represented by Units.

75. _Minimum Gain_ means the partnership minimum gain determined pursuant to Treasury Regulation Section 1.704-2(d).

76. _Net Income_ or _Net Losses_ means, for each Fiscal Year or Fiscal Period, the taxable income or tax loss of the Company as determined under Section 703(a) of the Code (including in such taxable income or tax loss all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code), adjusted to the extent the Board of Managers determines that such adjustment is necessary to comply with the requirements of Section 704(b) of the Code and the Treasury Regulations promulgated thereunder, but excluding all items of income, gain and expense specially allocated pursuant to this Agreement. If the Company's taxable income or tax loss for such period, as adjusted pursuant to the preceding sentence, is a positive amount, such amount shall be the Company's Net Income for such period; and if negative, such amount shall be the Company's Net Losses for such period.

77. _New Securities_ means any Equity Securities of the Company (including Common Units, Series A Preferred Units and Series B Preferred Units), whether or not currently authorized, or securities of any type whatsoever that are, or may by their terms become, convertible or exchangeable into or exercisable for Equity Securities of the Company.

78. _Non-Management Members_ means any Member that is not (and never was) a Management Member.

79. _Offer Notice_ has the meaning set forth in _Section 7.2(a)_.

A-9

80. **Officer** means those persons designated in this Agreement or by the Board of Managers pursuant to Section 5.9 to conduct the daily business of the Company.

81. **Percentage Interest** means with respect to each Member the amount (expressed as a percentage) equal to the product of (a) a fraction, the numerator of which is the number of Units held by such Member and the denominator of which is the total number of Units outstanding multiplied by (b) 100. The Percentage Interest so determined shall be rounded to the nearest one-thousandth of a percent. The Percentage Interests of the Members are set forth on the Schedule of Members, as from time to time amended in accordance with this Agreement, and are subject to adjustment from time to time in accordance with this Agreement. Notwithstanding anything to the contrary in this Agreement, none of the Class B Units will be treated as Units for purposes of the definition of Percentage Interest.

82. **Permitted Pledge** means a pledge of Units by a Member to a lender providing financing to the Company and/or one or more Subsidiaries pursuant to a loan approved by the Board of Managers.

83. **Permitted Transfer** means (a) a Transfer to a Permitted Transferee in accordance with this Agreement or (b) a Transfer that is approved by the Board of Managers.

84. **Permitted Transferee** means (a) with respect to any Person who is an individual, a member of such Person's Family Group, (b) in the case of a member who is not an individual, to or among such Member's Affiliates, provided that such Transfer is approved by the Board of Managers, (c) any Person who acquires the Units of a Member pursuant to a Permitted Pledge, and (d) any Person who acquires Units or Unit Equivalents from TFG.

85. **Person** means any individual, partnership, corporation, limited liability company, limited liability partnership, unincorporated association, trust or other entity.

86. **Prime Rate** means the prime rate of interest per annum published in the "Money Rates" column in the "Credit Markets" section of The Wall Street Journal.

87. **Prior LLC Agreement** has the meaning set forth in the Background.

88. **Professional Services Agreement** means the Professional Services Agreement dated on or around the Effective Date, between the Company and TFG, as from time to time amended.

89. **Public Offering** means any underwritten sale of common equity securities of the Company (or any successor thereto, whether by merger, conversion, consolidation, recapitalization, reorganization or otherwise) pursuant to an effective registration statement under the Securities Act filed with the Securities and Exchange Commission on Forms S-1, S-2 or S-3 (or any successor forms adopted by the Securities and Exchange Commission); provided that the following shall not be considered a Public Offering: (i) any issuance of common equity securities in connection with and as consideration for a merger or acquisition, and (ii) any

A-10

issuance of common equity securities or rights to acquire common equity securities to Service Providers or others as part of an incentive or compensation plan, agreement or arrangement.

90.    PVD means physical vapor deposition.

91.    Qualified Public Offering means the Company's or Successor's bona fide offering of its capital stock to the general public (a) that is underwritten on a firm commitment basis by one or more nationally recognized underwriters, (b) from which the Company receives net cash proceeds of at least $30,000,000, and (c) that gives the Company a pre-money valuation of at least $75,000,000.

92.    Redemption Notice Date has the meaning set forth in Section 7.19(a).

93.    Redemption Price has the meaning set forth in Section 7.19(a).

94.    Regulatory Allocations has the meaning set forth in Section 4.3(e).

95.    Regulatory Authority has the meaning set forth in Section 11.13.

96.    Rights Member has the meaning set forth in Section 11.16.

97.    ROFR Member has the meaning set forth in Section 7.2(a).

98.    Round 2 Net Equity Value has the meaning set forth in the Series A Purchase Agreement.

99.    Safe Harbor Election has the meaning set forth in Section 3.4.

100.   Sale Notice has the meaning set forth in Section 7.3(a).

101.   Sale of the Company means either (a) the sale, lease, transfer, conveyance or other disposition, in one transaction or a series of related transactions (including by way of merger, consolidation, recapitalization, reorganization or sale of securities of one or more of the Company's Subsidiaries), to any Person that is not a Member on the Effective Date or any Affiliate of such Member, for value, of all or substantially all of the assets of the Company and/or its Subsidiaries on a consolidated basis or (b) a transaction or series of transactions (including by way of merger, consolidation, recapitalization, reorganization or sale of securities by the holders of securities of the Company) with any Person that is not a Member on the Effective Date or any Affiliate of any such Member, the result of which is that the Members immediately prior to such transaction are (after giving effect to such transaction) no longer, in the aggregate, the "beneficial owners" (as such term is defined in Rule 13d-3 and Rule 13d-5 promulgated under the Securities Exchange Act), directly or indirectly through one or more intermediaries, of more than fifty percent (50%) of the voting power of the outstanding voting securities of the Company. Notwithstanding the foregoing, (y) no such transaction or series of related transactions (including by way of merger, consolidation, recapitalization, reorganization, sale of securities or otherwise) in connection with a Public Offering shall be deemed a Sale of

A-11

the Company, and (z) a Sale of the Company shall not include any such transaction effected by the issuance of voting securities by Company or any of its Subsidiaries without any subsequent redemptions of Equity Securities of the Company.

102.　　Sale Units has the meaning set forth in Section 7.3(a).

103.　　Securities Act means the Securities Act of 1933, as amended from time to time.

104.　　Securities Exchange Act means the Securities Exchange Act of 1934, as amended from time to time.

105.　　Series A Liquidation Preference means an amount equal to the sum of the Series A Preferred Units Unreturned Capital Amount plus the Unpaid Series A Yield, determined as of the time of a distribution pursuant to Section 10.3(a)(iv).

106.　　Series A Manager has the meaning set forth in Section 5.3(a)(ii).

107.　　Series A Preferred Unit means a Series A Preferred Unit representing a fractional part of the ownership of the Company and having the rights, preferences, and obligations specified with respect to Series A Preferred Units in this Agreement.

108.　　Series A Preferred Units Unreturned Capital Amount means, with respect to the Series A Preferred Units, the excess, if any, of (a) ninety-three percent (93%) of the aggregate purchase price paid to the Company for the Series A Preferred Units pursuant to the Series A Purchase Agreement over (b) the aggregate Excess Distribution Amount. On the Effective Date, the Series A Preferred Units Unreturned Capital Amount is as set forth on the books and records of the Company.

109.　　Series A Purchase Agreement means that certain Securities Purchase Agreement dated as of April 23, 2013, by and between the Company and TFG, pursuant to which TFG acquired Series A Preferred Units in the Company.

110.　　Series A Yield means, with respect to the Series A Preferred Units, the amount accruing on a daily basis at the rate of eight percent (8%) per annum, compounded on the last day of each quarter of each calendar year, on (a) the Series A Preferred Units Unreturned Capital Amount plus (b) the Unpaid Series A Yield thereon, for all periods. The Series A Yield began to accrue on April 23, 2013 and will continue to accrue as long as the Series A Preferred Units Unreturned Capital Amount balance is more than zero (0). In calculating the amount of any Distribution to be made during a period, the Series A Yield for such portion of such period elapsing before such Distribution is made shall be included as part of such Series A Yield.

111.　　Series B Liquidation Preference means an amount equal to the sum of the Series B Preferred Units Unreturned Capital Amount plus the Unpaid Series B Yield, determined as of the time of a distribution pursuant to Section 10.3(a)(iii).

A-12

112.     Series B Preferred Unit means a Series B Preferred Unit representing a fractional part of the ownership of the Company and having the rights, preferences, and obligations specified with respect to Series B Preferred Units in this Agreement.

113.     Series B Preferred Units Unreturned Capital Amount means, with respect to any Series B Preferred Unit, the excess, if any, of (a) the aggregate purchase price paid to the Company with respect of such Series B Preferred Unit pursuant to the Series B Purchase Agreement over (b) the aggregate amount of prior distributions made by the Company with respect to such Series B Preferred Units pursuant to Section 4.6(b). On the Effective Date, the Series B Preferred Units Unreturned Capital Amount is equal to the amount paid by the Members to the Company for the Series B Preferred Units under the Series B Purchase Agreement and is set forth on the books and records of the Company.

114.     Series B Purchase Agreement has the meaning set forth in the Background.

115.     Series B Yield means, with respect to the Series B Preferred Units, the amount accruing on a daily basis at the rate of fifteen percent (15%) per annum, compounded on the last day of each quarter of each calendar year, on (a) the Series B Preferred Units Unreturned Capital Amount plus (b) the Unpaid Series B Yield thereon, for all periods. The Series B Yield shall begin to accrue on the Effective Date and continue to accrue as long as the Series B Preferred Units Unreturned Capital Amount balance is more than zero (0). In calculating the amount of any Distribution to be made during a period, the Series B Yield for such portion of such period elapsing before such Distribution is made shall be included as part of such Series B Yield.

116.     Service Provider means any manager, director, officer or employee of the Company or any of its Subsidiaries or any independent contractor who performs services for the Company or any of its Subsidiaries.

117.     Subsidiaries means with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control the manager, managing member, managing director (or a board comprised of any of the foregoing) or general partner of such limited liability company, partnership, association or other business entity. For purposes hereof, references to a "Subsidiary" of any Person shall be given effect only at such times that such Person has one or more Subsidiaries, and, unless otherwise indicated, the term "Subsidiary" refers to a Subsidiary of the Company.

A-13

118.   Substituted Member means a Person admitted as a substitute Member pursuant to Section 7.7(b).

119.   Successor has the meaning set forth in Section 7.13(c).

120.   Tag-Along Notice has the meaning set forth in Section 7.3(a).

121.   Tax Distribution has the meaning set forth in Section 4.7.

122.   Taxing Jurisdiction means any federal, state, local, or foreign government that has the right to collect tax, interest or penalties, however designated, on any Member's share of the income or gain attributable to the Company.

123.   TFG means TFG Wheels, LLC, a Delaware limited liability company, and each other holder of Units that were held by TFG. If there is more than one such Person, whenever this Agreement references "TFG" such reference shall be to all such Persons and all decisions of TFG will be made by TFG in its sole discretion, unless TFG is not a Member, in which case all decisions of TFG will be made by the Person(s) holding at least a majority of the outstanding Units that were held by TFG outstanding at the time of the decision and all Distributions to TFG shall be made pro rata based on the number of TFG's Units held by them.

124.   TFG Catch-up Percentage means an amount expressed as a percentage equal to the quotient determined by dividing (a) seven percent (7%) of the aggregate purchase price paid to the Company for the Series A Preferred Units pursuant to the Series A Purchase Agreement by (b) the Round 2 Net Equity Value.

125.   Transaction Documents means, collectively, this Agreement, the Series A Purchase Agreement, the Series B Purchase Agreement, and such other documents and agreements entered in connection with the foregoing agreements on or around the Effective Date.

126.   Transfer has the meaning set forth in Section 7.1. The terms "Transferee," "Transferor," "Transferred," and other forms of the word "Transfer" shall have the correlative meanings.

127.   Transferring Holder has the meaning set forth in Section 7.2(a).

128.   Treasury Regulation means the regulations promulgated by the United States Department of Treasury pursuant to and in respect of provisions of the Code. All references herein to sections of the Treasury Regulations shall include any corresponding provisions of succeeding, similar, substitute, proposed, or final Treasury Regulations.

129.   Unexercised Warrants means those Warrants which have not been exercised by the Member(s) holding such Warrants as of the time of determination.

A-14

130. **Unit** means the units of Membership Interest in the Company representing a fractional part of the interests in Net Income, Net Losses and Distributions of the Company held by all of the Members and Assignees; provided, that any class, group, or series of Units issued shall have the relative rights, powers and obligations set forth in this Agreement.

131. **Unit Equivalents** means (without duplication with any Units or other Unit Equivalents) rights, warrants, options, convertible securities, exchangeable securities, indebtedness or other rights, in each case exercisable for or convertible or exchangeable into, directly or indirectly, Units or securities exercisable for or convertible or exchangeable into Units, whether at the time of issuance or upon the passage of time or the occurrence of some future event (including, without limitation, any Exercise Units).

132. **Unpaid Series A Yield** means, with respect to the holders of Series A Preferred Units, an amount equal to the excess, if any, of (a) the accrued Series A Yield, over (b) the aggregate amount of prior Distributions made by the Company to the holders of Series A Preferred Units pursuant to Section 10.3(a)(iv), Section 4.6(c) or deemed made pursuant to Section 4.6(c) as a result of Tax Distributions pursuant to Section 4.7 attributable to the Series A Yield.

133. **Unpaid Series B Yield** means, with respect to the holders of Series B Preferred Units, an amount equal to the excess, if any, of (a) the accrued Series B Yield, over (b) the aggregate amount of prior Distributions made by the Company to the holders of Series B Preferred Units pursuant to Section 10.3(a)(iii), Section 4.6(a) or deemed made pursuant to Section 4.6(a) as a result of Tax Distributions pursuant to Section 4.7 attributable to the Series B Yield.

134. **Visker** means Jamie T. Visker, a Florida resident.

135. **Warrants** means those certain Warrants to Purchase Common Units issued pursuant to the Series B Purchase Agreement along with any Warrants to Purchase Common Units issued in substitution of any such Warrant upon a partial exercise thereof.

136. **Winona Powder** means Winona Powder Coating, Inc., an entity controlled by Visker.

## SCHEDULE OF MEMBERS

(As of the Effective Date)

| Member | Common Units | Series A Preferred Units | Total | Percentage Interest |
|---|---|---|---|---|
| TFG Wheels, LLC | 0 | 18,175 | 18,175 | 53.79% |
| Jamie and Atlanta S. Visker | 8,659 | 0 | 8,659 | 25.627% |
| Jamie Visker IRA LPL Financial Custodian | 20 | 0 | 20 | 0.059% |
| Atlanta Visker IRA LPL Financial Custodian | 45 | 0 | 45 | 0.133% |
| Winona Powder Coating, Inc. | 780 | 0 | 780 | 2.308% |
| Eugene and Jodie Rothgerber | 1096 | 0 | 1,096 | 3.244% |
| Smith Investments Limited Partnership | 312 | 0 | 312 | 0.923% |
| The Petro Group Inc. | 312 | 0 | 312 | 0.923% |
| Rainbow 3 LLC | 349 | 0 | 349 | 1.033% |
| Fred Fribley | 343 | 0 | 343 | 1.015% |
| Frederich Fribley IRA Account | 437 | 0 | 437 | 1.293% |
| Connie Fribley | 156 | 0 | 156 | 0.462% |
| Sue Brown IRA Account | 460 | 0 | 460 | 1.361% |
| David Snyder IRA Account | 156 | 0 | 156 | 0.462% |
| Howard Fox & Audrey Ades | 156 | 0 | 156 | 0.462% |
| Scott Eyink IRA Account | 125 | 0 | 125 | 0.370% |
| Westhill Development, LLC | 624 | 0 | 624 | 1.847% |
| Danari LLC | 312 | 0 | 312 | 0.923% |
| Nathaniel & Catherine Drourr | 312 | 0 | 312 | 0.923% |
| Douglas K. Robinson | 160 | 0 | 160 | 0.474% |
| Dan J. and Cheryl Ann Robinson | 160 | 0 | 160 | 0.474% |
| Dennis and Nancy Harrison | 160 | 0 | 160 | 0.474% |
| The Carol A. Bockelman Revocable Trust DTD 12-19-05 | 160 | 0 | 160 | 0.474% |
| Anthony G. and Stacy S. Marlin | 160 | 0 | 160 | 0.474% |
| Burton A. Ramsey | 80 | 0 | 80 | 0.237% |
| Ernest B. Wiggins IRA | 80 | 0 | 80 | 0.237% |
| **Totals** | 15,614 | 18,175 | 33,789 | 100.00% |

EXHIBIT A

## FORM OF ADOPTION AGREEMENT

### ADOPTION AGREEMENT

This ADOPTION AGREEMENT (this "Adoption Agreement") is executed by the undersigned (the "Transferee") pursuant to the terms of that certain Second Amended and Restated Limited Liability Company Agreement of Winona PVD Coatings, LLC, a Delaware limited liability company (the "Company") dated as of August 5, 2015 (as amended, the "LLC Agreement"), by and among the Company and its Members. Capitalized terms used but not defined in this Adoption Agreement shall have the respective meanings ascribed to such terms in the LLC Agreement. By the execution of this Adoption Agreement, the Transferee agrees as follows:

1.      Acknowledgement.  Transferee acknowledges that Transferee is acquiring certain Common Units (the "Acquired Units"), subject to the terms and conditions of the LLC Agreement.

2.      Agreement.  Transferee (a) agrees that the Acquired Units acquired by Transferee shall be bound by and subject to the terms of the LLC Agreement, and (b) hereby adopts the LLC Agreement with the same force and effect as if the Transferee were originally a party thereto.

3.      Notice.  Any notice required or permitted by the Agreement shall be given to Transferee at the address listed beside the Transferee's signature below.

EXECUTED AND DATED this _____ day of _____, 20_____.

TRANSFEREE

By: _____

    Name: _____

    Title (if applicable): _____

Address: _____

          _____

Fax: _____

Accepted and Agreed by the Company:

WINONA PVD COATINGS, LLC

By: _____

    Name: _____

    Title: _____

<u>Exhibit B</u>

Summary Matrix of Changes to Prior Agreement

(see attached)

## Summary of Changes to Limited Liability Company Agreement of Winona PVD Coatings, LLC

Set forth below is a summary of the changes made in the Second Amended and Restated Limited Liability Company Agreement (the "New Operating Agreement") of Winona PVD Coatings, LLC, a Delaware limited liability company (the "Company"), which amends and restates, in its entirety, the Amended and Restated Limited Liability Company Agreement of the Company (the "Prior Operating Agreement"). The purpose of this summary is to highlight distinctions between key terms set forth in the Prior Operating Agreement and the New Operating Agreement, but is not intended to pick up every change made in amending and restating the Prior Operating Agreement such as new defined terms, deletion of defined terms that are no longer used, updated section references or general clean-up. If there is a conflict between this summary and the New Operating Agreement, the New Operating Agreement controls. Capitalized terms used and not defined herein shall have the meanings set forth in the New Operating Agreement.

| | Provision | Prior Operating Agreement Provision | New Operating Agreement Provision |
|---|---|---|---|
| 1. | Authorized Units (§3.1) | Authorized Units of the Company consist of Common Units and Series A Preferred Units. | Series B Preferred Units to be issued pursuant to the Series B Purchase Agreement added to authorized Units. |
| 2. | Admission (§3.4) | TFG is admitted to the Company as a member (within the meaning of the Delaware Law) as of the Effective Date. | Provision no longer necessary because TFG is an Existing Member at the time the New Operating Agreement takes effect. |
| 3. | Preemptive Rights (§3.8(a), (b), (g), (h)) | No provision for Series B Preferred or Warrants | Provision amended to provide preemptive rights to holders of Warrants, and clarify that holders of Series B Preferred Units do not have preemptive rights attributable to their Series B Preferred Units. |
| 4. | Preemptive Rights (§3.8(b), (c), (d)) | 10 days for a Member to elect to exercise its preemptive rights. | Time period extended to 20 days. |
| 5. | Effective Date Capital Accounts (§4.1(d)) | TFG's initial Capital Account balance was $9,000,000 and aggregate Capital Account balances of the Initial Members being the Round 1 Equity Value. | Provision has been deleted because no longer necessary. The Series A Unit Purchase Agreement has been completed and the current Capital Account balance of each Existing Member is as set forth on the book and records of the Company. |
| 6. | Noncompensatory Options – Regulatory Allocations (§4.3(f)) | None. | Capital account allocation language added to address exercise Warrants issued under the Series B Purchase Agreement, consistent with applicable tax rules. |
| 7. | Noncompensatory Options – Tax Allocations (§4.4(d)) | None. | Tax allocation provision consistent with applicable tax rules for Warrants. |

| | Provision | Prior Operating Agreement Provision | New Operating Agreement Provision |
|---|---|---|---|
| 8. | Distributions (§4.6) | All distributions to holders of Series A Preferred Units and Common Units, in order and priority set forth in Section 4.6. | The holders of Series B Units are entitled to a priority in distributions so that they will receive their entire Series B Yield (15% per annum) and return of capital invested before distributions can be made to the holders of Series A Units and Common Units. Distribution priority between Series A Preferred Units and Common Units is unchanged. |
| 9. | Board of Managers (§5.1) | Each Manager is entitled to one vote, provided, however that prior to the Second Closing Date, Visker shall be entitled to two votes. | Changes made to reflect that each Manager has only one vote as the Second Closing Date has already occurred and the proviso is no longer relevant. |
| 10. | Composition of Board of Managers (§5.3(a)) | Composition of Board of Managers changed following Second Closing Date. | Since the Second Closing Date has already occurred, composition of board prior to Second Closing Date was removed. |
| 11. | Member Voting (§6.4(e)) | Each Member is entitled to one vote for each Common Unit and/or Series A Preferred Unit held by such Member on each matter submitted to a vote or approval by the Members. | Voting provisions enhanced for Member's holding warrants by treated them as owning Common Units issuable upon exercise of the Warrants, as of the time of reference. |
| 12. | ROFR and Tag-Along (§7.2, 7.3) | No reference to Series B Preferred Units redemption provision. | ROFR and tag-along rights do not apply to the Company's redemption of Series B Preferred Units. |
| 13. | Change in Business Form (§7.13) | If Company is converted to a corporation, capital stock of the corporation would be shared among the Members in accordance with Percentage Interest. | If Company is converted to a corporation, amount of capital stock of new entity Members would receive will be determined in accordance with the waterfall provision, taking into account distribution provision. |
| 14. | Redemption of Series B Preferred Units (§7.19) | None. | Company may redeem all Series B Preferred Units for the aggregate purchase price of $1 after the Company has paid the Series B Yield and return invested capital with respect to the Series B Preferred Units. |
| 15. | Distribution on Dissolution and Termination (§10.3(a)) | Liquidation proceeds shared among holders of Series A Preferred Units and Common Units in accordance with priorities set forth in Section 10.3(a). | Series B Preferred Units' priority distribution rights added ahead of distributions to Series A Preferred Units and Common Units. |
| 16. | Definition of Capital Contribution (Appendix A) | No reference to Warrants. | Added reference to Warrants. |

2

| | Provision | Prior Operating Agreement Provision | New Operating Agreement Provision |
|---|---|---|---|
| 17. | Definition of Exempted Securities (Appendix A) | Includes Common Units and Series A Preferred Units issued to the Members. | Revised to also include Series B Preferred Units issued to the Members as well as Equity Securities issued pursuant to the exercise of Warrants. |
| 18. | Definition of Exercise Units (Appendix A) | None. | Common Units that would be issued by the Company upon an exercise of Warrants held by a Member. |
| 19. | Definition of Gross Asset Value (Appendix A) | No reference to Warrants. | Revised to provide for an exercise of Warrants. |
| 20. | Definition of Majority in Interest and Majority in Interest of Common (Appendix A) | Voting determined based on outstanding Units. | Enhances voting power of Members holding Warrants by treating such Members as owning the Common Units issuable upon an exercise of the Warrants held by the Members, as determined at the time of reference. |
| 21. | Definition of Series B Liquidation Preference (Appendix A) | No provision. | Series B Liquidation Preference equal to unpaid Series B Yield *plus* unreturned capital attributable to Series B Units. |
| 22. | Definition of Series B Yield (Appendix A) | No provision. | 15% per annum, cumulative and compounded quarterly return. |
| 23. | Schedule of Members | Reflected ownership following TFG Wheels, LLC's initial investment. | Updated to reflect Unit ownership as of August 3, 2015. Only change was to include TFG Wheels, LLC's subsequent investment made on September 30, 2013. |

6945088v4

Exhibit C

2014 Financial Statements

(see attached)

## PROFESSIONAL SERVICES AGREEMENT

This **Professional Services Agreement** ("*Agreement*") is made as of April 23, 2013, by and between **Winona PVD Coatings, LLC**, a Delaware limited liability company (the "*Company*"), and **TFG Wheels, LLC**, a Delaware limited liability company ("*TFG*"). Certain capitalized terms used herein are defined in Section 6.

Simultaneously with the execution of this Agreement, TFG is acquiring certain membership interests in the Company pursuant to the Securities Purchase Agreement dated as of even date herewith, among the Company, Jamie T. Visker, TFG and the Other Members identified therein (the "*Purchase Agreement*"). The Company desires to engage TFG to provide certain advisory and monitoring services of TFG and TFG desires to provide such services and advice to the Company on the terms and conditions herein set forth. Accordingly, the Company and TFG desire enter into this Agreement.

**NOW, THEREFORE,** in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

**Section 1.** **Engagement of TFG.** The Company hereby engages TFG, and TFG hereby accepts such engagement, as a financial and management consultant, upon the terms and conditions set forth in this Agreement.

**Section 2.** **Term.** This Agreement shall remain in force and TFG shall provide the services described hereunder for the period (the "*Term*") commencing on the date hereof and ending on the first to occur of (i) an underwritten public offering of the Company's capital stock or limited liability company interests, or (ii) a Sale of the Company.

**Section 3.** **Monitoring Services.**

(a) During the Term, TFG shall advise the Company's board of managers with respect to management matters related to the Company's business, administration and policies, as the Company may specifically and reasonably request from time to time; provided that TFG shall be required to devote only so much time and resources as TFG, in its reasonable discretion, deems necessary in order to provide such services. TFG shall be free of domination or control by the Company over the scope, manner and time of rendering its services hereunder, and the Company shall have no right to dictate or direct the details of the services rendered hereunder. TFG shall (i) use its reasonable efforts to deal effectively with all matters submitted to it hereunder and (ii) endeavor to further, by performance of its services hereunder, the goals, strategies and objectives of the Company.

(b) Except as provided in Section 12, this Agreement shall in no way prohibit or limit TFG or any of its Affiliates from engaging in any other activities.

**Section 4.** **Monitoring Fee.** During the Term, in consideration for the continuing engagement of TFG as a financial and management consultant as set forth herein and regardless of the services, if any, actually performed hereunder, the Company shall pay to TFG an annual fee of $200,000 (the "*Monitoring Fee*"). The Monitoring Fee shall be deemed fully earned and payable by the Company to TFG at all times during the Term. The Monitoring Fee shall be payable in advance in equal quarterly installments beginning on each July 1, October 1, January 1 and April 1 during the

# EXHIBIT "C"

Term; provided that the Monitoring Fee for the quarter beginning on April 1, 2013 shall be prorated based on the actual number of days in the quarter beginning with the date of this Agreement and shall be payable within 5 days of the date of this Agreement.

Section 5.    **Expenses; Construction Housing.**  The Company shall reimburse TFG for its reasonable out-of-pocket expenses (including travel expenses, legal fees, consulting fees, accounting fees and other professional fees) incurred in connection with performing its duties hereunder. TFG shall endeavor to provide Company with advanced written notice if TFG anticipates any such single expense will exceed the sum of Five Thousand Dollars ($5,000.00); provided that TFG's failure to provide such notice shall not have any impact on the Company's obligation to reimburse TFG for such expenses. In addition, during the period of construction of Production Line 2 and Production Line 3 (each as defined in the Purchase Agreement), the Company agrees to make available to TFG one (1) furnished apartment of the same size and character and in the same apartment complex that provides housing for existing management of the Company.

Section 6.    **Certain Defined Terms.**

"**Affiliate**" means, as to any person, any individual, partnership, corporation, group or trust that directly or indirectly controls, is controlled by or is under common control with such person.

"**Person**" shall be construed broadly and shall include, without limitation, an individual, a partnership, a limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"**Sale of the Company**" means the direct or indirect sale of the Company to an independent third party or affiliated group of independent third parties pursuant to which such party or parties acquire (i) capital stock or other equity interests of the Company possessing the voting power to elect a majority of its board of managers or similar governing body (whether by merger, consolidation or sale or transfer of the Company's capital stock) or (ii) all or substantially all of the Company's assets determined on a consolidated basis.  For greater certainty, sale of capital stock or membership interests of the Company to TFG or any other existing member or their respective Affiliates shall not result in a Sale of the Company.

Section 7.    **Notices.**  All notices, requests, demands, claims, and other communications hereunder shall be in writing. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given when delivered personally to the recipient, telecopied to the intended recipient at the telecopy number set forth thereof or below (with hard copy to follow), or sent to the recipient by reputable express courier service (charges prepaid) and addressed to the intended recipient as set forth below:

if to the Company:

Winona PVD Coatings LLC
P.O. Box 1856
Warsaw, Indiana 46581
Telecopy:      (302) 575-0877
Attention:      Jamie Visker

2

if to TFG:

TFG Wheels, LLC
821 Fifth Avenue South, Suite 202
Naples, FL 34102
Telecopy:     (302) 636-5401
Attention:    Domenic Ferrante

Any party may send any notice, request, demand, claim or other communication hereunder to the intended recipient at the address set forth above using any other means, but no such notice, request, demand, claim or other communication shall be deemed to have been duly given unless and until it actually is received by the intended recipient. Any party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other party notice in the manner herein set forth.

**Section 8.     Liability.**  Neither party nor any of its respective affiliates, subsidiaries, members, partners, employees or agents ("*Representatives*") shall be liable to the other party or its respective Representatives for any loss, liability, damage or expense arising out of or in connection with the performance of services contemplated by this Agreement.

**Section 9.     Indemnification.**  Each party agrees to indemnify and hold harmless the other party and its respective Representatives against and from any and all loss, liability, suits, claims, costs, damages and expenses (including attorneys' fees) arising from their performance hereunder, except as a result of their gross negligence or intentional wrongdoing.

**Section 10.    TFG an Independent Contractor.**  TFG and the Company agree that TFG shall perform services hereunder as an independent contractor, retaining control over and responsibility for its own operations and personnel. Neither TFG nor its directors, officers, or employees shall be considered employees or agents of the Company as a result of this Agreement nor shall any of them have authority to contract in the name of or bind the Company, except as expressly agreed to in writing by the Company.

**Section 11.    Proprietary Rights.**  All written materials produced or created by TFG and delivered to the Company, whether created solely or jointly with others, relating to any work performed by TFG for the Company under this Agreement (collectively referred to as the "*Work*"), shall be considered work made for hire and ownership of the entire right, title and interest in the Work, including but not limited to any copyrights, patents, trade secrets, trademarks and other intellectual property rights therein, shall reside in the Company. If the Work cannot for any reason be considered a work made for hire, then the parties agree that the entire right, title and interest in the Work, shall be and hereby are assigned by TFG to the Company, and that TFG will execute all documents necessary to assign and transfer to the Company, or its nominees, successors, or assigns, free of encumbrances, all right, title, and interest in and to the Work and for the Company to perfect such rights in and to the Work.

**Section 12.    Non-Compete.**  During the Term, TFG shall not, directly or indirectly, for themselves or on behalf of any other person engage in the business or acquire an interest in any business that operates a wheel coating business. Nothing in this Agreement prohibits TFG from owning (of record or beneficially) not more than 3% of the outstanding common stock of any publicly traded company that has more than 500 shareholders.

3

Section 13. **Entire Agreement.** This Agreement contains the complete and exclusive expression of the agreement between the Company and TFG with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements or understandings among the Company and TFG with respect hereto.

Section 14. **Assignment.** This Agreement shall not be assigned by any party without the consent of the other party.

Section 15. **Benefits of Agreement.** The terms and provisions of this Agreement shall be binding upon, and will inure to the benefit of, the parties and their respective successors and permitted assigns.

Section 16. **Amendments and Waivers.** The terms and provisions of this Agreement shall not be modified, altered or otherwise amended, except pursuant to a writing signed by the parties. Any waiver by either party of a breach of any provision of this Agreement by the other party shall be in writing and shall not operate or be construed as a waiver of any other or subsequent breach by such other party.

Section 17. **Governing Law.** This Agreement shall be governed by, and construed in accordance with the substantive laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

Section 18. **Counterparts.** This Agreement may be executed in any number of counterparts, and each such counterpart shall be an original instrument, but all counterparts together shall constitute a single agreement.

[Counterpart Signature Pages Follow]

4

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the date first above written.

WINONA PVD COATINGS, LLC

By: _____
Name: Jamie T. Vishon
Title: Manager

TFG WHEELS, LLC

By: _____
Name: Todd Binkowski
Title: Vice President

*(Signature Page to the Professional Services Agreement)*

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the date first above written.

WINONA PVD COATINGS, LLC


By: _____
Name:
Title:

TFG WHEELS, LLC


By: _____
Name: Todd Binkowski
Title: Vice President

*(Signature Page to the Professional Services Agreement)*



August 18, 2015

Dear Members:

The Board of Managers of Winona PVD Coatings, LLC (the "Company") is pleased to announce that it recently authorized and approved the Company securing additional investments of up to $5.5 million by issuing and selling shares of the Company's newly authorized Series B Preferred Units (the "Series B Preferred") to existing members of the Company (the "Series B Offering"). The Company will use proceeds from the Series B Offering to stay current under its existing credit facility and expand its manufacturing capabilities and to provide working capital. As part of the Series B Offering, each purchaser of Series B Preferred will also receive a Warrant to Purchase Common Unit for every $281.147 invested (in substantially the form attached hereto as Exhibit F) (the "Warrants" and each a "Warrant"). The Company consummated an initial closing for the Series B Offering on or about August 5, 2015 (the "Closing"). At the Closing, TFG Wheels, LLC purchased 1,400,000 Series B Preferred (and received a Warrant to purchase 4,979.418 Common Units of the Company at an exercise price of $0.01 per Common Unit) in exchange for $1,400,000.00.

The purposes of this letter (the "Letter") are to (i) provide you with a brief update on the Company's achievements and recent developments, (ii) summarize the terms of the Series B Offering, and (iii) request that you take certain actions. *After reviewing this Letter and the accompanying materials, please provide us with the documents referenced in Part III of this Letter, captioned "Action Items."*

For your convenience and review, a copy of each of the following is attached to this Letter:

    (a)    Second Amended and Restated Limited Liability Company Agreement of the Company (as amended, the "Operating Agreement"), amending and restating in its entirety, the Amended and Restated Limited Liability Company Agreement of the Company (as amended, the "Prior Agreement"), establishing the rights and obligations of the holders of the Series B Preferred and Warrants (including a preferred distribution and priority liquidation preference to the holders of Series B Preferred), which the Company intends to execute at the time of the Closing (see Exhibit A);

    (b)    Summary Matrix of changes made to the Prior Agreement (see Exhibit B);

# EXHIBIT "D"

(c)     Reviewed financial statements of the Company for the year ended December 31, 2014 (see Exhibit C);

(d)     Unaudited financial statements of the Company as of June 30, 2015, and for the year to date period ending on such date (see Exhibit D);

(e)     Unit and Warrant Purchase Agreement setting forth the terms and conditions of the purchase, sale and issuance of Series B Preferred and Warrants in connection with the Series B Offering, which the Company intends to execute at the time of the Closing (see Exhibit E);

(f)     Form of Warrant to be issued to the purchasers of Series B Preferred (see Exhibit F);

(g)     Preemptive Rights Waiver/Election Form (See Exhibit G) for those members of the Company who currently own any Units and are accredited investors;

(h)     Written Consent of the Members of the Company approving the Series B Offering (see Exhibit H); and

(i)     Executed Written Consent of the Board of Managers of the Company approving the Series B Offering (see Exhibit I).

You should consult your own tax advisor, business advisor and attorney as to tax, business, legal and related matters concerning the Series B Offering or any other matter relating to this Letter or the attached Exhibits. If you are an "accredited investor" and desire to participate in Series B Offering, please contact Jamie Visker at (561) 627-7557 and carefully review the "Risk Factors" set forth as Exhibit B to the Unit and Warrant Purchase Agreement prior to making any election to participate in the Series B Offering. If you are not an "accredited investor" you may not participate in the Series B Offering and you do not have preemptive rights or other rights to purchase any of the Series B Preferred or Warrants issued in the Series B Offering.

## 1.     RECENT DEVELOPMENTS

Since our last investor newsletter, the Company has successfully commissioned our second high-capacity line ("Line 3"). Shipments have increased from approximately 33,000 wheels in January to over 100,000 wheels in May. Importantly, in the last several months we have also significantly reduced defects from the low-teens as we started to run the new lines at full capacity to 6.3% in July, with further improvement expected.

To support growth, we have made significant additions to our leadership team including a new Director of Operations, a new Chief Financial Officer, and management hires in quality and materials management. In March, we also began a search for a new CEO who will be responsible for the next phase of the Company's growth. We have several viable candidates and expect to have the new CEO in place within the next 60 days, if not sooner.

-2-

We have quoted a number of new programs over the first half of the year including the next generation GM pickup truck, the demand of which could equal the Ford F150.

One challenge we have faced during the first half of the year is the return of five F150 wheels which came back under warranty. These wheels were produced during a steep portion of the learning curve for Line 2 and we believe no more than 400 wheels made it to the field (out of over 400,000 wheels shipped for F150 and 700,000+ shipped for all Ford programs combined). We have worked closely with Ford on this issue and do not believe it will have a material adverse effect on our relationship with Ford.

In general we have been very busy. The Company has been growing quickly and while the support of that growth has been a challenge, we believe the effort was well worth it as the Company is now stabilized and poised for additional growth and profitability.

## II.    SERIES B OFFERING

The following briefly highlights the terms of the Series B Preferred being offered and sold in connection with the Series B Offering. These terms are more fully set forth in the Exhibits to this Letter:

*   The Series B Offering consists of up to 5,500,000 shares of Series B Preferred for a purchase price of $1.00 per share ($5,500,000.00 in the aggregate)

*   For approximately every $281.147 paid to the Company for Series B Preferred, the purchaser will receive Warrants to acquire 1 Common Units of the Company, with an exercise price of $0.01. Assuming all 5,500,000 shares of Series B Preferred are issued in the Series B Offering, the Warrants would be exercisable for an aggregate of 19,562 Common Units of the Company, which as of today would represent approximately 36.667% of the issued and outstanding Common Units and Series A Preferred Units of the Company, determined on an as-converted to Common Units basis.

*   A preferred return accrues on the Series B Preferred at a rate of 15% per annum, compounded on the last day of each quarter of each calendar year (the "Series B Yield"). The Series B Yield is cumulative, and will be paid prior and in preference to distributions payable to the holders of the Series A Preferred Units and the Common Units.

*   The holders of Series B Preferred have a liquidation preference over the holders of Series A Preferred Units and Common Units equal to the unreturned invested capital and unpaid Series B Yield (the "Liquidation Preference Amount"). Upon payment of the Liquidation Preference Amount, the Series B Preferred will no longer be entitled to participate in distributions.

*   The Company may redeem the Series B Preferred for an aggregate purchase price of $1.00 upon such time as when the holders of Series B Preferred shall have received distributions from the Company equal to the Liquidation Preference Amount.

-3-

* Subject to certain exceptions specified in the Operating Agreement, each holder of Warrants has "pre-emptive rights" to purchase such holder's pro-rata share of securities proposed to be issued by the Company.

## III.   POTENTIAL INTERESTED PARTY MATTERS

The Series B Offering will result in a few potential interested party matters of which you should be aware. First, the Company's offering of Series B Preferred will be limited to existing Members. Therefore, Members who elect to participate in the Series B Offering will increase their relative percentage interests in the Company, while Members who elect not to participate (or do not have an opportunity to participate because they are not an "accredited investor") will be diluted. The lead investor in the Series B Offering is TFG Wheels, LLC, the majority owner of the Company. TFG Wheels, LLC's has two representatives on the Company's three person board of managers. The other member of the Company's board of managers is Jamie Visker.

In addition, the Company's lender, First Farmers Bank & Trust ("First Famer's") will release Jamie Visker from his personal guarantee of the Company's indebtedness following the Closing. First Farmer's will also return two certificate of deposits, each in the amount of $500,000, previously provided by each of Domenic Ferrante and Winona Powder Coating, Inc. as additional security for loans made to the Company. Winona Powder Coating, Inc. is an affiliate of Jamie Visker.

## IV.   ACTION ITEMS

1.   Complete and execute your counterpart signature page to the Operating Agreement enclosed herewith and return it to the Company at the address set forth below in the enclosed self-addressed envelopes **immediately upon receipt of this letter**.

2.   If you are an "accredited investor" and choose to participate in the Series B Offering, please complete and execute a counterpart signature page to the Unit and Warrant Purchase Agreement and return it to the Company at the address set forth below in the enclosed self-addressed envelopes.

3.   At your earliest convenience, prior to September 7, 2015, please complete and sign the attached Preemptive Rights Waiver/Election Form and return it to the Company at the address set forth below in the enclosed self-addressed envelopes.

4.   At your earliest convenience, prior to September 7, 2015, please complete and sign the attached Written Consent of the Members and return it to the Company at the address set forth below in the enclosed self-addressed envelopes.

-4-

For more information regarding the Company, or to ask questions regarding the Company, this Letter or the attached Exhibits, please contact:

Jamie T. Visker
Winona PVD Coatings, LLC
1180 Polk Drive
Warsaw, Indiana  46582
Phone: (561) 627-7557
Fax: (574) 269-3255
Email: JVisker@winonapvd.com

Very truly yours,

Jamie T. Visker, CEO and Manager

-5-

**From:** Jamie Visker
**Sent:** Friday, November 11, 2016 1:11 PM
**To:** Domenic Ferrante <DF@theferrantegroup.com>; Todd Binkowski <TB@theferrantegroup.com>
**Subject:** Resignation Letter

Attached is my letter resigning from the Board of Managers.  I wish the company much success but cannot continue to be a member of the board.  I will continue to work on the patent if that is your choice.
Thanks,
Jamie

# EXHIBIT "E"

Dominic Ferrante
Todd Binkowski
Winona PVD Coatings, LLC
1180 Polk Drive
Warsaw, IN 46582

RE: Resignation from Board of Managers

Please consider this letter as notice of my resignation from the Board of Managers of Winona PVD Coatings, LLC, and all related companies, as applicable. The resignation shall be effective immediately. The reason for my resignation is multiple fundamental disagreements over the operation of the Company with the other members of the Board of Managers. The single largest issue is the decision not to hire an accomplished manufacturing CEO to run the company day to day given the inability of current management to generate profits through reducing scrap rates. I believe this decision has not been in the best interest of the company and its members.

To the extent helpful, I offer to continue to assist the Company with the prosecution of its patent and continue to be the interface with Dan Lueders and Kevin Sprecher. I am also available to answer questions, if helpful, regarding historical Company operational issues.

I encourage the Company to schedule a members meeting in the immediate future, and provide all members with a thorough presentation on material matters affecting the Company's operation and financial performance. I do not believe the members have been kept informed on such matters. I am making all members aware of my resignation.

Finally, I understand a party adverse to the Company is seeking to take my deposition. Please ask company legal counsel to direct all communications regarding this matter through my legal counsel, Scott Treadway at (317) 706-6718 or scott@estiawllc.com.

Regards,

Jamie T. Visker



E. SCOTT TREADWAY
ATTORNEY AT LAW

February 24, 2017

10401 N. MERIDIAN STREET
SUITE 225
INDIANAPOLIS, IN 46290

O | 317.706.5718
C | 317.413.3365
F | 317.708.6492

SCOTT@ESTLAWLLC.COM

Ed Sullivan
FAEGRE BAKER DANIELS LLP
202 South Michigan Street, #1400
South Bend, IN 46601

     RE:  Winona PVD Coatings, LLC v. Excel Enterprise, LLC, et al.

Dear Ed:

     We had requested all relevant emails and documents relating to Mr. Visker and the dispute in question.  We are certain that those documents exist, are in your possession, and have not been provided to us.  I suspect the delay is attributable to the inflammatory nature and content of the documents.  I shall contact Mr. Dunn and request copies.  I will copy you on that request.  I also request you take steps to preserve all records in your control or possession relating to Winona PVD Coatings, LLC including emails, notes, memoranda, and correspondence.

     Additionally, please be aware I have been retained by the common shareholders in conjunction with possible claims against the Company and the majority shareholder.  The Company will be receiving a letter in the near future outlining those claims.  On behalf of the common shareholders, I am requesting a status report on your negotiations with Excel Enterprise, LLC and/or Barry Buha ("Excel").  I am also requesting a copy of any settlement agreement or proposal that has been exchanged with Mr. Dunn.  As you are aware, the company has elected not to reasonably inform the common shareholders of material events affecting the Company.  As the shareholders have cause to believe the Company lacks adequate cash flow to fund a large settlement, they are also seeking an explanation regarding the funding mechanism for any future payments due Excel.  The Common Shareholders are also requesting a detailed description of any verbal or written factual representations, claims, warranties, or promises made to Excel in order to induce Excel to consider a settlement.  If you prefer, I can request this information from Mr. Dunn.

     Finally, if we do not receive the requested documents on or before the close of business on Monday, February 27, 2017, we shall no longer hold open the March 13th deposition date.

               Very truly yours,

               EST Law, LLC

               E. Scott Treadway

EST/tm
cc: Jamie Visker

# EXHIBIT "F"



E. SCOTT TREADWAY
ATTORNEY AT LAW

10401 N. MERIDIAN STREET
SUITE 225
INDIANAPOLIS, IN 46290

O | 317.706.6718
C | 317.413.3365
F | 317.708.5492

SCOTT@ESTLAWLLC.COM

March 10, 2017

Patrick Mosley
Will Ward Henderson
3700 Bank of America Plaza
101 E. Kennedy Blvd.
Tampa, FL 33602-5195

**RE: Common Shareholder Dispute – Winona PVD Coatings, LLC**

Dear Mr. Mosley:

Please consider this letter as a preliminary response to your letter dated March 7, 2017.

First, please advise us whether you represent Winona PVD Coatings, LLC ("Winona"), Todd Binkowski, or Domenic Ferrante, or all of the above.

As to the content of your letter, it is replete with inaccurate and incomplete information. We will elaborate.

1. The Representative Agreement was fully disclosed to Mr. Ferrante. In fact, Mr. Ferrante's counsel, your partner, reviewed and approved the agreement. Mr. Ferrante and Mr. Binkowski demanded, as a condition of closing, that a new, virtually identical Representative Agreement, be executed by Barry Buha. For anyone to suggest otherwise is simply an intentional effort to misrepresent irrefutable facts. Moreover, Mr. Ferrante and Mr. Binkowski had the opportunity to meet and interview Mr. Buha. No concerns were expressed regarding Mr. Buha or the Representative Agreement.

2. Payments due Mr. Buha were built into all financial projections for Winona, as was known to your client. As we will detail in a future letter, the financial performance of the company has been greatly harmed by substantial mismanagement, wholly unrelated to Mr. Visker or Mr. Buha.

3. Reference to the new "automotive team" joining the company, on page two of your letter, is deceptive at best. Current management has been in exclusive control of the company for at least two (2) years. This new "team" was interviewed in 2016. We understand that the

2 | Page

new "team" will have a commission structure substantially similar to that of Mr. Buha. Further, if Mr. Buha's performance was so substandard, what is the rationale for the multi-million dollar settlement?

4. Mr. Visker resigned for a wide variety of reasons, including the following:

   a. Mismanagement of the company;

   b. Decisions made by the Series A Managers, which were causing harm to Winona;

   c. Refusal of the Series A Managers to listen to advice and warnings being provided by Mr. Visker;

   d. Refusal of the Series A Managers to provide material information to the common unit holders; and

   e. The behavior of Mr. Binkowski. I encourage you to review his electronic mails, which typify his demeanor.

5. Your reference to a succession plan on page three of your letter is nonsensical. The Series A Managers removed Mr. Visker as an officer many months earlier. The Series A Managers were making virtually all major decisions of Winona without the consent of Mr. Visker. In fact, when Mr. Visker offered advice, he was routinely disregarded and belittled. The Series A Managers ensured that Mr. Visker had no significant role in company management. Succession was not an issue. Mr. Binkowski has made very clear that he had little regard for the experience and/or expertise of Mr. Visker.

6. Mr. Visker has been unable to identify a person willing to serve as a manager with Mr. Binkowski. Mr. Binkowski's conduct has created a caustic and hostile environment. Mr. Ferrante has been unwilling or unable to control Mr. Binkowski, which is in large part responsible for the company's performance. We would suggest Mr. Binkowski be replaced with an independent manager who has no prior connection to Mr. Ferrante or Winona. This action would likely enable a replacement manager to be identified.

7. The reason for the lack of information is due to the secretive nature by which the company is operated. When is the last time the company conducted a meeting of members to inform members of material events affecting the company? Mr. Visker has repeatedly encouraged the Series A Managers to conduct such a meeting. Has the true financial condition of the company been disclosed to the members? Have the Series A Managers disclosed they are actually meeting and attempting to sell the company in a manner which would leave the common members with no return on their investment and loss of their initial investment amounts? Why is information being concealed from members?

As for the Settlement Agreement, first, please identify the language in the Operating Agreement which either requires or permits approval by Mr. Visker. Mr. Visker is a common unit holder. Second, Mr. Visker has been kept largely in the dark regarding the litigation. Until

3 | P a g e

recently, when Mr. Buha sought Mr. Visker's deposition, Mr. Visker knew few details regarding the litigation. Mr. Visker requested relevant documents during the deposition process. That request for information has been repeatedly rejected by the company's outside counsel. We believe this action is being taken at Mr. Binkowski's instruction.

We believe the Series A Managers should schedule a meeting in the immediate future with all members to provide a thorough presentation on the following subjects:

1. Approval of the Settlement Agreement;

2. The current financial condition of the company and its ability to meet its financial obligations. We understand it may currently be in default to lenders;

3. Efforts by Mr. Ferrante and Mr. Binkowski to sell the company or its assets; and

4. The reason the company has been unable to solve its scrap rate problems, which developed under Mr. Binkowski's management.

As to the merits of Mr. Buha's Settlement Agreement, it appears Mr. Buha has agreed to accept materially less money than those sums due under the Representative Agreement. As Mr. Visker has not been briefed on the specific factual and legal issues, he cannot offer an informed opinion as to its further merits.

Finally, enclosed herewith is a second letter, requesting that the company, its employees, agents, managers, and representatives take immediate steps to preserve evidence and data.

Yours very truly,

EST LAW, LLC

E. Scott Treadway

EST/tm
Enclosure

cc: Common Unitholders

**Theresa**

| | |
|---|---|
| **From:** | Scott Treadway |
| **Sent:** | Thursday, October 12, 2017 9:24 AM |
| **To:** | Patrick M. Mosley |
| **Subject:** | RE: Winona PVD Coatings [HWHLAW-FirmLive.FID1254993] |

Patrick

While I appreciate the response, my clients are unwilling to indefinitely delay a resolution of this matter. Simply explaining that someone will get back to the unitholders at some unspecified date is unacceptable. Further, applicable law does not allow your client to ignore its fiduciary responsibilities under the excuse of a missing board member. Because of the nature of how your clients have operated the company, no individual has been willing to serve as a board member.

Please advise if your firm will accept service of process for the company, its board members and the majority unitholders. Additionally, please advise if your firm is representing both the company and its controlling unitholder. We previously understood your firm only represented the company.

Finally, please provide me contact information for the insurance carrier and its adjuster.

Scott Treadway

**From:** Patrick M. Mosley [mailto:Patrick.Mosley@hwhlaw.com]
**Sent:** Tuesday, October 10, 2017 3:27 PM
**To:** Scott Treadway <scott@estlawllc.com>
**Cc:** Lance Curry <lance.curry@hwhlaw.com>
**Subject:** RE: Winona PVD Coatings [HWHLAW-FirmLive.FID1254993]

Thanks, Scott. Following up on our call from Friday and as we discussed, we will be drafting a response to your demand letter but we are waiting to hear back from the carrier on any input or their thoughts on the response/demand. We followed up with the carrier again late last week regarding their views on the current situation, but still have not heard back. As soon as we hear something back and obtain their views on the response we will follow up with you.

As to information from the company and as we have previously indicated via correspondence, the minority unitholders source of information from the company is through the board seat controlled by the minority unitholders. By vacating that seat and refusing to appoint a new board member the minority unitholders have chosen to remain in the dark regarding the company's current operation and financial condition. If the minority unitholders wish to appoint a new board member I know my clients would welcome that individual and look forward to working with them.

Again, I will follow up with a more detailed response once I speak further with the carrier and claims agent.

Thanks.


Patrick M. Mosley

HILL WARD HENDERSON
3700 Bank of America Plaza
101 East Kennedy Boulevard
Tampa, FL 33602

1

http://www.hwhlaw.com
Main: 813-221-3900
Fax: 813-221-2900
Direct: 813-222-8507
patrick.mosley@hwhlaw.com

**From:** Scott Treadway [mailto:scott@estlawllc.com]
**Sent:** Monday, October 09, 2017 2:10 PM
**To:** Patrick M. Mosley
**Subject:** RE: Winona PVD Coatings

Patrick

I wanted to confirm our telephone conversation last Friday. At that time, you stated you were waiting to hear from a carrier and would be emailing me. However, you did not provide additional information. I also did not receive an email from you. I will be speaking to my client group later this week. Unless we reach some understanding regarding a potential resolution of our claims, I am confident we will be moving forward as outlined in my prior letter. As you are aware, the minority unitholders have received virtually no information regarding the current operation of the company.

Scott Treadway

**From:** Patrick M. Mosley [mailto:Patrick.Mosley@hwhlaw.com]
**Sent:** Friday, March 31, 2017 3:25 PM
**To:** Scott Treadway <scott@estlawllc.com>
**Subject:** RE: Winona PVD Coatings

Following up on this. What do you look like on Monday for the call. Thanks.

Patrick M. Mosley

HILL WARD HENDERSON
3700 Bank of America Plaza
101 East Kennedy Boulevard
Tampa, FL 33602
http://www.hwhlaw.com
Main: 813-221-3900
Fax: 813-221-2900
Direct: 813-222-8507
patrick.mosley@hwhlaw.com

**From:** Patrick M. Mosley
**Sent:** Thursday, March 30, 2017 12:58 PM
**To:** 'Scott Treadway'
**Subject:** RE: Winona PVD Coatings

Scott – Sorry I missed you. Was in South Florida the past two days. Let me know if you have some time for a call this afternoon or tomorrow morning. Thanks.

Patrick M. Mosley

HILL WARD HENDERSON
3700 Bank of America Plaza

2

101 East Kennedy Boulevard
Tampa, FL. 33602
http://www.hwhlaw.com
Main: 813-221-3900
Fax: 813-221-2900
Direct: 813-222-8507
patrick.mosley@hwhlaw.com

**From:** Scott Treadway [mailto:scott@estlawllc.com]
**Sent:** Monday, March 27, 2017 12:16 PM
**To:** Patrick M. Mosley
**Subject:** RE: Winona PVD Coatings

Patrick

I am generally available tomorrow for a call.

Scott

> **From:** Patrick M. Mosley [mailto:Patrick.Mosley@hwhlaw.com]
> **Sent:** Friday, March 24, 2017 3:16 PM
> **To:** Scott Treadway <scott@estlawllc.com>
> **Cc:** Tricia Elam <Tricia.Elam@hwhlaw.com>
> **Subject:** Winona PVD Coatings
>
> Scott — Wanted to follow up on the messages I have left for you and see if there is a time
> when you are free for a call next week regarding the letters that have been going back
> and forth regarding our clients. Figured it may be good for you and I to talk and open a
> line of communication that may be helpful to our clients. I am generally free next week
> other than Tuesday or Wednesday. Let me know if there is a time that works for you
> and we can get something on the calendar. Thanks.
>
>
> **Patrick M. Mosley**
>
> HILL WARD HENDERSON
> 3700 Bank of America Plaza
> 101 East Kennedy Boulevard
> Tampa, FL. 33602
> http://www.hwhlaw.com
> Main: 813-221-3900
> Fax: 813-221-2900
> Direct: 813-222-8507
> patrick.mosley@hwhlaw.com



HILL WARD HENDERSON
ATTORNEYS AT LAW
TAMPA | CLEARWATER

CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and confidential
information, and is intended only for the use of the individual or entity named above. If the reader of this message is not the
intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly
prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received
this communication in error and then delete it. Thank you.

**Theresa**

| | |
|---|---|
| **From:** | Scott Treadway |
| **Sent:** | Friday, December 8, 2017 5:26 PM |
| **To:** | 'patrick.mosley@hwhlaw.com' |
| **Cc:** | Scott Treadway |
| **Subject:** | Winona PVD |

Patrick-

We have good cause to believe Winona PVD has retained Donnelly Penman to represent the company in an effort to sell the company and/or its assets. Jamie Visker confirmed this belief with Roy W. Vorhees. First, we are shocked that, to the extent this information is true, it has not been discussed with the minority shareholders, who collectively own almost one-half of the company. Second, to the extent this information is accurate, we request the following information be provided on or before Wednesday, December 13, 2017:

1. The date Donnelly Penman was retained;
2. The amount of any fee paid to Donnelly Penman;
3. The payor of any fee paid to Donnelly Penman;
4. A copy of all information supplied to Donnelly Penman by the company;
5. A copy of all brochures, offerings, or subscription materials prepared by Donnelly Penman;
6. The names and addresses of each party to whom that information has been distributed; and
7. A copy of all board minutes wherein the aforementioned action was voted upon and authorized.

Finally, Mr. Vorhees has led our client to believe that he was specifically instructed by legal counsel for the company to not discuss the above referenced information with shareholders of the company. To the extent this information is accurate, please provide us the name of the attorney who gave this instruction and the identity of the client upon whose behalf this instruction was given.

We look forward to promptly receiving this information, so that the same can be disseminated to the minority shareholders.

Scott

EST Law, LLC
10401 North Meridian Street
Suite 225
Indianapolis, IN 46290
Ofc (317) 706-6718
Fax (317) 708-6492

EST Law, LLC, 10401 North Meridian Street, Suite 225, Indianapolis, Indiana 46290, 317-706-6718/office  317-708-6492/fax

CONFIDENTIALITY NOTICE: This email and any attachments are confidential and may be protected by legal privilege. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the email or any attachment is prohibited. If you have received this email in error, please notify us immediately by returning it to the send and delete this copy from your system. Thank you.

CIRCULAR 230 DISCLOSURE: Except to the extent that this advice concerns the qualification of any qualified plan, to ensure compliance with U.S. Treasury Department Regulations, we are now required to advise you that, unless otherwise expressly indicated, any federal tax advice contained in this communication, including any attachments, is not intended or written by us to be used, and cannot be used, by anyone for the purpose of avoiding

1



E. SCOTT TREADWAY
ATTORNEY AT LAW

10401 N. MERIDIAN STREET
SUITE 225
INDIANAPOLIS, IN 46290

O | 317.706.6718
C | 317.413.3365
F | 317.708.6492

SCOTT@ESTLAWLLC.COM

September 20, 2017

Patrick Mosley
Will Ward Henderson
3700 Bank of America Plaza
101 E. Kennedy Blvd.
Tampa, FL 33602-5195

      **RE:    Common Unitholder Dispute – Winona PVD Coatings, LLC**
              **Notice of Claim**

Dear Mr. Mosley:

      As you are aware, we represent the nineteen (19) minority unitholders (the "Minority") in Winona PVD Coatings, LLC ("Winona"). The Minority owns thirty-eight percent (38%) of Winona.

      In April of 2013, Dominic Ferrante ("Mr. Ferrante") assumed control of Winona through a private equity investment. An entity owned or controlled by Mr. Ferrante named TFG Wheels, LLC ("TFG") was formed by Mr. Ferrante for purposes of making this investment. Upon information and belief, Mr. Ferrante invited a number of his friends and/or business associates to be part of TFG ("TFG Investors").

      Jamie Visker ("Mr. Visker") is the largest Minority unitholder. Mr. Visker is also the founder of Winona and was its chief executive officer at the time of the TFG investment in Winona.

      Todd Binkowski ("Mr. Binkowski") is a close business associate of Mr. Ferrante. Upon information and belief, Mr. Binkowski and Mr. Ferrante's relationship began during their years in college together. We do not believe Mr. Binkowski has any significant engineering or manufacturing expertise.

      We believe that Mr. Ferrante placed Mr. Binkowski in actual control of Winona since at least February of 2015. We further believe that the controlling majority (the "Majority") of Winona has engaged in a wide variety of actions and omissions which equate to gross mismanagement of Winona, possible fraud, and breaches of multiple fiduciary duties owed to the Minority. The following is only a partial list of the wrongful actions and omissions:

# EXHIBIT "G"

Page | 2
September 20, 2017
RE: Common Unitholder Dispute – Winona PVD Coatings, LLC

1. Mr. Binkowski has a volatile personality. The conduct and hostile language of Mr. Binkowski has alienated key employees and created a hostile work environment. Mr. Binkowski has also made written statements regarding Mr. Visker, and possibly others, which we believe to be defamatory. A small sampling of Mr. Binkowski writings are attached hereto as Exhibit "A."

2. Key technical employees of Winona either quit or were discharged because of a hostile work environment, creating a technical skills and experience void greatly harming the manufacturing process. Winona's profitability has been severely harmed by the lack of competent employees.

3. Winona management engaged in wrongful conduct directly resulting in litigation against Winona. This conduct included wrongfully terminating the contract of a key salesperson. To make matters worse, current or former representatives of Winona were asked to fabricate evidence during the pendency of the litigation pursued by the salesperson in order to defend Winona. Understandably, these representatives refused this request. We have documented these events.

4. Management's actions and leadership failures caused the firing or resignation of key personnel, including but not limited to:

   * Jamie Visker, CEO
   * Scott Eyink, Director of Engineering
   * Roy Green, Maintenance and Powder Coating Specialist
   * Larry Case, Maintenance Manager and Operations
   * Lori Stanger, Vice President and General Counsel

5. In addition to the above resignations and firings, management has made several other hiring/firing decisions that have deeply impacted the production, efficacy, and overall stability of Winona, including but not limited to, the following:

   * The removal of Larry Beals from operations and the subsequent replacement with Rick Groom. Mr. Beals had previously been in charge of the operation of two (2) separate OEM wheel manufacturing facilities for Superior Industries International. In contrast, Mr. Groom previously managed a manufactured homes facility and had absolutely no knowledge of the technology utilized in the physical vapor deposition ("PVD") process, no history of automotive supply and no relevant wheel industry experience.

   * The termination of Barry Buha's sales representative agreement. Mr. Buha was a key representative of Winona, responsible for Winona's single largest customer.

Page | 3
September 20, 2017
RE: Common Unitholder Dispute – Winona PVD Coatings, LLC

* The revolving door CEO position after the removal of Mr. Visker. Winona has been through three (3) CEO's in the past three (3) years. Winona has been without a competent CEO since 2015.

6. Winona utilizes a highly complex manufacturing process. After forcing out key Winona employees who were qualified to implement and manage these processes, remaining management engaged in an uninformed and ill-advised effort to modify equipment, alter processes, and modify equipment settings. It should be noted that remaining management had no expertise with the PVD process or the equipment in question. The following are merely examples:

* Placing "I-Control" modules on the Vacuprime booth on Line 3. The result was that no improvements were realized and recipes were changed. The additional problem was that wheels could no longer be coated on both A and B sides. The result was longer cycle times and increased scrap rates.

* A decision that additional air conditioning was required for Line 3 with no understanding of how chilled water systems operated. This caused the addition of two (2) fifty (50) ton chillers and air handlers, which resulted in a substantial increase in foreign material and, in turn, an additional increase in scrap rate. It was later determined that the units were not needed and removed from the system. The total cost for this blunder (excluding the increased cost associated with the scrap rate) was over one hundred fifty thousand dollars ($150,000.00). Mr. Binkowski has no HVAC expertise and ignored the advice of those persons with relevant knowledge.

* A decision (again, with no prior knowledge of the industry and no input from existing employees) to change gun positions, wheel coating recipes and removal (and subsequent replacement) of coating guns. The existing gun positions had previously coated over four thousand (4,000) wheel styles on Line 1. This resulted in increased scrap rates.

* A decision to unnecessarily incur substantial cost in adding humidification to the coating rooms. Humidity was likely never a factor which impacted scrap rates and was never required on Line 1.

* A decision to unnecessarily change air flow to the coating rooms on Line 3, negatively impacting the ovens and powder collection from the paint booths. Remarkably, Mr. Binkowski would make major changes to equipment settings without keeping detailed records of the changes.

P a g e | 4
September 20, 2017
RE: Common Unitholder Dispute – Winona PVD Coatings, LLC

7. Management, again with Mr. Ferrante's actual knowledge and consent, engaged in a number of other highly wrongful actions, such as:

- Injecting themselves into key relationships with vendors and customers, while knowing little about Winona's policies and processes. Third-parties quickly recognized Winona was now being operated by individuals with little manufacturing knowledge or technical competence.

- Inviting an individual by the name of Thomas Schwing into the plant for an extensive plant tour. Management failed to remember that Mr. Schwing was an aggressive competitor who had engaged lawyers and asserted patent infringement claims against Winona. Mr. Binkowski and Mr. Ferrante were on actual notice of Mr. Schwing's identity and on actual notice of the infringement claim. This oversight, while shockingly incompetent, has exposed Winona to future claims. We have also now learned that Mr. Schwing is an employee of a direct competitor, Superior. Superior is in the process of building a competing PVD wheel-coating facility, likely utilizing the knowledge and expertise acquired by Mr. Schwing during the plant tour he was provided by Winona management. The lack of company security and failure to protect the intellectual property of Winona typifies the shortcomings of current management.

- Adding millions of dollars of debt to Winona's balance sheet, rendering Winona in serious risk of becoming insolvent.

- Placing Winona in serious jeopardy of receiving a "going concern" warning from Winona's outside accountants.

- Causing Winona to be in violation of its loan covenants with First Farmers Bank & Trust Company (the "Lender").

- Possibly failing to disclose to the Lender material adverse financial information required to be disclosed by relevant loan documents.

8. Current management has been directly responsible for high product scrap rates. This persistent problem is a direct result of incompetent employees altering sensitive equipment in a haphazard fashion and failing to maintain records of changes. These actions have destroyed profitability.

Page | 5
September 20, 2017
RE: Common Unitholder Dispute – Winona PVD Coatings, LLC

9. We also believe the Majority has attempted to conceal the above actions and other information. This conduct has taken many forms including the following:

* Providing different or conflicting information to the Minority and the TFG Investors;

* Suspending the practice of sending a regular newsletter to the Minority;

* Not advising the Minority of major negative financial events materially affecting Winona;

* Failing to replace Mr. Visker. Mr. Visker was the designated representative of the Minority;

* Not distributing financial records to the Minority;

* Attempting to secretly sell Winona at a discounted price, which would completely dilute the Minority position; and

* Not scheduling or conducting unitholder meetings despite repeated encouragement by Mr. Visker to do so.

The Minority has not been supplied with any material information relating to Winona, with the exception of reviewed financial statements and highly sanitized quarterly financials, in over eighteen (18) months.

The actions and omissions of management and the controlling ownership has caused millions of dollars of damages to the Minority. Winona has also been irreparably harmed. Profitability has been destroyed. Actions of the Majority has also caused the Minority to be unlawfully diluted. While the precise amount of damages has not yet been determined, the Minority has engaged Jason Thompson of Sponsel CPAs to assist in the determination. A copy of Mr. Thompson's CV is attached hereto as Exhibit "B." Damages will no doubt include the loss of value to the units, loss of investment return, expert fees, attorney's fees, interest, and possible damages which will result in the event of any unlawful sale. *See* Gatz Properties, LLC v. Auriga Capital Corp., 59 A.3d 1206 (Del. 2012); Ryan v. Tad's Enterprises, Inc., 709 A.2d 682 (Del. Ch. 1998).

II.
Applicable Law

As you are aware, the Second Amended and Restated Limited Liability Company Agreement of Winona PVD Coatings, LLC, dated August 3, 2015 ("Operating Agreement"), provides for the application of Delaware law at Section 2.1. The Operating Agreement further preserved and incorporated Delaware common law as it relates to fiduciary duties owed by

Page | 6
September 20, 2017
RE:  Common Unitholder Dispute -- Winona PVD Coatings, LLC

majority unitholders to minority unitholders.  *See* Operating Agreement at Sections 5.3(e) and 5.9(c).

      Under Delaware Law, Mr. Ferrante, who in all material respects controls every aspect of Winona, owes specific duties to Winona and the Minority, including the following:

    A.  The duty to act in the utmost good faith;

    B.  The duty to operate Winona so as to protect all unitholders;

    C.  The duty to not place Mr. Ferrante's personal interest above fellow unitholders;

    D.  The duty to deal fairly with the Minority;

    E.  The duty not to conceal material financial information from the Minority;

    F.  The duty to act with "unselfish loyalty";

    G.  The duty to exercise unbiased judgment not influenced by self-interest or loyalty to third parties who are not unitholders such as Mr. Binkowski. Decisions based on self-interest or loyalties to outside parties is constructively fraudulent; and

    H.  There is an implied covenant of good faith and fair dealing found in every operating agreement.

*See* Loftland v. Cahall, 118 A. 1 (Del. 1922); Bovay v. H.M. Byllesby & Co., 38 A.2d 808 (Del. 1944); Cede & Co. v. Technicolor, Inc., 634 A.2d 345 (Del. 1993); Harriman v. E.I. Du Pont de Nemours & Co., 372 F. Supp. 101 (D. Del. 1974); Gatz Properties, LLC v. Auriga Capital Corp., 59 A.3d 1206 (Del. 2012); and Guth v. Loft Incorporated, 5 A.2d 503 (Del. 1939).

      In addition to the recovery of damages, we believe the Minority may ask a Court to appoint a receiver to audit and/or operate Winona.  A receiver is an appropriate remedy in the event of fraud and/or gross and reckless mismanagement by the controlling majority.  *See* Feldman v. Pennroad Corp., 60 F. Supp 716, 219 (D. Del. 1945).

III.
Relief Requested

      In an attempt to mitigate the harm caused by prior actions and omissions, the Minority is requesting the following prompt action:

    A.  First, the Minority believes Mr. Binkowski should be permanently removed from the Board of Managers and from all responsibilities relating to the management of Winona.

Mr. Ferrante's continued blind loyalty to Mr. Binkowski has caused substantial harm to the Minority;

B. Second, the Minority requests copies of all financial records of Winona for 2015, 2016, and 2017, including the following:

    a. All loan covenant compliance reports;
    b. All changes to loan covenants on existing loans; and
    c. All communications between the Board of Managers and all outside accountants and/or business brokers or advisors.

C. Third, the Minority requests a detailed report regarding manufacturing scrap rates for 2015, 2016, and 2017. Included within this report should be an explanation of what caused the scrap rates and what steps have been taken to address the same;

D. Fourth, the Minority requests that competent management be immediately hired to run Winona on a day to day basis;

E. Fifth, the Minority requests copies of all communications between Winona, Mr. Ferrante, and/or Mr. Binkowski and the TFG Investors, which in any manner relate to Winona;

F. Sixth, the Minority requests copies of all communications between Winona, Mr. Ferrante, and/or Mr. Binkowski and all outside lenders and accountants of Winona;

G. Seventh, the Minority requests that they be immediately briefed on all action by the Majority to sell Winona and further request that the Majority agree to keep the Minority regularly and fully advised on all such activity;

H. Eighth, the Minority requests ongoing quarterly updates regarding Winona's operations, financial performance, and plans to return Winona to profitability; and

I. Ninth, a prompt meeting between the Majority and a small group representing the Minority to discuss future operations of Winona. We believe that time is of the essence is scheduling and holding such a meeting.

In the event the Majority refuses to comply with all of the above referenced requests within a reasonable timeframe, we see only two (2) available options:

A. The Minority pursues its legal remedies, including seeking the appointment of a receiver for Winona. Only in this way can the Minority ensure competent management is engaged to save Winona. Such action would also include a claim for monetary damages and a request for a forensic accounting; or

Page | 8
September 20, 2017
RE: Common Unitholder Dispute — Winona PVD Coatings, LLC

---

B. The Majority and/or Winona purchase the collective interest of the Minority. We have discussed with our clients their willingness to sell their units and they have agreed to sell their collective interest for the sum of ten million dollars ($10,000,000.00). We believe this sum to be less than damages that would be pursued in a legal claim.

The Minority cannot allow the status quo to continue. The requests and offers made in this letter shall remain open until September 29, 2017, at which time they should be considered withdrawn. The Minority shall then be forced to pursue their alternative legal remedies. In such case, the Minority requests that Winona place Winona's insurance carrier(s), including but not limited to, its Directors and Officers liability carrier on notice of this claim.

Very truly yours,

EST Law, LLC

E. Scott Treadway

EST/tm
Enclosures
cc:     Minority Unitholders

#4

## Jamie Visker

| | |
|---|---|
| **From:** | Todd Binkowski |
| **Sent:** | Friday, June 19, 2015 2:53 PM |
| **To:** | jvisker_winonapvd.com@winonapowder.com; Domenic Ferrante |
| **Subject:** | RE: HVAC Capex |

Jamie I am going to state up front that I am exhausted. I have been up for 32 straight hours trying to get Ford data they need to try and get this warranty issue under control. And the production data from 4Q14 to February looks like complete shit.

Having thought about this more I am opposed to your plan below. You always have known the best guy for years and you are always getting the best deal. Yet from the most important details, like making good wheels for the F150 to the most mundane details like not having phone network cross-linked to a production network, you have failed to deliver. How these lines could go into production without HVAC ever having been configured is beyond me – grossly negligent in my opinion. Why should I not presume that the same attention to detail that went into configuring the systems (none) went into the engineering of the systems? We have configured per the engineering drawings and it doesn't work – not even close. We lost a lot of wheels because the system was never configured to begin with, we lost production time when van came in to configure per the drawings, and we lost wheels and production time when the system spun out of control and we had to again bring it back to a workable state.

I think you had your chance to configure and prove the engineering last year when the line went into production. We are tight on inventory and I don't want you guys (really just Scott (who is not a problem solver) because you are not going to come in to oversee) on the line doing experiments which slow the line and possibly drive defects. We are already forced into working Sunday because we had another power glitch yesterday which crashed the lines because the experts you have known for a long time and who give you a great deal decided not to put battery backup in place for these highly automated lines – despite my request to do so.

We are hanging on with Ford both in terms of warranty issue and delivering 20K wheels a week, but it has been a huge struggle and the struggle continues. Van has two units which we can get on two weeks notice. If we don't get those units we will likely be pushed into the warmest part of the year with inadequate HVAC. If you want to negotiate the deal with Van because they are screwing us then have it. And of course the final decision on which path we take is up to Dom. But you guys didn't get it right in the first place and I think the idea of playing with HVAC now while we are under ongoing significant inventory constraints is a bad idea, even before considering you will likely push us into the hottest part of the year without HVAC. If we can't keep that line running in a few weeks due to temps and miss delivery schedule, between bad wheels and delivery failure we are asking Ford to put us out of business. Not a good strategy in my opinion.

And while I am being a dick I should also mention I don't like the Axalta plan. Completely unsurprising it is nothing like originally described, and we have screwed around pursuing this scheme when we should have been focused on correctly capitalizing the company. Now we are weeks away from running out of money......

C: 704 907 6847
O: 239 304 8990
F: 239 304 8997

**From:** Jamie Visker
**Sent:** Friday, June 19, 2015 7:45 AM
**To:** Todd Binkowski; Domenic Ferrante (DF@theferrantegroup.com)
**Subject:** RE: HVAC Capex

1

## EXHIBIT "A"

Guys,

Give us a chance to get this done. The engineering drawings state exactly how much outside/plant air was to be brought in to meet code and it was very little. I was not there when they did the balance. Lets see if we set the system up per the design and Scott makes sure the ovens are running slightly negative pressure per the design we get there. It will not take long to see where we are. The design on line 2 and 3 was not to save money but to incorporate what we learned from line 1. Because all the rooms were not connected on the new lines the system became simpler. Also we originally set up line 1 to do 20 air changes per hour and it was too much. We set up line 2 to do 10 air changes an hour. Line 1 was dialed back almost immediately after installation. We are all on the same team here. If the engineering is bad we will find out. I have been doing design and build projects with this engineer since 1994. Steve does an incredible amount of process work for Eli Lilly in Indianapolis.

Jamie

**From:** Todd Binkowski
**Sent:** Thursday, June 18, 2015 9:43 PM
**To:** Domenic Ferrante; Rick Groom
**Cc:** Jamie Visker; Scott Eyink; LuElla Gill
**Subject:** RE: HVAC Capex

I think there is data to show the engineering is highly flawed, since we had the system dialed in as specified on the engineering drawings and it resulted in a gross failure of line cooling.

I think Jamie's position is that Van doesn't know what they are doing and wasn't capable of configuring the system per the engineering drawing, or elected not to do so in pursuit of additional business. I believe van installed and configured the cooling system on line 1. I believe they were only engaged to install the system on line 2 and 3 - the equipment was purchased direct and no one was engaged to configure the system to the engineering drawings. Van was only paid to install, and we subsequently paid them to come back and configure per the drawings.

*C: 704 907 6847*
*O: 239 304 8990*
*F: 239 304 8997*

**From:** Domenic Ferrante [mailto:DF@theferrantegroup.com]
**Sent:** Thursday, June 18, 2015 9:35 PM
**To:** Rick Groom
**Cc:** Todd Binkowski; Jamie Visker; Scott Eyink; LuElla Gill
**Subject:** Re: HVAC Capex

While all these bets seem fun, it seems at some point we are betting the company. If we believe it can't be done, it seems as if we can do substantial damage?? Is this the right approach?

Sent from my iPhone

On Jun 18, 2015, at 8:43 PM, Rick Groom <rickgroom@winonapvd.com> wrote:

> Count me in on the bet.
>
> Sent from my iPhone. Please excuse typos.
>
> On Jun 18, 2015, at 7:46 PM, Todd Binkowski <tbinkowski@winonapvd.com> wrote:

2

Great and good luck. Please recognize that the system will not balance without bringing in outside air. Without outside air to add pressure to a room you will get, for example, a phenomena where when the doors open to take wheels out of dry off oven the pressure in the room seems to drop which causes the primer ovens to flood primer spray room with heat from the primer oven. At the same time the pressure drop is a result of cooler air from the room flooding into the dry off oven through bottom of the large open doors while hot air from the dry off oven flows into the room from top of the open doors. We have used telltales at all air transfer locations to understand air flow. 55% damper open is required to control air flows which otherwise cause temps in the room to spike.

Same issue in PVD transfer. Without pressurizing that room it is very difficult to stop air from base oven from flooding that room. One way to reduce flow into pvd transfer is to up exhaust fans, but if you do that you suck large quantities of air from base into the base oven (since base spray and pvd transfer are both connected to and impacted by the base oven exhaust systems) and create significant stardust issues, and you suck additional air from primer oven into base rooms which spikes that temperature. You can't pressurize base at all because even with base exhausts damped as much as possible and pvd transfer with as much pressure as possible, there is significant flow from the base room into the base oven and you have stardust issues.

We have experimented for days with different fan speeds, fresh air damper settings, and supply and return damper settings to get things to a point where we can run the system.

Recall that Van spent two days configuring the hvac on line 3 exactly to the engineering drawings, including fresh air dampers adjusted to meet the specified drawings. They actually went ballistic when we told them we had unwound their work until we explained to them that we had room temps of 140 degrees and made several hundred bad wheels at 50 bucks a pop as a result. They could be very crafty and have faked anger at our changes from engineering drawings in order to sucker us into buying something from them. Or they could have been making a good faith effort to conform the system to the engineering drawings. Maybe they are super crafty.

We continue to be very tight on inventory. As long as you guys go slow, change one thing at a time, and then monitor all room temps and air flow (via telltells) diligently to make sure we don't go above 90 degrees and don't create shit tons of stardusting that is fine. You also need to plan to be here for a number of days as the required configuration will drift as the weather changes and building pressure changes (as supply fan filters do their job and flow into the building decreases, which decreases building pressure – we are currently cleaning those filters every few days in order to help keep the system balanced). Rick right now walks both lines at least twice per day to make manual adjustments. Chillers are wide open.

$5 bucks says you guys can't the system to consistently maintain room temps under 90 degrees for 36 hours without ongoing manual adjustments. $100 says you can't do it for 72 hours. Let me know if you want to take the bet (Rick let me know if you want half the action). Also recognize that if you are wrong, however many days it takes you to reach that conclusion puts us that many days closer to weather conditions that we believe will shut down the line. We will see Scott on Monday.

C: 704 907 6847
O: 239 304 9990

3

## Jason S. Thompson, CPA/ABV, ASA, CFE, CFF

| | | |
|---|---|---|
| Phone: (317) 608-6699 | Sponsel CPA Group, LLC | email: jthompson@sponselcpagroup.com |
| | 251 N. Illinois, Suite 450 | |
| | Indianapolis, IN 46204 | |

**Education:** Indiana University
Bachelor of Science Degree in Accounting , 1994

**Professional Certifications:** Licensed as a Certified Public Accountant (CPA), 1999
Accredited in Business Valuation (ABV), 2005
Accredited Senior Appraiser (ASA) of the American Society of Appraisers, 2008
Certified Fraud Examiner (CFE), 2005
Certified in Financial Forensics (CFF) August 2008

**Professional Memberships:** Indiana CPA Society (INCPAS)
American Institute of Certified Public Accountants (AICPA)
American Society of Appraisers (ASA)
Institute of Business Appraisers (IBA)
Association of Certified Fraud Examiners (ACFE)
Financial Consulting Group (FCG)

**Awards/Recognition:** *Indiana Super CPA* – Indiana Business Magazine (November 2008)

**Employment:** Sponsel CPA Group, LLC
Partner – Director of Valuation and Litigation Services Group
September 2008 to present

Greenwalt Sponsel & Co., Inc.
Partner – Business Valuation and Litigation Services Group
August 1998 to September 2008

London Witte Group, LLC.
Staff accountant
1995 through July 1998

**Professional Experiences:** Business consulting, audit, tax and accounting experience with privately-held

| Industries: | Areas: |
|---|---|
| Manufacturing/Distribution Construction | Business Valuation |
| Professional Services | Fraud & Forensic Accounting |
| Not-for-Profit | Merger & Acquisition Transactions |
| Retail | Business and Strategic Planning |
| | Litigation Services |
| | Buy/Sell Agreements |

## EXHIBIT "B"

Jason S. Thompson, CPA/ABV, ASA, CFE, CFF
Page 2

| | |
|---|---|
| Representative Summary of Expert Testimony: | **Baily v. Bailey**<br>Deposition Testimony<br>Johnson County, Indiana<br>*Identification of Assets - 2007* |

**Conroy v. Johnston**
Trial Testimony
Hamilton County, Indiana, Superior Court No. 3
*Income Available for Child Support - 2008*

**Custom Cast Stone v. Intricate Masonry, Inc. Advanced Restoration, Inc. and Carl Aikman**
Trial Testimony
Marion County, Indiana
*Forensic Accounting (Piercing the Corporate Veil) – July 2009*

**Guerrettax v. Guerrettaz**
Deposition Testimony
Hendricks County, Indiana
*Valuation of Marital Assets – August 2009*

**Dianne Williams v. Michael Williams**
Trial Testimony
Carroll County, Indiana, Superior Court
*Determination of Business Sale Proceeds – April 2010*

**Dr. Peter Torok v. Ms. Torok**
Trial Testimony
Tippecanoe County, Indiana, Superior Court No. 2
*Valuation of Marital Assets and Determination of Income – May 2010*

**Dr. Wayne Burnett v. Ms. Burnett**
Trial Testimony
Hamilton County, Indiana, Superior Court No. 3
*Valuation of Marital Assets – October 2011*

**Jerrrey Kooi v. Keri Kooi**
Trial Testimony
Hamilton County, Indiana, Superior Court No. 2
*Income Available for Child Support – July 2012*

Jason S. Thompson, CPA/ABV, ASA, CFE, CFF
Page 3

| | |
|---|---|
| Representative Summary of Expert Testimony: *(continued)* | **Russell Sipes v. Linda George, Kathleen Farinas, and George & Farinas, LLP** Deposition Testimony Marion County, Indiana, Superior Court *Partnership Dissolution – February 2013* |

**Simon Services, Inc. d/b/a Simon Business Network, et. al., v. Control Building Services, Inc.**
Deposition Testimony
Marion County, Indiana, Superior Court
*Economic Damages – May 2013*

**Cindy Lewis v. Scott Lewis**
Trial Testimony
Hamilton County Superior Court No. 4
*Value of Legal Practice – September 2013*

**Dave's Detailing, Inc. d/b/a The Allen Groupe, Debtor**
Appointed as Examiner
Trial Testimony
U.S. Bankruptcy Court Southern division of Indiana
*Bankruptcy – October 2014*

**Wendy D. Piatek v. Roger A. Piatek**
Trial Testimony
Hendricks County Superior Court No. 2
*Valuation and Forensic Accounting Fees – January 2015*

**Smith v. Smith**
Trial Testimony
Whitley Circuit Court
*Valuation of Marital Assets – September 2015*

**Gasper v. Gasper**
Trial Testimony
Boone County Superior Court
*Valuation of Marital Assets – March 2016*

**Taylor v. Taylor**
Trial Testimony
Tippecanoe County Circuit Court
*Valuation of Marital Assets – August 2016*

Jason S. Thompson, CPA/ABV, ASA, CFE, CFF
Page 4

| | |
|---|---|
| **Representative Summary of Expert Testimony:** (continued) | *Wright v. Wright* Trial Testimony Boone County Superior Court *Valuation of Marital Assets – September 2016* |
| | *Vocational Consultants, LTD., et al, v. H&R Block Tax Services, LLC, Walnut Business Center, LLC and David E. Freedheim* Deposition Testimony U.S. District Court for the Southern District of Illinois *Valuation of Business Assets – November 2016* |
| **Seminars Presented:** | *"Stressed for Success: Business Issues in a Family Owned Business"* - March 2000 |
| | *"The Generation Gap Comes to Age in Your Office: How to Motivate and Compensate Employees from Boomers to Generation X'rs"* – March 2001 |
| | *"Intellectual Property – Financial Reporting, Tax Consequences"* |
| | *"How to Minimize the Risk of Fraud in your Organization"* – October 2003 |
| | *"Business Valuation for the Professional Firm"* – December 2004 |
| | *"New Business Valuation Standards for Accountants – Understanding the Impact",* co-author, December 2007, The Matrimonial Strategist |
| | *"Business Valuation and the SBA Program"* – February 2008 |
| | *"How to Help your client buy or sell their small to medium sized Business"* – National Business Institute, September 2008, September 2009 |
| | *"Business Valuation: A Primer"* – National Business Institute, April 2009 |
| | *"Business Valuation Best Practices"* – Lafayette, Indiana, June 2009 |
| | *"Choosing the Business Entity"* – Indiana Continuing Legal Education Foundation Seminar, Indianapolis, Indiana, May 2012 |
| | *"Business Damages"* – Indiana Continuing Legal Education Foundation Seminar, Indianapolis, Indiana, June 2012 |
| | *"How to Prepare a Marital Balance Sheet for Settlement and Trial"* – Indianapolis Bar Association Seminar, January 2013 |

Jason S. Thompson, CPA/ABV, ASA, CFE, CFF
Page 5

| | |
|---|---|
| **Seminars Presented:**<br><br>(continued) | *"Advanced Asset Identification and Valuation Techniques"* – Indianapolis Bar Association Seminar, March 2013 |
| | *"Business Valuation and Other Financial Issues in Divorce"* –Indiana State Bar Association – Family & Juvenile Law Section, April 17, 2013 |
| | *"Business Valuation and Financial Considerations"* - Advanced Family Law (North), Ft. Wayne, IN – September 13, 2013 |
| | *"Fraud Prevention Seminar"* – PNC Business Networking Event, Indianapolis, IN – December 4, 2014 |
| | *"Financial Issues in Divorce"* – ICLEF Webcast, August 27, 2015 |
| | *"Occupational Fraud"* – IMASCIC luncheon, December 10, 2015 |
| **Articles Published:** | *Occupational Fraud: How to Identify and Prevent It-* Inside Edge E-Newsletter (January 2015) |
| | *Succession Planning: A Guide for Business Owners* -Inside Edge E-Newsletter (March 2015) |
| | *Craziest Business Expenses of 2015* – Inside Edge E-Newsletter (December 2015) |
| **Service to the Profession:** | *Volunteer, Vice President of Programs for the Indiana Chapter of the American Society of Appraisers, 2009* |
| | *CPA Associates International's – Business Valuation Committee Past Chair 2008 and 2009, Business Valuation Committee Past Member, Litigation Services Committee Past Member* |
| | *Indiana CPA Society's – 2015 inaugural business valuation conference project team committee member* |
| **Service to the Community:** | *Volunteer board member Reach for Youth, Inc (Summer of 2000 to present)*<br>Board Chair (2011-2012)<br>Past Board Treasurer (2004 to 2010) |

## Theresa

| | |
|---|---|
| **From:** | Patrick M. Mosley <Patrick.Mosley@hwhlaw.com> |
| **Sent:** | Tuesday, October 10, 2017 3:27 PM |
| **To:** | Scott Treadway |
| **Cc:** | Lance Curry |
| **Subject:** | RE: Winona PVD Coatings [HWHLAW-FirmLive.FID1254993] |

Thanks, Scott. Following up on our call from Friday and as we discussed, we will be drafting a response to your demand letter but we are waiting to hear back from the carrier on any input or their thoughts on the response/demand. We followed up with the carrier again late last week regarding their views on the current situation, but still have not heard back. As soon as we hear something back and obtain their views on the response we will follow up with you.

As to information from the company and as we have previously indicated via correspondence, the minority unitholders source of information from the company is through the board seat controlled by the minority unitholders. By vacating that seat and refusing to appoint a new board member the minority unitholders have chosen to remain in the dark regarding the company's current operation and financial condition. If the minority unitholders wish to appoint a new board member I know my clients would welcome that individual and look forward to working with them.

Again, I will follow up with a more detailed response once I speak further with the carrier and claims agent.

Thanks.


Patrick M. Mosley

HILL WARD HENDERSON
3700 Bank of America Plaza
101 East Kennedy Boulevard
Tampa, FL 33602
http://www.hwhlaw.com
Main: 813-221-3900
Fax: 813-221-2900
Direct: 813-222-8507
patrick.mosley@hwhlaw.com

---

**From:** Scott Treadway [mailto:scott@estlawllc.com]
**Sent:** Monday, October 09, 2017 2:10 PM
**To:** Patrick M. Mosley
**Subject:** RE: Winona PVD Coatings

Patrick

I wanted to confirm our telephone conversation last Friday. At that time, you stated you were waiting to hear from a carrier and would be emailing me. However, you did not provide additional information. I also did not receive an email from you. I will be speaking to my client group later this week. Unless we reach some understanding regarding a potential resolution of our claims, I am confident we will be moving forward as outlined in my prior letter. As you are aware, the minority unitholders have received virtually no information regarding the current operation of the company.


Scott Treadway

i

**From:** Patrick M. Mosley [mailto:Patrick.Mosley@hwhlaw.com]
**Sent:** Friday, March 31, 2017 3:25 PM
**To:** Scott Treadway <scott@estlawllc.com>
**Subject:** RE: Winona PVD Coatings

Following up on this. What do you look like on Monday for the call. Thanks.


Patrick M. Mosley

HILL WARD HENDERSON
3700 Bank of America Plaza
101 East Kennedy Boulevard
Tampa, FL 33602
http://www.hwhlaw.com
Main: 813-221-3900
Fax: 813-221-2900
Direct: 813-222-8507
patrick.mosley@hwhlaw.com

---

**From:** Patrick M. Mosley
**Sent:** Thursday, March 30, 2017 12:58 PM
**To:** 'Scott Treadway'
**Subject:** RE: Winona PVD Coatings

Scott – Sorry I missed you. Was in South Florida the past two days. Let me know if you have some time for a call this afternoon or tomorrow morning. Thanks.


Patrick M. Mosley

HILL WARD HENDERSON
3700 Bank of America Plaza
101 East Kennedy Boulevard
Tampa, FL 33602
http://www.hwhlaw.com
Main: 813-221-3900
Fax: 813-221-2900
Direct: 813-222-8507
patrick.mosley@hwhlaw.com

---

**From:** Scott Treadway [mailto:scott@estlawllc.com]
**Sent:** Monday, March 27, 2017 12:16 PM
**To:** Patrick M. Mosley
**Subject:** RE: Winona PVD Coatings

Patrick

I am generally available tomorrow for a call.

Scott

**From:** Patrick M. Mosley [mailto:Patrick.Mosley@hwhlaw.com]
**Sent:** Friday, March 24, 2017 3:16 PM
**To:** Scott Treadway <scott@estlawllc.com>

2

Cc: Tricia Elam <Tricia.Elam@hwhlaw.com>
Subject: Winona PVD Coatings

Scott -- Wanted to follow up on the messages I have left for you and see if there is a time when you are free for a call next week regarding the letters that have been going back and forth regarding our clients.  Figured it may be good for you and I to talk and open a line of communication that may be helpful to our clients.  I am generally free next week other than Tuesday or Wednesday.  Let me know if there is a time that works for you and we can get something on the calendar.  Thanks.


**Patrick M. Mosley**

HILL WARD HENDERSON
3700 Bank of America Plaza
101 East Kennedy Boulevard
Tampa, FL  33602
http://www.hwhlaw.com
Main: 813-221-3900
Fax: 813-221-2900
Direct: 813-222-8507
patrick.mosley@hwhlaw.com


HILL WARD HENDERSON
ATTORNEYS AT LAW
TAMPA · CLEARWATER

CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and confidential information, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.



| COURT OF COMMON PLEAS<br>HAMILTON COUNTY, OHIO | CLASSIFICATION FORM<br><br>WWW.COURTCLERK.ORG | AFTAB PUREVAL<br>CLERK OF COURTS |
|---|---|---|

**CASE NUMBER:** _____ **PLAINTIFF:** Jamie Visker, et al. _____

**PURSUANT TO SUPERINTENDENCE RULE 4, THIS CASE WAS ORIGINALLY FILED AND DISMISSED**

**UNDER CASE NUMBER:** _____ **BY JUDGE** _____

## PLEASE INDICATE CLASSIFICATION INTO WHICH THIS CASE FALLS (please only check one):

☐ Other Tort – C360
☐ Personal Injury – C310
☐ Wrongful Death – C320
☐ Vehicle Accident – C370

☐ Professional Tort – A300
☐ Personal Injury – A310
☐ Wrongful Death – A320
☐ Legal Malpractice – A330
☐ Medical Malpractice – A340

☐ Product Liability – B350
☐ Personal Injury – B310
☐ Wrongful Death – B320

☐ Worker's Compensation
☐ Non-Compliant Employer – D410
☐ Appeal – D420

☐ Administrative Appeals – F600
☐ Appeal Civil Service – F610
☐ Appeal Motor Vehicle – F620
☐ Appeal Unemployment – F630
☐ Appeal Liquor – F640
☐ Appeal Taxes – F650
☐ Appeal Zoning – F660

☐ Certificate of Qualification – H600

☐ Other Civil – H700-34
☐ Appropriation – H710
☐ Accounting – H720
☐ Beyond Jurisdiction –730
☐ Breach of Contract – 740
☐ Cancel Land Contract – 750
☐ Change of Venue – H760
☐ Class Action – H770
☐ Convey Declared Void – H780
☑ Declaratory Judgment – H790
☐ Discharge Mechanics Lien – H800
☐ Dissolve Partnership – H810
☐ CONSUMER SALES ACT (1345 ORC) – H820
☐ Check here if relief includes declaratory judgment, injunction or class action recovery – H825
☐ Habeas Corpus – H830
☐ Injunction – H840
☐ Mandamus – H850
☐ On Account – H860
☐ Partition – H870
☐ Quiet Title – H880
☐ Replevin – H890
☐ Sale of Real Estate – H900
☐ Specific Performance – 910
☐ Restraining Order – H920
☐ Testimony – H930-21
☐ Environmental – H940
☐ Cognovit – H950
☐ Menacing by Stalking – H960
☐ ] Repo Title – Transfer of Title Only – 970
☐ ] Repo Title – With Money Claim – H980
☐ Injunction Sexual Predator – 990
☐ SB 10 – Termination – H690
☐ SB 10 – Reclassification – H697

**DATE:** 03/02/2018 _____

**ATTORNEY (PRINT):** Brian W. Fox _____

**OHIO SUPREME COURT NUMBER:** 0086851 _____

Revised 01/02/2017

COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO


JAMIE VISKER
    **PLAINTIFF**

                                          Use below number on
                                          all future pleadings

      -- vs --

                                  No.  A 1801222
                                          SUMMONS

DOMINIC FERRANTE
    **DEFENDANT**


      TODD BINKOWSKI
      1568 MARSH WREN LANE             D - 2
      NAPLES FL 34105




You are notified
that you have been named Defendant(s) in a complaint filed by

      JAMIE VISKER
      1145 SAN MICHELE WAY
      PALM BEACH GARDENS FL 33418


                                                  Plaintiff(s)

in the Hamilton County, COMMON PLEAS CIVIL Division,
**AFTAB PUREVAL, 1000 MAIN STREET  ROOM 315,
CINCINNATI, OH 45202.**
You are hereby summoned and required to serve upon the plaintiff's
attorney, or upon the plaintiff, if he/she has no attorney of record, a
copy of an answer to the complaint within twenty-eight (28) days after
service of this summons on you, exclusive of the day of service. Your
answer must be filed with the Court within three (3) days after the
service of a copy of the answer on the plaintiff's attorney.

Further, pursuant to Local Rule 10 of Hamilton County, you are also required to
file a Notification Form to receive notice of all future hearings.

If you fail to appear and defend, judgement by default will be rendered
against you for the relief demanded in the attached complaint.


Name and Address of attorney           AFTAB PUREVAL
BRIAN W FOX                         Clerk, Court of Common Pleas
312 WALNUT STREET                  Hamilton County, Ohio
SUITE 1800
CINCINNATI      OH      45202
                                By  RICK HOFMANN
                                                Deputy


                                Date:    March 6, 2018

D121137199

COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

JAMIE VISKER
    **PLAINTIFF**

              Use below number on
              all future pleadings

    -- vs --

             No.  A 1801222
                  SUMMONS

DOMINIC FERRANTE
    **DEFENDANT**

    DOMINIC FERRANTE
    25 16TH AVENUE SOUTH          D - 1
    NAPLES FL 34102

You are notified
that you have been named Defendant(s) in a complaint filed by

    JAMIE VISKER
    1145 SAN MICHELE WAY
    PALM BEACH GARDENS FL 33418

                          Plaintiff(s)

in the Hamilton County, COMMON PLEAS CIVIL Division,
**AFTAB PUREVAL, 1000 MAIN STREET   ROOM 315,
CINCINNATI, OH 45202.**
You are hereby summoned and required to serve upon the plaintiff's
attorney, or upon the plaintiff, if he/she has no attorney of record, a
copy of an answer to the complaint within twenty-eight (28) days after
service of this summons on you, exclusive of the day of service. Your
answer must be filed with the Court within three (3) days after the
service of a copy of the answer on the plaintiff's attorney.

Further, pursuant to Local Rule 10 of Hamilton County, you are also required to
file a Notification Form to receive notice of all future hearings.

If you fail to appear and defend, judgement by default will be rendered
against you for the relief demanded in the attached complaint.

Name and Address of attorney        AFTAB PUREVAL
BRIAN W FOX                 Clerk, Court of Common Pleas
312 WALNUT STREET           Hamilton County, Ohio
SUITE 1800
CINCINNATI      OH      45202
                      By  RICK HOFMANN
                              Deputy

                      Date:    March 6, 2018

D121137195

COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

JAMIE VISKER
    **PLAINTIFF**

        -- vs --

DOMINIC FERRANTE
    **DEFENDANT**

Use below number on
all future pleadings

No. A 1801222
      SUMMONS

TFG WHEELS LLC
821 5TH AVE S           D - 4
NAPLES FL 34102

You are notified
that you have been named Defendant(s) in a complaint filed by

    JAMIE VISKER
    1145 SAN MICHELE WAY
    PALM BEACH GARDENS FL 33418

                                Plaintiff(s)

in the Hamilton County, COMMON PLEAS CIVIL Division,
**AFTAB PUREVAL, 1000 MAIN STREET ROOM 315,
CINCINNATI, OH 45202.**
You are hereby summoned and required to serve upon the plaintiff's
attorney, or upon the plaintiff, if he/she has no attorney of record, a
copy of an answer to the complaint within twenty-eight (28) days after
service of this summons on you, exclusive of the day of service. Your
answer must be filed with the Court within three (3) days after the
service of a copy of the answer on the plaintiff's attorney.

Further, pursuant to Local Rule 10 of Hamilton County, you are also required to
file a Notification Form to receive notice of all future hearings.

If you fail to appear and defend, judgement by default will be rendered
against you for the relief demanded in the attached complaint.

Name and Address of attorney        AFTAB PUREVAL
BRIAN W FOX                     Clerk, Court of Common Pleas
312 WALNUT STREET            Hamilton County, Ohio
SUITE 1800
CINCINNATI      OH      45202
                          By  RICK HOFMANN
                                    Deputy

Date:   March 6, 2018

D121137216

COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO


JAMIE VISKER
    **PLAINTIFF**

                                                Use below number on
                                              all future pleadings

        -- vs --

                                          No.  A 1801222
                                              SUMMONS

DOMINIC FERRANTE
    **DEFENDANT**


        WINONA PVD COATINGS LLC
        1180 POLK DRIVE                         D - 3
        WARSAW IN 46582


You are notified
that you have been named Defendant(s) in a complaint filed by

        JAMIE VISKER
        1145 SAN MICHELE WAY
        PALM BEACH GARDENS FL 33418

                                                    Plaintiff(s)

in the Hamilton County, COMMON PLEAS CIVIL Division,
**AFTAB PUREVAL, 1000 MAIN STREET   ROOM 315,
CINCINNATI, OH 45202.**
You are hereby summoned and required to serve upon the plaintiff's
attorney, or upon the plaintiff, if he/she has no attorney of record, a
copy of an answer to the complaint within twenty-eight (28) days after
service of this summons on you, exclusive of the day of service. Your
answer must be filed with the Court within three (3) days after the
service of a copy of the answer on the plaintiff's attorney.

Further, pursuant to Local Rule 10 of Hamilton County, you are also required to
file a Notification Form to receive notice of all future hearings.

If you fail to appear and defend, judgement by default will be rendered
against you for the relief demanded in the attached complaint.


Name and Address of attorney            AFTAB PUREVAL
BRIAN W FOX                         Clerk, Court of Common Pleas
312 WALNUT STREET                    Hamilton County, Ohio
SUITE 1800
CINCINNATI        OH        45202

                                      By  RICK HOFMANN
                                                    Deputy

                                      Date:    March 6, 2018

D121137209

**Court of Common Pleas - Hamilton County, Ohio**

Jamie Visker, et al.

:
:
:

D121216005

v.

:
:

Case No. A1801222

Dominic Ferrante, et al.

:
:
:
:
:

2018 MAR 13 A (illegible)

CLERK OF COURTS
HAMILTON COUNTY (illegible)
COMMON PLEAS (illegible)

## MOTION FOR PERMISSION TO APPEAR PRO HAC VICE

Pursuant to Gov.Bar R. XII(2)(A)(6), Edward Treadway , attorney for the Plaintiffs ,

hereby moves the Hamilton Co. Ct. of Common Ple to grant him permission to appear pro

hac vice and participate as counsel or co-counsel in this case for the Plaintiffs

Movant represents that the following is a list of the jurisdictions in which _____ has ever

been licensed to practice law, including dates of admission to practice, resignation, or retirement, and any

attorney registration numbers:

Admitted to practice law in the State of Indiana on June 9, 1989.  Attorney Registration #14675-49.

Admitted Pro Hac Vice in multiple other jurisdictions.

Movant represents that ____he____ has not been granted permission to appear pro hac vice in more than

three proceedings before Ohio tribunals in the current calendar year pursuant to Gov.Bar R. XII(2)(A)(5).

Brian W. Fox , an active Ohio attorney in good standing, has agreed to

associate with Movant on this case.

The affidavit required by Gov.Bar R. XII(2)(A)(6), a copy of Movant's certificate of pro hac vice

registration furnished by the Supreme Court of Ohio Office of Attorney Services, and a certificate indicating

service of this Motion on all known parties and attorneys of record are attached. Movant understands that, if

this Motion is granted, Movant must file a Notice of Permission to Appear Pro Hac Vice and a copy of the

Order granting permission with the Supreme Court of Ohio Office of Attorney Services within thirty days of the

Order.

**Edward Scott Treadway**
(Name of Movant/PHV Attorney)

PHV - **#19044-2018**
(PHV Registration Number)

**EST Law, LLC**
(Law Firm or Employer, if applicable)

**10401 N. Meridian St., #225**
(Business Address)
**Indianapolis, IN  46290**
(City, State or Country, ZIP Code)
**(317) 706-6718**
(Business Telephone)


(Business Fax)
**scott@estlawllc.com**
(Business E-Mail)

**15288 Kampen Circle**

**Carmel, IN  46033**


(Residential Address)

# THE SUPREME COURT *of* OHIO

### OFFICE OF ATTORNEY SERVICES

IN THE MATTER OF THE APPLICATION OF

**Edward Treadway**

FOR PRO HAC VICE REGISTRATION

per Gov. Bar R. XII, Section 2(A)(3)

Certificate of

PRO HAC VICE

REGISTRATION

2018

Registration Number:

PHV- 19044-2018

Edward Treadway
_____, having met the requirements of, and found to be in

full compliance with, Section 2(A)(3) of Rule XII of the Rules for the Government of the Bar of

Ohio, is hereby issued this certificate of pro hac vice registration in the state of Ohio.

To receive permission to appear pro hac vice in an Ohio proceeding, a motion requesting such

permission must be filed with the tribunal in accordance with Section 2(A)(6) of Rule XII of the

Rules for the Government of the Bar of Ohio.

*G.W. Palmer*
_____

Gina White Palmer
Director, Attorney Services

**Expires December 31, 2018**

**IN THE MATTER OF THE MOTION OF**

Edward Scott Treadway

**FOR PERMISSION TO APPEAR PRO HAC VICE**

CASE NO.  A1801222

**AFFIDAVIT OF**
**OUT-OF-STATE ATTORNEY**
Gov. Bar R. XII, Section 2(A)(6)

Edward Scott Treadway being first duly cautioned, swears or affirms as follows:

a.  I have never been disbarred from the practice of law.

b.  I have been admitted to the practice of law in the following jurisdictions (attach additional jurisdictions if necessary):

Indiana

Pro Hac Vice in multiple jurisdictions

c. Choose   one:
- [✓] I am not currently suspended from the practice of law in any jurisdiction where I have been admitted to practice.
- [ ] I am currently suspended from the practice of law in the following jurisdictions:

d. Choose   one:
- [✓] I have not resigned from the practice of law with discipline pending in any jurisdiction where I have been admitted to practice.
- [ ] I have resigned from the practice of law with discipline pending in the following jurisdiction(s):

**SIGNATURE OF APPLICANT**

Sworn to or affirmed before me and subscribed in my presence the ___ day of March ,

20 18 , in the state of Indiana and county of Marion .

THERESA MCCLURE
Notary Public, State of Indiana
Hamilton County
Commission # 670948
My Commission Expires
June 09, 2023

**SIGNATURE OF NOTARY PUBLIC***

* Affix stamp & seal (or notary's in Ohio).

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing *Motion for Permission to Appear Pro Hac Vice* was sent via U.S. Postal Service, first class mail, and/or electronic mail, pursuant to Ohio R. Civ. P. 5(B)(2)(c) and 5(B)(2)(f), this 7th day of March, 2018, to the following parties of records:

| | | |
|---|---|---|
| Jamie Visker | Connie Fribley | Dennis Harrison |
| Atlanta Visker | Sue Brown IRA Account | Nancy Harrison |
| Jamie Visker IRA LPL Financial Custodian | Howard Fox | The Carol A. Bockelman Revocable Trust |
| Atlanta Visker IRA LPL Financial Custodian | Audrey Ades | Anthony G. Marlin |
| Winona Powder Coating, Inc. | Scott Eyink IRA Account | Stacy S. Marlin |
| Eugene Rothgerber | Westhill Development LLC | Burton Ramsey |
| Jodie Rothgerber | Douglas K. Robinson | Earnest B. Wiggins IRA |
| Smith Investments LP | Dan J. Robinson | Dominic Ferrante |
| The Petro Group, Inc. | Cheryl Ann Robinson | Todd Binkowski |
| Rainbow 3 LLC | Denari LLC | Winona PVD Coating, LLC |
| Fred Fribley | Nathaniel Drourr | TFG Wheels, LLC |
| Frederich Fribley IRA Account | Catherine Drourr | |

By: ___/s/ E. Scott Treadway_____
    E. Scott Treadway (PVH# 19044-2018)

E. Scott Treadway
EST Law, LLC
10401 North Meridian Street, Suite 225
Indianapolis, IN 46290
scott@estlawllc.com

**UNITED STATES**
**POSTAL SERVICE.**

Date Produced: 03/19/2018

HAMILTON COUNTY CLERK OF COURTS:

The following is the delivery information for Certified Mail™ item number 7194 5168
6310 0852 7036. Our records indicate that this item was delivered on 03/12/2018 at
04:41 p.m. in NAPLES, FL 34105. The scanned image of the recipient information is
provided below.

Signature of Recipient :

Address of Recipient :

Thank you for selecting the Postal Service for your mailing needs.  If you require
additional assistance, please contact your local post office or Postal Service
representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United
States Postal Service. It is solely for customer use.

Customer Reference Number: 13819089SEQ1

ELECTRONIC CERTIFIED MAIL SERVICE RETURN
SUMMONS & COMPLAINT
A 1801222    D1
DOMINIC FERRANTE
FILED: 03/19/2018  8:01:06

**UNITED STATES**
**POSTAL SERVICE**

Date Produced: 03/19/2018

HAMILTON COUNTY CLERK OF COURTS:

The following is the delivery information for Certified Mail™ item number 7194 5168 6310 0852 7029. Our records indicate that this item was delivered on 03/12/2018 at 12:47 p.m. in NAPLES, FL 34102. The scanned image of the recipient information is provided below.

Signature of Recipient :

Address of Recipient :

Thank you for selecting the Postal Service for your mailing needs.  If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal Service. It is solely for customer use.

Customer Reference Number: 13819087SEQ1

# UNITED STATES
# POSTAL SERVICE.

Date Produced: 03/19/2018

HAMILTON COUNTY CLERK OF COURTS:

The following is the delivery information for Certified Mail™ item number 7194 5168 6310 0852 7050. Our records indicate that this item was delivered on 03/13/2018 at 02:16 p.m. in NAPLES, FL 34102. The scanned image of the recipient information is provided below.

Signature of Recipient :

Address of Recipient :

Thank you for selecting the Postal Service for your mailing needs.  If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal Service. It is solely for customer use.

Customer Reference Number: 13819097SEQ1

**UNITED STATES**
**POSTAL SERVICE**

Date Produced: 03/19/2018

HAMILTON COUNTY CLERK OF COURTS:

The following is the delivery information for Certified Mail™ item number 7194 5168 6310 0852 7043. Our records indicate that this item was delivered on 03/12/2018 at 10:01 a.m. in WARSAW, IN 46582. The scanned image of the recipient information is provided below.

Signature of Recipient :

Address of Recipient :

Thank you for selecting the Postal Service for your mailing needs.  If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal Service. It is solely for customer use.

Customer Reference Number: 13819093SEQ1